## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GOOGLE, INC.,<br><br>               *Petitioner,*<br><br>    v.<br><br>DIGITIAL CITIZENS ALLIANCE, ET AL.,<br><br>               *Respondents.* | Case No. 15-mc-707-JEB-DAR<br><br>Case in Other Court:<br>No. 3:14-cv-981-HTW-LRA (S.D. Miss.)<br><br>Judge James E. Boasberg<br><br>Magistrate Judge Deborah A. Robinson |

## MEMORANDUM OPPOSING PETITIONER GOOGLE INC.'S
## RULE 45 MOTIONS TO COMPEL COMPLIANCE WITH SUBPOENAS

David Handzo
JENNER & BLOCK LLP
1099 New York Avenue NW, Ste. 900
Washington, DC 20001
Tel. (202) 639-6000
Fax (202) 639-6060
dhandzo@jenner.com

*Counsel for Respondents Motion Picture
Association of America, Inc.*
and *Jenner & Block LLP*

Norman Hirsch (*pro hac vice* forthcoming)
Christopher Tompkins (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654
Tel. (312) 222-9350
Fax (312) 527-0484
nhirsch@jenner.com
ctompkins@jenner.com

*Counsel for Respondent Jenner & Block
LLP*

Jeremy Creelan (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10002-3908
Tel. (212) 891-1600
Fax (212) 891-1699
jcreelan@jenner.com

*Counsel for Respondent Motion Picture
Association of America, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ..........................................................................................................1

BACKGROUND ............................................................................................................2

I.      Google's Illegal Content and the Attorney General's Investigation...................................2

II.     The Mississippi Litigation .........................................................................................6

III.    Google's Overbroad Subpoenas ...................................................................................8

ARGUMENT ...............................................................................................................11

I.      Documents Never Provided to Attorney General Hood or His Staff Are Irrelevant
        to Litigation over Attorney General Hood's Actions. ......................................................12

II.     Ordering Production Would Trigger a Massive and Fruitless Review Process
        and Extensive Litigation over the Attorney-Client and First Amendment Privileges .......19

        A.      Granting Google's Motion Will Trigger Extensive Litigation over the
                Attorney-Client Privilege .......................................................................................19

        B.      Granting Google's Motion Will Trigger Extensive Litigation over the
                First Amendment Privilege .....................................................................................24

III.    Even a Narrower Version of Google's Subpoena, Seeking Documents
        Memorializing Oral Statements, Would Fail Rule 45 Analysis .......................................27

IV.     The Court Should Enter a Protective Order.....................................................................30

# TABLE OF AUTHORITIES[*]

**Page**

**CASES**

*\*AFSCME v. Scott*, 277 F.R.D. 474 (S.D. Fla. 2011) ............................................................16, 21

*\*Alexander v. FBI*, 186 F.R.D. 54 (D.D.C. 1998) .......................................................30

*Alexander v. FBI*, 186 F.R.D. 21 (D.D.C. 1998) .........................................................28

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011) ...............................................................15

*Black Panther Party v. Smith*, 661 F.2d 1243 (D.C. Cir. 1981), *vacated on other grounds*,
    458 U.S. 1118 (1982) ............................................................................................25

*Burlodge Ltd. v. Standex International Corp. (In re Motion To Compel Compliance with
    Subpoena Direct To Department of Veterans Affairs)*, 257 F.R.D. 12 (D.D.C.
    2009) ....................................................................................................13, 27, 29

*Coleman v. District of Columbia*, 275 F.R.D. 33 (D.D.C. 2011) ..................................11

*Condit v. Dunne*, 225 F.R.D. 100 (S.D.N.Y. 2004) ......................................................18

*Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) ........................................12

*Dukes v. Wal-Mart Stores, Inc.*, No. 01-cv-2252, 2013 WL 1282892 (N.D. Cal. Mar. 26,
    2013) ......................................................................................................................23

*Education Finance Council v. Oberg*, No. 10-mc-0079, 2010 WL 3719921 (D.D.C. Mar
    08, 2010) ................................................................................................................12

*\*FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380 (D.C. Cir. 1981) .............25, 26

*\*Food Lion, Inc. v. United Food & Commercial Workers International Union*, 103 F.3d
    1007 (D.C. Cir. 1997) ............................................................................................18

*International Action Center v. United States*, 207 F.R.D. 1 (D.D.C. 2002) ..................25

*International Union, UAW v. National Right to Work Legal Defense & Educational
    Foundation*, 590 F.2d 1139 (D.C. Cir. 1978) ........................................................27

*Klayman v. Judicial Watch, Inc.*, 247 F.R.D. 19 (D.D.C. 2007) ........................... 31-32

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir.) *cert. denied*, 135 S. Ct. 680 (2014) ...............3

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Millennium TGA, Inc. v. Comcast Cable Communications LLC*, 286 F.R.D. 8 (D.D.C. 2012) ..................................................................................................................11, 12

*In re Motor Fuel Temperature Sales Practices Litigation*, 641 F.3d 470 (10th Cir. 2011) ..........26

*Nichols v. Truscott*, 424 F. Supp. 2d 124 (D.D.C. 2006)...............................................................28

*North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49 (D.D.C. 2005) .........................16, 30

*Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010) ............................................................26

*Peskoff v. Faber*, 230 F.R.D. 25 (D.D.C. 2005), *order clarified by*, 233 F.R.D. 207 (D.D.C. 2006) ....................................................................................................................30

*Sackman v. Liggett Group, Inc.*, 173 F.R.D. 358 (E.D.N.Y. 1997)................................................23

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984)......................................................................30

*SEC v. Thrasher*, No. 92 Civ. 6987, 1996 WL 125661 (S.D.N.Y. Mar. 20, 1996)......................24

*Simmons, Inc. v. Bombardier, Inc.*, 221 F.R.D. 4 (D.D.C. 2004)..................................................18

*St. John v. Napolitano*, 274 F.R.D. 12 (D.D.C. 2011) ............................................................ 15-16

*State Compensation Insurance Fund v. WPS, Inc.*, 82 Cal. Rptr. 2d 799 (Cal. Ct. App. 1999) .............................................................................................................................. 22-23

*Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.*, 276 F.R.D. 376 (D.D.C. 2011) .....................................................................................................................11, 20, 21

*United States v. BDO Seidman, LLP*, 492 F.3d 806 (7th Cir. 2007) ............................................22

*United States v. Magnesium Corp. of America*, No. 2:01-CV-00040, 2006 WL 1699608 (D. Utah June 14, 2006), *modified in part*, 2006 WL 2350155 (D. Utah Aug. 11, 2006) ....................................................................................................................................24

*United States v. Philip Morris, Inc.*, 347 F.3d 951 (D.C. Cir. 2003)............................................24

*Watts v. SEC*, 482 F.3d 501 (D.C. Cir. 2007)...............................................................11, 12, 30

*Wyoming v. United States Department of Agriculture*, 208 F.R.D. 449 (D.D.C. 2002)................26

## STATUTES

Miss. Code Ann. § 75-24-5(1) .........................................................................................................6

Miss. Code Ann. § 75-24-5(2)(e)......................................................................................................6

Miss. Code Ann. § 75-24-5(2)(g) .....................................................................................................6

Miss. Code Ann. § 75-24-27(1)(a) ................................................................................6

**OTHER AUTHORITIES**

D.C. Bar Ass'n Legal Ethics Committee, Opinion 318 (2002) ....................................22

*Fed. R. Civ. P. 26(b)(2)(C)(i) ...................................................................................22

Fed. R. Civ. P. 26 1993 Advisory Committee Notes..................................................24

Google Quarterly Filing (Form 10Q) (April 24, 2014)................................................4

Google, *Transparency Report*, *available at*
    https://www.google.com/transparencyreport/removals/copyright/domains/kickass.so/
    (last visited on June 10, 2015) ...............................................................................5

National Press Release, FBI, *Update on Sony Investigation* (Dec. 14, 2014),
    https://www.fbi.gov/news/pressrel/press-releases/update-on-sony-investigation ..................10

Non-Prosecution Agreement (Aug. 19, 2011), *available at*:
    http://www.justice.gov/usao/ri/news/2011/august2011/Google%20Agreement.pdf.............3, 4

Josh Peterson, *Texas AG Sues Google for Withholding Documents in Antitrust
    Investigation*, Daily Caller, June 22, 2012, http://dailycaller.com/2012/06/22/texas-
    state-ag-sues-google-for-witholding-documents-in-antitrust-investigation/ ............................4

Press Release, Office of Attorney General Bob Ferguson, *Google To Pay Washington
    State $610,600 To Settle Consumer Tracking Allegations* (Nov. 18, 2013),
    http://www.atg.wa.gov/news/news-releases/google-pay-washington-state-610600-
    settle-consumer-tracking-allegations ......................................................................4

Press Release, Office of Attorney General Eric T. Schneiderman, *A.G. Schneiderman
    Announces $17 Million Multistate Settlement With Google Over Tracking Of
    Consumers* (Nov. 18, 2013), http://www.ag.ny.gov/press-release/ag-schneiderman-
    announces-17-million-multistate-settlement-google-over-tracking ........................................4

Press Release, U.S. Dep't of Justice, *Google Forfeits $500 Million Generated by Online
    Ads & Prescription Drug Sales by Canadian Online Pharmacies* (Aug. 24, 2011),
    *available at* http://www.justice.gov/opa/pr/google-forfeits-500-million-generated-
    online-ads-prescription-drug-sales-canadian-online ..............................................3

David Streitfeld, *Google Concedes That Drive-By Prying Violated Privacy*, NY Times,
    Mar. 12, 2013, http://www.nytimes.com/2013/03/13/technology/google-pays-fine-
    over-street-view-privacy-breach.html.....................................................................4

U.S. Fed. Trade Comm'n, *Google To Refund Consumers At Least $19 Million To Settle FTC Complaint It Unlawfully Billed Parents for Children's Unauthorized In-App Charges* (Sept. 4, 2013), *available at* http://www.ftc.gov/news-events/press-releases/2014/09/google-refund-consumers-least-19-million-settle-ftc-complaint-it. ..............4

## INTRODUCTION

Google filed a lawsuit in Mississippi against the Attorney General of the State of Mississippi, Jim Hood, principally contending that federal law preempts Attorney General Hood's efforts to investigate Google for potential violations of Mississippi law.  MS Dkt. 88 at 1.[1]  Throughout the litigation in the U.S. District Court for the Southern District of Mississippi, Google and Attorney General Hood[2] have "agreed upon the relevant facts" and "viewed this matter primarily as a dispute of law."  *Id.* at 6.  Google's counsel told the district court that "there isn't really a fight on the facts here."  *See* MS Dkt. 83 at 11 (PI Hearing Transcript), and further, that it only needed "targeted" discovery.  MS Dkt. 84 at 5, 7 (Hearing Transcript).  Indeed, Google has opposed the discovery requests it received in this litigation on the ground that the case involves "a legal question, squarely answered by the Constitution and the Communications Decency Act ("CDA")," and "what little fact development needs to be done pertains primarily to the Attorney General's own conduct and motivation."[3]  But while plaintiff Google is refusing to respond to discovery requests because it contends the case involves primarily legal issues, it is simultaneously pursuing these motions to enforce the wide-ranging and burdensome subpoenas that it served on non-parties the Motion Picture Association of America, Inc., ("MPAA") and its counsel, the law firm of Jenner & Block ("Jenner").

Google attempts to justify its burdensome third-party subpoenas by asserting that Attorney General Hood's motives for pursuing his investigation are the heart of the Mississippi

---

[1] All citations hereinto "MS Dkt." refer to the docket in *Google Inc. v. Hood*, Case No. 3:14-cv-00981-HTW-LRA (filed S.D. Miss. Dec. 19, 2014).

[2] References hereinafter to "Attorney General Hood" shall include the Attorney General and members of the Mississippi Attorney General's Office.

[3] Declaration of Christopher Tompkins in Opposition to Petitioner Google Inc's Rule 45 Motion To Compel Compliance with Subpoena ("Tompkins Decl."), ¶ 8, Ex. 5 at 3 (Plaintiff Google's Memorandum in Support of Motion for a Protective Order).

lawsuit, and that all documents in the possession of the MPAA and Jenner that in any way relate to Attorney General Hood and Google are relevant to that issue.  But even if Attorney General Hood's motives are tangentially relevant to the litigation—and they can hardly be more than that, given Google's repeated representations to the Mississippi court that the case largely presents questions of law—it does not follow that the MPAA and Jenner have to empty their files.

The MPAA and Jenner have already agreed to produce all responsive documents they exchanged with Attorney General Hood prior to Google's lawsuit; after all, only documents that Attorney General Hood actually saw could conceivably influence him.  That should suffice if Google wants to probe the Attorney General's motives.

Google filed the present motion because it insists on more.  Google demands documents that the Attorney General never saw, and that instead include the internal deliberations of the MPAA, its communications with its members, and the legal advice of Jenner, as well as communications with others similarly aggrieved by Google's conduct, on the misguided theory that such documents somehow are probative of Attorney General Hood's intent.  Moreover, Google's demands impose very substantial burdens on the subpoenaed parties, not only because they require a wide-ranging search for documents, but more importantly because many of the documents are protected by the attorney-client and First Amendment associational privileges. Not only would the MPAA and Jenner be required to devote countless hours to the creation of privilege logs, but further time-consuming and expensive litigation with Google over the privilege assertions would be a near certainty.  Google's motions should be denied.

## BACKGROUND

### I.    Google's Illegal Content and the Attorney General's Investigation

Google portrays itself as the innocent victim of malicious efforts to abridge its First Amendment rights.  In reality, Google is far from innocent.  Google facilitates, and profits from,

the distribution of third-party content that even Google concedes is "objectionable." *See* Tompkins Decl. ¶ 6, Ex. 3 at 3 (Google Memorandum of Law in Support of PI) ("Google agrees that much of the third-party content about which the Attorney General complains is objectionable."). "Objectionable" is Google's euphemism for "illegal." Some of the content infringes copyrighted material owned by the MPAA's members and others, and some of the content is illegal for other reasons, for example, because it advertises illegal drugs or fraudulent government identification documents, such as driver's licenses and passports.

Google routinely defends against allegations relating to its facilitation of unlawful conduct by claiming that it is merely a passive re-publisher of others' content—making it available indirectly (through its search engine) or directly on its own servers (through YouTube). *Id.* at 6-8, 19-21. If it could make out that factual case,[4] Google might indeed be protected for certain of its activities, including by Section 230 of the Communications Decency Act. In 2011, however, Google's "it's all someone else's fault" pretense crumbled. In that year, Google entered into a non-prosecution agreement (the "NPA") with the United States Department of Justice and the Attorney General for the State of Rhode Island, agreeing to forfeit $500 million for allowing illegal Canadian online pharmacy sales into the U.S. through Google's advertising services.[5] Google's conduct leading to that settlement was not merely displaying another party's

---

[4] Section 230 is an affirmative defense, *see Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir.) *cert. denied*, 135 S. Ct. 680 (2014), and thus it is Google's burden to prove that it applies in any particular case.

[5] Press Release, U.S. Dep't of Justice, *Google Forfeits $500 Million Generated by Online Ads & Prescription Drug Sales by Canadian Online Pharmacies* (Aug. 24, 2011), *available at* http://www.justice.gov/opa/pr/google-forfeits-500-million-generated-online-ads-prescription-drug-sales-canadian-online; *see also* Non-Prosecution Agreement at 3, 4 (Aug. 19, 2010), *available at*: http://www.justice.gov/usao/ri/news/2011/august2011/Google%20Agreement.pdf ("NPA").

content; it included Google employees actively involved in developing illegal advertisements targeting American consumers with unlawful pharmaceuticals.[6]

     It should be no surprise that this and other revelations about Google's actions led to interest from other state Attorneys General.[7]  One of them was Attorney General Hood, who serves as co-Chair of the National Association of Attorneys General's ("NAAG") IP Committee, a national information clearinghouse for IP enforcement, legislation, and training.  It was business practices akin to those resulting in Google's $500 million settlement with another state Attorney General that led Attorney General Hood to focus on Google's conduct in late 2012.  Mots. at 5.

---

[6] NPA at 4, 7.

[7] For example, in 2013 Google paid a combined $24 million to settle two separate investigations by thirty-seven states and the District of Columbia into violations of consumer protection and privacy laws.  *See, e.g.*, Press Release, Office of Attorney General Eric T. Schneiderman, *A.G. Schneiderman Announces $17 Million Multistate Settlement With Google Over Tracking Of Consumers* (Nov. 18, 2013), http://www.ag.ny.gov/press-release/ag-schneiderman-announces-17-million-multistate-settlement-google-over-tracking; Press Release, Office of Attorney General Bob Ferguson, *Google To Pay Washington State $610,600 To Settle Consumer Tracking Allegations* (Nov. 18, 2013), http://www.atg.wa.gov/news/news-releases/google-pay-washington-state-610600-settle-consumer-tracking-allegations; David Streitfeld, *Google Concedes That Drive-By Prying Violated Privacy*, N.Y. Times, Mar. 12, 2013, http://www.nytimes.com/2013/03/13/technology/google-pays-fine-over-street-view-privacy-breach.html. Google more recently agreed to refund customers at least $19 million to settle a Federal Trade Commission ("FTC") complaint that it had unlawfully billed parents for unauthorized charges by their children since at least 2011.  *See* U.S. Fed. Trade Comm'n, *Google To Refund Consumers At Least $19 Million To Settle FTC Complaint It Unlawfully Billed Parents for Children's Unauthorized In-App Charges*, (Sept. 4, 2013), *available at* http://www.ftc.gov/news-events/press-releases/2014/09/google-refund-consumers-least-19-million-settle-ftc-complaint-it.  And these are just a sampling of the many law enforcement efforts nationwide.  The Attorneys General of Ohio, Mississippi and Texas, among others, have investigated Google since 2011 for engaging anticompetitive practices since.  *See* Google, Quarterly Filing (Form 10Q) 24 (April 24, 2014).  The Texas Attorney General was even forced to sue Google for withholding documents requested during the course of the investigation.  *See* Josh Peterson, *Texas AG Sues Google for Withholding Documents in Antitrust Investigation*, Daily Caller, June 22, 2012, http://dailycaller.com/2012/06/22/texas-state-ag-sues-google-for-witholding-documents-in-antitrust-investigation/.

It should also be no surprise that other victims of online crime, including the MPAA's members, took notice of the NPA.  The MPAA is the voice and advocate of the motion picture and television industry, whose member studios are among the many daily victims of digital piracy.  It is plain that Google facilitates and profits from piracy in a way that directly harms the MPAA's members.  For example, in a Google search for "download Rounders," five of the six top non-advertisement results link to sites providing illegal copies of the film.  Tompkins Decl. ¶ 7, Ex. 4.  One of these sites, thepiratebay.la, has received 516,653 URL takedown requests according to Google's "Transparency Report"—its own tally of enforcement efforts by copyright owners.[8]  These piracy sites appear above results linking to legitimate sites like Amazon and iTunes.  Tompkins Decl. ¶ 7, Ex. 4.  That the MPAA was concerned about such issues— particularly in light of Google's many attempts to assure users its services were safe—and sought to work with the Attorney General of Mississippi, who was considering an investigation of Google, is unexceptional and entirely legitimate.  It is also fully protected by the free speech and petitioning clauses of the First Amendment.  To assist it, the MPAA engaged the law firm Jenner & Block, whose litigators MPAA regularly uses as part of its multi-pronged enforcement efforts.

After years of fruitless efforts to obtain answers to questions regarding consumer protection concerns through informal requests, Attorney General Hood served Google with a subpoena under the authority of Mississippi law on October 27, 2014 (hereinafter, the "Hood Subpoena").  MS Dkt. 17-30, Ex. 30.  The Hood Subpoena made clear that the Attorney General possessed information "providing reasonable grounds to believe that Google Inc. may have violated one or more of the provisions of. . . the Mississippi Consumer Protection Act" and that

---

[8] Google, *Transparency Report*, *available at* http://www.google.com/transparencyreport/removals/copyright/domains/thepiratebay.la/ (last visited June 10, 2015).

he had "reasonable grounds to believe that Google Inc. has used trade practices that are unfair, deceptive, and misleading."[9]  *Id.* at 1-2.  The Hood Subpoena targeted information that would be relevant to proving violations of the MCPA, including information about Google's representations and practices regarding content regulation of videos on YouTube, *see id.* (e.g., Interrogatories Nos. 38, 46, 48-49, 52, 54-57 and Document Requests 54-55, 57-58, 83-86), its representations and practices regarding the quality of its search algorithm, *see id.* (e.g., Interrogatory No. 24 and Document Requests 60-61, 63-66), and about apparently deceptive statements and conduct regarding Google's advertising policies.  *See id.* (e.g., Interrogatories Nos. 7-14, 21, 24 and Document Requests 10-36, 52-53).  The subpoena also requested documents relevant to whether Google's Autocomplete—a Google feature that predicts and supplies the rest of a user's search before it is completely entered by the user—predictions facilitate dangerous or illegal conduct and do so contrary to Google's representations.  *See id.* (e.g., Interrogatory Nos. 61-62).

## II.      The Mississippi Litigation

On December 19, 2014, Google filed a "juridical preemptive strike" (in the words of the district court) and sought a temporary restraining order and a preliminary injunction against Attorney General Hood to prevent him from enforcing the state law subpoena or taking action to enforce the MCPA.  MS Dkt. 88 at 1; *see* Tompkins Decl. ¶ 6, Ex. 3 at 4-5.  Google argued that Attorney General Hood's investigation into Google's conduct was preempted by the

---

[9]  The Mississippi Consumer Protection Act ("MCPA") prohibits "unfair or deceptive trade practices in or affecting commerce."  Miss. Code Ann. § 75-24-5(1).  It also prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have" or "[r]epresenting that goods or services are of a particular standard, quality, or grade."  *Id.* § 75-24-5(2)(e), (g).  Section 75-24-27(1)(a) of the Mississippi Code specifically authorizes the Attorney General to issue subpoenas to investigate potential violations of the MCPA.

Communications Decency Act of 1996, the Federal Copyright Act; the Digital Millennium

Copyright Act, and the Food, Drug, and Cosmetic Act.  Tompkins Decl. ¶ 6, Ex. 3 at 15-21, 29-

33.  Google also contended that Attorney General Hood violated the Fourth Amendment by

issuing an overly broad subpoena, and that he issued his October 27 subpoena in bad faith,

purportedly in retaliation for Google's continuing to engage in what it claims is constitutionally

protected speech.  *Id.* at 24-26, 28-29.  Attorney General Hood responded by filing a motion to

dismiss, in part asserting the *Younger* abstention doctrine.  *See, e.g.*, MS Dkt. 32 at 5, 30-39.

On March 2, 2015, the district court denied Attorney General Hood's motion to dismiss

and granted Google's motions for a temporary restraining order and preliminary injunction.  *See*

MS Dkt. 82.  In the written opinion that followed on March 27, the court observed that "the

parties agreed upon the relevant facts," and "viewed this matter as primarily a dispute of law."

MS Dkt. 88 at 6.  Turning to the first legal question, the district court rejected Attorney General

Hood's argument that the *Younger* abstention applied, because in the Court's view, there were no

pending state enforcement proceedings that required the Court to abstain from exercising

jurisdiction.  *Id.* at 13.  The court also determined that in the event that the *Younger* abstention

doctrine was potentially applicable, Google had presented sufficient evidence that the Hood

Subpoena was pursued in "bad faith," thus falling into a *Younger* exception.  *Id.* at 14.

As to the merits of Google's claims, the district court found that—while even Google

acknowledged that Attorney General Hood's concerns were not completely "unfounded"—

Google was likely to succeed on its argument that the federal CDA grants it immunity from

Hood's investigation.  *Id.* at 15-18.  It further found that Google was likely to succeed on the

merits of its claims of preemption under the FCA and FDCPA.  *Id.* at 20-22.  The court also

concluded that Google had a likelihood of success on the merits of its First Amendment claim

that Attorney General Hood regulated Google's speech based on its content, retaliated against Google for its speech, and sought to place unconstitutional limits on the public's access to information. *Id.* at 18-19. Finally, it found that Google was likely to succeed on its Fourth Amendment claim based on alleged overbreadth of the Hood Subpoena. *Id.* at 19-20.

Attorney General Hood filed a notice of appeal from the district court's decision, but discovery is ongoing. On April 10, the district court directed Attorney General Hood to produce five categories of documents, along with a privilege log, by April 15. Rubin Decl. ¶ 5, Ex. 14 at 1. In accordance with that order, on April 15 the Attorney General produced documents and provided a privilege log, in which Attorney General Hood asserted privilege as to certain of the requested documents on the basis of: (1) the attorney-client privilege, (2) attorney work-product, and (3) the common-interest doctrine. In response, on April 22, Google filed a motion to compel against the Attorney General, challenging the Attorney General's assertions of privilege. *See* MS Dkt. 100. Attorney General Hood opposed the motion. *See* MS Dkt. 103. At a hearing on May 19, the district court directed the Attorney General to provide the court copies of all documents by May 21 to review *in camera*, which review is ongoing as of this writing. *See* MS Dkt. (Minute Entry of May 19, 2015).

## III.   Google's Overbroad Subpoenas

On March 13, 2015, Google served third-party subpoenas upon several non-parties, including the MPAA and Jenner (hereinafter, the "Subpoenas"). *See, e.g.*, Rubin Decl. ¶ 2, Exs. 1-2; MS Dkt. 85 at 1-2. The Subpoenas' requests are overbroad and unduly burdensome, yet Google refuses to limit its requests to documents that might at least be tangentially relevant to the underlying proceeding. With the issuance of the Subpoenas, Google demanded thousands of confidential MPAA and Jenner documents that the Attorney General's Office never saw. The Subpoenas seek "*all* documents that *relate to or refer* to" Google and Attorney General Hood's

Office (Request No. 1 (emphasis added)), "*all* communications concerning efforts or possible efforts by Attorney General Hood to investigate Google," that were sent to or received from (among others) multiple private and governmental entities (Request No 2. (emphasis added)), and "*all* documents that refer or relate to *any actual or potential investigation* . . . against Google by Attorney General Hood, whether alone *or in conjunction with other state attorneys general*." (Request No. 3 (emphasis added)).

These requests seek a broad swath of documents, including documents that represent entirely confidential non-party communications which the Attorney General's Office never saw, and would therefore be irrelevant to assessing Attorney General Hood's motivation or intent in pursuing his investigation of Google.  Moreover, these requests subsume any attorney-client communication between the MPAA and Jenner commenting on Attorney General Hood's proposed or actual investigation.  Indeed, Google's motions to compel openly admit that it seeks documents such as "legal assessments."  Mots. at 3.  Because these documents are squarely covered by the attorney-client privilege, Google is, in effect, demanding that MPAA and Jenner *first* undertake the burdensome process of conducting a time-consuming search of all of their documents, only *then* to prepare a privilege log with thousands of entries for Google, leading to additional consumption of legal and judicial resources in the inevitable resulting dispute.[10]  In addition, Request 7, which requests all documents "referenced" in any defined "News Article,"

---

[10] In another instance of Google's overreaching, Request No. 5 calls for literally any document in the parties' possession that "refer or relate" to a consulting firm—Keystone—that might be retained in any number of types of unrelated matters.  *See* Rubin Decl. ¶ 2, Exs. 1-2 at 7 (Request No. 9).

on its face demands production of privileged and other documents stolen in the Sony hack[11] that

are referenced or reproduced in the designated newspaper articles about the hack.[12]

The MPAA and Jenner properly and timely served objections to Google's Subpoenas by

letter dated March 27.  Rubin Decl. ¶ 4, Exs. 10, 11.  Among other objections, both objected that

the Subpoenas (1) seek "documents that are irrelevant, immaterial, and not reasonably calculated

to lead to the discovery of relevant and admissible evidence"; (2) impose undue burden and

expense on the MPAA and Jenner; and (3) seek production of documents protected by a number

of privileges, including the attorney-client privilege and under the First Amendment.  Rubin

Decl. ¶ 4, Ex. 10 at 1-4; Ex. 11 at 1-2.  Both the MPAA and Jenner additionally objected to the

Subpoenas to the extent they rely on or refer to privileged information Google obtained as a

result of the Sony hack.  *See* Rubin Decl. ¶ 4, Ex. 10 at 3; Ex. 11 at 2.

The MPAA and Jenner served amended responses and objections on Google on April 24.

Rubin Decl. ¶ 9, Exs. 27, 28.  The MPAA and Jenner agreed to produce responsive

communications to which Attorney General Hood's Office was a party from January 1, 2012 (the

start date for Google's requests) to December 18, 2014 (the day before Google filed its federal

complaint), as long as those documents were not privileged or not otherwise protected.  Rubin

Decl. ¶ 9, Ex. 27 (General Responses and Objections ¶ 16); Ex. 28 (Objections at 11-18).  With

respect to the attorney work product doctrine, however, the MPAA and Jenner explained that

---

[11] The "Sony hack" refers to the release of confidential data belonging to Sony Pictures
Entertainment on November 24, 2014, determined by the U.S. Government to be perpetrated by
the North Korean dictatorship government.  *See* Nat'l Press Release, FBI, *Update on Sony
Investigation* (Dec. 14, 2014), https://www.fbi.gov/news/pressrel/press-releases/update-on-sony-
investigation.

[12] *See, e.g.*, Rubin Decl. ¶ 2, Exs. 1-2 at 5 (Definitions ¶ 13) (defining the term "News Article" as
referring to six links to newspaper articles on the Sony Hack, including a Verge article entitled,
"Project Goliath: Inside Hollywood's secret war against Google," which cites among other
emails obtained as a result of the Sony Hack emails from MPAA's General Counsel marked
"Privileged and Confidential").

they understood Attorney General Hood to have asserted protection over certain documents. Rubin Decl. ¶ 9, Ex. 27 at 2; Ex. 28 at 1.  In order not to moot the Attorney General's work product claims under review by Judge Wingate, the MPAA and Jenner stated they would allow Attorney General Hood to identify any documents that he determined to withhold from their productions on the basis of privilege.  Rubin Decl. ¶ 9, Ex. 27 at 1-2; Ex. 28 at 2-3.

Google then filed the present motions to compel, seeking a far broader production of documents.  But the MPAA and Jenner have agreed to provide the only documents that could conceivably be relevant to the claims Google makes in the Mississippi court—documents sent to or received from Attorney General Hood's office—and this Court should reject Google's attempt to intrude on the attorney-client privilege, to obtain irrelevant documents from those who seek the assistance of law enforcement officials, or to otherwise pursue its real objective here—to intimidate the MPAA and other victims of Google's unlawful conduct from ever seeking the assistance of state law enforcement officials.

## ARGUMENT

This a classic case where "the burden or expense of the proposed discovery outweighs its likely benefit."  *Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.*, 276 F.R.D. 376, 382 (D.D.C. 2011) (quoting Fed. R. Civ. P. 26(b)(2)(C)(iii)); *see Coleman v. District of Columbia*, 275 F.R.D. 33, 36 (D.D.C. 2011) (standard governs Rule 45 subpoenas).  It is "quite clear that parties and attorneys who issue subpoenas have an affirmative duty to prevent undue burden or expense to the persons subject to the subpoena," *Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC*, 286 F.R.D. 8, 11 (D.D.C. 2012), particularly after considering whether the discovery is "unreasonably cumulative or duplicative" and "taking into account the needs of the case . . . and the importance of the proposed discovery in resolving the issues."  *Watts v.*

*SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007) (quotation marks omitted); *see also Educ. Fin. Council v. Oberg*, No. 10-mc-0079, 2010 WL 3719929 (D.D.C. Mar. 8, 2010) ("To determine whether a subpoena imposes an 'undue burden,' courts balance several factors," including the relevance of the materials sought and the breadth of the request.).  District courts applying Rule 45 must be "generally sensitive" to the costs and burdens imposed on third parties.  *Watts*, 482 F.3d at 509 (citing *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) (explaining that "concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs" in the Rule 45 inquiry) (quotation marks omitted)).  Consequently, courts possess discretion to limit discovery to prevent undue expense or burden to third parties, "even if the discovery sought is within the permissible scope of Rule 45 and Rule 26."  *Millennium TGA, Inc*, 286 F.R.D. at 11.

This is far from a case where non-party discovery is so important to resolving litigation that it justifies the burden it would impose on non-parties.  The MPAA and Jenner documents that Google seeks to compel are irrelevant to its litigation with Attorney General Hood, and would require a massive review of documents in addition to litigation over attorney-client and First Amendment privileges.  Because Google asks this court to authorize a fishing expedition at the MPAA's and Jenner's expense into documents that cannot meaningfully assist it in prosecuting its litigation in Mississippi, the non-parties respectfully request that the Court deny Google's motions to compel.

## I.     Documents Never Provided to Attorney General Hood or His Staff Are Irrelevant to Litigation over Attorney General Hood's Actions.

At the outset, one thing should be clear:  To whatever extent one could argue that documents provided to Attorney General Hood are relevant in assessing his actions, the MPAA and Jenner have mooted that issue.  That is, subject to a privilege assertion being litigated

between Google and Attorney General Hood in Mississippi over a small number of documents,[13]

the MPAA and Jenner have already agreed to produce all documents exchanged with Attorney

General Hood that are responsive to Google's Subpoenas.[14]  Whether relevant or not, documents

exchanged with Attorney General Hood are being produced, even though Google has never

explained why the MPAA and Jenner should bear the burden of locating, collecting, reviewing,

and producing documents that Google could just as easily have obtained from Attorney General

Hood.  *See Burlodge Ltd. v. Standex Int'l Corp.* (*In re Motion to Compel Compliance with*

*Subpoena Directed at Dep't of Veterans Affairs*), 257 F.R.D. 12, 19 (D.D.C. 2009) ("[E]ven

modifying the subpoena to seek this limited information is unduly burdensome because of the

absence of any showing that the information sought is not available from other sources.").

    But Google unreasonably demands more.  Purportedly for the purpose of divining

Attorney General Hood's intentions, Google insists on receiving tens of thousands of highly

confidential documents that Attorney General Hood *never even saw or was aware of*.  The

Subpoenas broadly demand all documents that so much as "relate" or "refer" to Google and

Attorney General Hood.  They further demand production of privileged documents stolen in the

Sony hack, among others.  Google's motions to compel even openly admit that it seeks

documents such as "legal assessments," "solicitations of others to the cause," and "any

---

[13] The exception concerns a small number of documents over which Attorney General Hood has claimed work-product protection or another applicable privilege.  Google filed a motion to compel those or similar documents in the Southern District of Mississippi, which remains pending, *see* MS Dkt. 100; in order not to unilaterally negate the Attorney General's privilege assertion that is currently being litigated, MPAA and Jenner are withholding those documents at the request of Attorney General Hood until Google's motion to compel is resolved, *see, e.g.*, Rubin Decl. ¶ 19, Ex. 51 at 1.  If the Mississippi District Court rejects Attorney General Hood's assertion of work-product privilege, MPAA and Jenner will produce those documents as well.

[14] MPAA has notified Google that it will produce the responsive, non-privileged documents it has identified immediately if Google agrees to treat such documents as Confidential pending the resolution of Google's motion to compel and the aforementioned request for a protective order in this matter.  As of this writing, Google has not responded to MPAA's offer to produce.

documents relating to the scope and burden of the Attorney General's investigation of Google."
Mots. at 3, 14.

The MPAA and Jenner drew the line there.  Even if documents that the MPAA or Jenner *did* exchange with Hood could arguably be relevant, clearly documents that the MPAA or Jenner *did not* exchange with Hood are not.  The opinions, legal assessments, and views of the MPAA and its counsel are irrelevant to Attorney General Hood's motives.  There is no legally reasonable argument or factually grounded theory on which the MPAA or Jenner documents, never seen by Attorney General Hood, could be relevant to its constitutional case against Attorney General Hood.

Google's first attempt to explain the inexplicable posits that the subpoenaed documents may show "that the Attorney General and the Subpoenaed parties expressly discussed use of the CID as a retaliatory measure."  *Id.* at 12.  But the MPAA and Jenner are producing their "express[] discuss[ions]" with Attorney General Hood, and Google has no additional need for the MPAA or Jenner documents that do not consist of such discussions with the Attorney General. For the same reason, the MPAA's or Jenner's own subjective motivations are irrelevant to establish the Attorney General's alleged bad faith for *Younger* abstention purposes (*id.* at 12-13); nothing that the MPAA or Jenner might think or say in private could demonstrate Attorney General Hood's good or bad faith.

Google's second hypothesis, that the documents "are likely to demonstrate that the Attorney General and the Subpoenaed parties knew just how oppressive and burdensome the 79-page CID was" (*id.* at 12), fares no better.  The subjective statements of Jenner and the MPAA, who do not control Google's systems and documents, shed no light on whether the Hood Subpoena posed any burden on Google, let alone whether Attorney General Hood acted with

retaliatory motive; indeed, were a third party to assert that the subpoena to Google was *not* burdensome, Google would undoubtedly argue that the statement was wholly irrelevant. Nothing that the MPAA or Jenner could say about the subpoena out of Attorney General Hood's earshot would make the request burdensome or not.

Third, Google also is clearly wrong in arguing that Jenner's and the MPAA's statements might be relevant to its Fourth Amendment claim. *Id.* at 13-14. The Fourth Amendment requires an objective inquiry; with limited exceptions (none applicable here). A court must ask if "the circumstances, viewed objectively, justify [the challenged] action," and if so, then "that action was reasonable whatever the subjective intent motivating the relevant officials." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (alteration in original) (internal quotation marks omitted). Google's Fourth Amendment claim will therefore turn on whether the subpoena was so overly burdensome as to trigger a violation of the Constitution; Attorney General Hood's subjective perspective is irrelevant. And even if Attorney General Hood's subjective perspective had some relevance to the Fourth Amendment, the MPAA's and Jenner's subjective perspective—not shared with Attorney General Hood—surely would not.

Google also speculates that Attorney General Hood might give testimony that he did not consult with third parties, and that some MPAA and Jenner documents would impeach that hypothetical testimony. Mots. at 14. Such speculation about possible future testimony does not authorize a wide-ranging inquiry into documents that Attorney General Hood never saw. As this Court has explained, "the relevance standard is 'not so liberal as to allow a party to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so.'" *St. John v. Napolitano*, 274 F.R.D. 12, 16

(D.D.C. 2011) (quoting *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103

F.3d 1007, 1012 (D.C. Cir. 1997)).

Ultimately, the most striking feature of Google's motions to compel is that they do not

cite a single case that has ever ordered production of documents under remotely similar

circumstances.  Citizens have been communicating with government officials since the dawn of

the Republic, yet Google identifies no case in which a court has directed production of—or even

relied on—private citizens' documents to establish the motives of government officials.  To the

contrary, courts have consistently rejected efforts to inject the motives of third parties into

constitutional challenges to state action.  For instance, in *AFSCME v. Scott*, 277 F.R.D. 474 (S.D.

Fla. 2011), the ACLU served as counsel to plaintiffs challenging Florida's drug-testing laws, and

then received a subpoena concerning its "knowledge and position" on employer drug tests.  The

court found all such non-public documents to be irrelevant, holding:  "Whatever the ACLU

knows or believes about the frequency or propriety of employer drug testing or drug use simply

has no relevance to the constitutional claim at issue—whether drug testing of these state

employees in executive agencies is permissible under the Fourth Amendment."  *Id.* at 478.

Similarly, in *North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49 (D.D.C. 2005), a case

challenging constitutionality of campaign finance laws, the court quashed a subpoena directed to

third-party *amici*, finding that the sought-after documents were irrelevant to the constitutional

issues in the case.  *Id.* at 51-52.

Google seems to think it is somehow wrong for companies or associations to raise law

enforcement concerns with law enforcement officials, and it seeks documents to show that the

MPAA did just that.  To the extent that Google already has such documents—and it has them

only because the documents were stolen when Sony's computers were hacked, as Google well

16

knows—Google goes so far as to refer to such documents as "damning." Mots. at 15. But it is, of course, every citizen's right to raise issues with law enforcement authorities. Google no doubt invokes these documents as part of its public relations campaign directed at the MPAA, but these documents are both likely inadmissible (because they are stolen documents protected by the attorney-client privilege), and completely irrelevant to the Mississippi litigation. As the Mississippi court noted, "Google constantly has stated in its papers that this action seems to have been pushed by the Hollywood industry" but "I can't think of why it would be germane to a ruling by the court." MS Dkt. 83 at 73 (PI Hearing Transcript).

A decision adopting Google's theory that, because the MPAA and its counsel exercised their constitutional right to communicate with and raise issues of concern to a law enforcement official, its private communications are discoverable to shed light on the *government*'s state of mind, would have implications stretching far beyond this case. For instance, suppose a victim of consumer fraud approaches a consumer protection bureau, which initiates an investigation of the company accused of fraud. Under Google's position, the company could subpoena the victim and obtain her personal files—even those she never showed to the bureau—because her personal files purportedly might shed light on the bureau's motives. Likewise, suppose a church persuades a city council to grant it a zoning variance. Under Google's position, a third party challenging the zoning variance could sue the church and obtain its internal communications on the theory that they may shed light on the city council's motives. No court has ever permitted "relevance" to stretch so far, and this Court should not be the first.

More generally, Google does not cite any case in which a court has relied on the private statements of one entity to establish the state of mind of an entirely different entity, which is the theory Google advances here. Again, courts have consistently rejected this theory and there is no

17

authority to support Google's attempt to conflate the MPAA's or Jenner's state of mind with that of the Attorney General.  For instance, in *Food Lion, Inc. v. United Food & Commercial Workers International Union*, 103 F.3d 1007 (D.C. Cir. 1997), an employer brought an action against a union for abuse of process, and served subpoenas on two nonparty public relations firms seeking fourth-party documents related to other unions' "corporate campaigns" against other employers.  *Id.* at 1009.  The Court held that the subpoena must be quashed, finding that the employer's case turned on the *defendant*'s state of mind, and, therefore, the states of mind of *other* unions was irrelevant to that inquiry.  *Id.* at 1013.  Likewise, in *Simmons, Inc. v. Bombardier, Inc.*, 221 F.R.D. 4 (D.D.C. 2004), an accused patent infringer asserted a defense of good faith reliance on counsel's advice, and the patent holder served a subpoena on counsel seeking opinion letters that were *not* shared with the accused infringer.  The Court found those documents irrelevant, refusing to "assume, in the absence of any contrary evidence, that drafts of [counsel's] opinions are somehow probative of the [patent holder's] state of mind despite the fact that they have not been shared with [the patent holder]."  *Id.* at 10.  Notably, the Court refused to impute the state of mind of the lawyer to the client even when there was a fiduciary attorney-client relationship; *a fortiori*, a court could not possibly impute the MPAA's or Jenner's state of mind to Attorney General Hood when neither an agency nor a fiduciary relationship exists. *Accord Condit v. Dunne*, 225 F.R.D. 100, 111 (S.D.N.Y. 2004).

Tellingly, when the discovery shoe "is on the other foot"—*i.e.*, when Google is objecting to discovery by Attorney General Hood—it emphasizes how limited that case's discovery should be.  In resisting a discovery request for Rule 30(b)(6) testimony, Google insisted that "this case is about whether the Attorney General can regulate Google's making accessible a specific type of content—content created by third parties that the Attorney General deems objectionable.  This is

a legal question, squarely answered by the Constitution and the Communications Decency Act ("CDA")."   Tompkins Decl. ¶ 8, Ex. 5 at 3 (Memorandum in Support of Google Motion for a Protective Order).   Google then goes on to argue that "[t]his case turns largely on questions of law, and what little fact development needs to be done pertains primarily to the *Attorney General's own conduct and motivation*."   *Id.* at 13 (emphasis added).   By Google's own assessment, neither the MPAA's nor Jenner's "conduct and motivation" are relevant to that case, and documents never seen by the Attorney General do not bear at all on the limited issue of his "conduct and motivation."

## II.   Ordering Production Would Trigger a Massive and Fruitless Review Process and Extensive Litigation over the Attorney-Client and First Amendment Privileges.

### A.   Granting Google's Motion Will Trigger Extensive Litigation over the Attorney-Client Privilege.

Because the documents that Google seeks are so plainly irrelevant to the issues in its litigation with Attorney General Hood, the Subpoenas would be improper even if they were the least burdensome requests imaginable.   But Google's Subpoenas are, in fact, very burdensome. Jenner's initial searches have revealed that Google's overly broad Subpoenas will likely require the review of over 24,000 documents', and the MPAA's initial searches have revealed over 100,000 documents likely requiring review.[15]   Moreover, as discussed below, the burden in this case extends well beyond that imposed simply as a result of having to review documents for responsiveness and relevance.

Google has taken the extraordinary step of serving a subpoena on a law firm, Jenner, seeking discovery of communications with its clients, including the MPAA and member movie studios.   Not surprisingly, a substantial number of these communications are privileged, and

---

[15] *See* Tompkins Decl. ¶ 4, Ex. 1.

Google's attempt to go after MPAA's law firm is simply an attempt to invade the attorney-client relationship.

First, so there is no confusion or ambiguity, the MPAA and Jenner are not asserting privilege over the documents that were exchanged with Attorney General Hood and that Jenner and MPAA have already produced or agreed to produce.[16]  The only documents that the MPAA and Jenner have indicated they will withhold from that production are those over which Attorney General Hood intends to assert a work product or related privilege.  The Mississippi court presently is considering whether these or similar documents are privileged, and to avoid mooting the issues before the Mississippi court, Jenner and MPAA are withholding at the request of Attorney General Hood these documents pending the court's decision.  Jenner and MPAA, however, have not withheld any documents exchanged with Attorney General Hood based on their own privilege claims.

It is otherwise, however, for the documents that Jenner and the MPAA have not agreed to produce that are the subject of Google's motions to compel.  The production required by Google's motion would not be a simple matter, as courts express deep concern about subpoenas addressed to lawyers and law firms.  In a related context, this Court recently gave a number of reasons against permitting discovery from a lawyer.  First, such discovery "may disrupt the effective operation of the adversarial system by chilling the free and truthful exchange of information between attorneys and their clients."  *Sterne Kessler Goldstein & Fox*, 276 F.R.D. at 380-81 (considering deposition subpoena).  "Undermining attorney-client communications due to the risk that counsel may be compelled to testify at a deposition in a pending or future 'scorched earth' litigation is certainly not helpful to effective legal practice."  *Id.* at 381.  Second,

---

[16] Jenner did redact the portions of e-mail communications it produced to Google that were **not** transmitted to Attorney General Hood or his office.

such discovery "present[s] a unique opportunity for harassment." *Id.* (internal quotation marks

omitted). Third, such discovery "carr[ies] the substantial potential of spawning litigation over

collateral issues related to assertion of privilege, scope, and relevancy, that only end up imposing

additional pretrial delays and costs on both parties and burdens on the courts to resolve work-

product and privilege objections." *Id.* at 382.

    As another court has characterized it, subpoenas issued to counsel are "troubling"

because they disrupt the attorney-client relationship and have a chilling effect on a client's

candor with its counsel. *AFSCME*, 277 F.R.D. at 478-49. Indeed, in certain circumstances, the

party seeking discovery is required to meet a higher standard than relevance to enforce a

subpoena; in addition to relevance, that party must demonstrate it has no other means of

obtaining the information *and* that the information is crucial to preparation of its case. *Id.* at 479;

*see also Sterne*, 276 F.R.D. at 380-86 (in the case of a subpoena directed to an attorney a court

should consider factors such as the need for the information, the lawyer's role, the risk of

encountering privilege issues, and the extent of discovery already conducted).

    The reasons that this Court cited in *Sterne* are compelling and precisely the concerns that

granting Google's motion would implicate. It is obvious that many of the documents sought by

Google are privileged; indeed, that is apparently *the point* of subpoenaing counsel retained to

advise on and implement a multi-pronged enforcement strategy. The documents Google

acknowledges it seeks—internal legal assessments regarding potential enforcement efforts, for

example—are the epitome of privileged communications.

    But for documents that are not privileged—for instance, if they were sent to third parties,

other than Attorney General Hood, with whom Jenner or the MPAA had not "under[taken] a

joint effort with respect to a common legal interest" such that they would be protected under the

common-interest doctrine, *see United States v. BDO Seidman, LLP*, 492 F.3d 806, 816 & n.6

(7th Cir. 2007)—the burden remains the same.  As written, the Subpoenas would require Jenner

to review, and then log, thousands of ordinary day-to-day client communications in a privilege

log for Google's inspection.  Significantly, Google has specifically chosen *not* to narrow its

Subpoenas to documents sent to third parties, *see, e.g.*, Rubin Decl. ¶ 16, Ex. 41; Ex. 42—which

means it is knowingly and deliberately imposing the pointless burden on Jenner to review and

log all of its attorney-client communications.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (requiring court

to limit discovery that is "obtainable from some other source that is more convenient, less

burdensome, or less expensive").  For a third party to Google's litigation, the burden that would

come from undertaking the review and asserting and litigating the privilege is plainly

disproportionate.

      That burden becomes even greater—and Google's Subpoenas become even more

troubling—when the Court considers the nature of some of the documents sought.  Google bases

its arguments in part on privileged documents that were stolen.  Notwithstanding disingenuous

assertions that these are "[d]ocuments uncovered by reporters," such as the "New York Times,"

Mots. at 2, 4, the true source of these documents was a criminal hack of Sony Entertainment's

servers, *id.* at 4-5 & n.6, reportedly perpetrated by the communist dictatorship that governs North

Korea.  And Google certainly knows this.

      In many circumstances, lawyers are not even permitted to *review* documents like these.

*E.g.*, D.C. Bar Ass'n Legal Ethics Comm., Opinion 318 (2002) (noting that "[i]f a lawyer

receives materials that are privileged on their face, having a reasonable basis to conclude that the

privilege has not been waived and that they have been obtained without authorization, he may

violate Rules 1.15(b) and 8.4(c) by reviewing the material"); *State Comp. Ins. Fund v. WPS, Inc.*,

82 Cal. Rptr. 2d 799, 807 (Cal. Ct. App. 1999) ("When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged."); *see also Dukes v. Wal-Mart Stores, Inc.*, No. 01-cv-2252, 2013 WL 1282892, at *6 (N.D. Cal. Mar. 26, 2013) (privileged document that was illegally stolen and sent to the *New York Times* was still privileged); *Sackman v. Liggett Group, Inc.*, 173 F.R.D. 358, 365 (E.D.N.Y. 1997) (privileged document that was illegally stolen and publicly disseminated was still privileged).

Google seeks to use these illegally-leaked documents in support of its arguments to obtain *additional* confidential documents in discovery. The Court should not permit Google to leverage those stolen documents to obtain information that is protected by the attorney-client and First-Amendment privileges.

Quite apart from the policy concerns that arise if lawyers are allowed to use confidential documents first obtained by hackers, the fact that some privileged documents were published in the wake of the Sony hack will trigger subsequent litigation over privilege assertions. Privileged documents obtained by hackers and later published nevertheless remain privileged. Presumably, given Google's apparent interest in the documents, Google will contest the privilege assertions.[17]

---

[17] Google's argument that the MPAA and Jenner waived attorney-client privilege by failing to serve a privilege log (Mots. at 23) is incorrect. Because the MPAA and Jenner have consistently objected that the documents sought by Google are irrelevant and would be burdensome to produce regardless of the attorney-client privilege, *see, e.g.*, Rubin Decl. ¶ 4, Ex. 11 at 1-2, MPAA and Jenner were not obligated to serve a privilege log until the Court ruled on its

The burden of identifying and logging privileged communications—of which where will be many given the fact that a law firm has been subpoenaed—will be multiplied by the almost certain ensuing litigation over the validity of privilege claims under the circumstances of this case. Such an outcome would be both tremendously wasteful and profoundly troubling as a precedent.

**B. Granting Google's Motion Will Trigger Extensive Litigation over the First Amendment Privilege.**

The privileged discussions that Google seeks here concern not just discussions between attorney and client, but discussions that implicate core First Amendment concerns. Google seeks private communications concerning MPAA's and its counsel's strategies to advocate to government officials and respond to violations of law affecting MPAA members. Again, and to be clear, Google does not merely seek communications that were *sent* to government officials. Rather, it seeks confidential strategy materials created for the purpose of legal advocacy, as well

---

relevance objections. *United States v. Philip Morris, Inc.*, 347 F.3d 951, 954 (D.C. Cir. 2003) ("[I]f a party's pending objections apply to allegedly privileged documents, the party need not log the document until the court rules on its objections.") (internal quotation marks omitted); *see also* Fed. R. Civ. P. 26 1993 Advisory Committee Notes (noting correspondence between Rule 26 and analogous provisions of Rule 45). Google cites Jenner's privilege treatise for the proposition that failure to provide a privilege log can have "severe consequences, including waiver of the privilege," Mots. at 23 (quoting Jenner Treatise p. 69), yet fails to mention that Jenner's treatise cites *Philip Morris* on the very next page as an exception to that principle. Tompkins Decl. ¶ 9, Ex. 6 at 70 (Jenner Treatise). *See also United States v. Magnesium Corp. of Am.*, No. 2:01-CV-00040, 2006 WL 1699608, at *5 (D. Utah June 14, 2006) (determining that a detailed privileged log was not necessary when the documents to be logged would number in the thousands and when "it seem[ed] clear that most of the documents at issue would be protected from disclosure by the work product privilege, the attorney-client privilege, or the joint defense privilege."), *modified in part*, 2006 WL 2350155 (D. Utah Aug. 11, 2006); *SEC v. Thrasher*, No. 92 Civ. 6987, 1996 WL 125661, at *1-2 (S.D.N.Y. Mar. 20, 1996) (finding that defendant was not obligated to provide a detailed privilege log for his communications with counsel after noting that a document-by-document listing would be unduly burdensome and that the documents sought were likely protected by the work product or attorney-client privilege). If the Court grants the motion to compel, Jenner and the MPAA reserve the right to prepare privilege logs asserting privilege. To the extent Google wishes to challenge specific privilege assertions, it may do so at that time.

as other confidential discussions relating "to campaign assistance, contributions, or other campaign- or election-related activities."[18]

These are precisely the kinds of material to which courts commonly apply the First Amendment privilege.  The reason is simple:  While discovery of mere "commercial or financial data" raises few constitutional concerns, the discovery of information "with . . . a real potential for chilling the free exercise of political speech and association" raises very different concerns. *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 388 (D.C. Cir. 1981).  The "highly sensitive character of the information sought" warrants a particularly close consideration of the basis for the subpoena—whether agency jurisdiction for an investigation, as in *FEC v. Machinists, id.* at 389, or the relevance and burden of the Subpoenas at issue here.  In the closely related context of discovery orders that require disclosure of the identities of political association members, the D.C. Circuit has mandated "a balancing inquiry . . . to determine whether a claim of privilege should be upheld. . . . [T]he plaintiff's First Amendment claim should be measured against the defendant's need for the information sought.  If the former outweighs the latter, then the claim of privilege should be upheld."  *Black Panther Party v. Smith*, 661 F.2d 1243, 1266 (D.C. Cir. 1981), *vacated on other grounds*, 458 U.S. 1118 (1982); *see also Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 3 n.6 (D.D.C. 2002) (stating that *Black Panther Party* remains good law despite Supreme Court vacatur).  And contrary to Google's suggestion that the First Amendment privilege merely serves to protect anonymity (Mots. at 19), several circuits have explicitly applied the First Amendment privilege to preclude discovery of internal advocacy-related communications, including that which, as here, "requires trade groups and their members

---

[18]*See, e.g.*, Rubin Decl. ¶ 2, Exs. 1, 2 (Request No. 4) (seeking "All DOCUMENTS that refer or relate to campaign assistance, contributions, or other campaign- or election-related activities for ATTORNEY GENERAL HOOD, including but not limited to DOCUMENTS referring or relating to an entity known as Friends of Jim Hood.").

to disclose to a private party their communications regarding strategy for lobbying." *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 481 (10th Cir. 2011); *see Machinist Non-Partisan Political League*, 655 F.2d at 397 ("But a sweeping demand by the FEC for membership lists and internal communications of a political group over which no showing of jurisdiction has been made cannot now be approved by this court without ignoring vitally important constitutional freedoms by which Americans conduct their political affairs."); *accord Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010); *see also Wyoming v. United States Dep't of Agric.*, 208 F.R.D. 449, 454 (D.D.C. 2002) ("Membership lists are not the only information afforded First Amendment protection . . . . [I]t is crucial to remember that we are considering the essence of First Amendment freedoms—the freedom to protest policies to which one is opposed, and the freedom to organize, raise money, and associate with other like-minded persons so as to effectively convey the message of the protest.") (internal citations and quotation marks omitted).

      In view of that authority, the MPAA and Jenner, if they are forced to prepare a privilege log, intend to assert a First Amendment privilege over numerous categories of documents. *See supra* at n.17 (citing authority holding that obligation to prepare a privilege log does not occur until court addresses threshold relevance objections).

      But the MPAA and Jenner should not be put to that extraordinary burden. Rule 45 grants this Court the authority to quash a subpoena that imposes an undue burden on the receiving party. Here, Google seeks to force the MPAA and Jenner to review thousands of documents and produce privilege logs with numerous entries claiming the First Amendment privilege, which would trigger document-by-document battles over whether particular documents are protected by

the privilege.  Reviewing these documents and preparing the privilege log—let alone the subsequent litigation—would obviously be an expensive and time-consuming burden.

The burden would be questionable enough were the documents actually relevant to the Mississippi litigation.  But where a party asserts a First Amendment privilege claim that is "substantial," and the documents go nowhere near "the heart of the lawsuit," courts must think twice.  *See Int'l Union, UAW v. Nat'l Right to Work Legal Defense & Educ. Found. Inc.*, 590 F.2d 1139, 1152 (D.C. Cir. 1978).  Here, Google could and should seek information about the Attorney General's state of mind from the obvious source of such information—the Attorney General—rather than attempting to divine it from MPAA and Jenner documents that the Attorney General never saw.

**III.    Even a Narrower Version of Google's Subpoena, Seeking Documents Memorializing Oral Statements, Would Fail Rule 45 Analysis.**

As noted above, the MPAA and Jenner have sought to avoid litigation by agreeing to produce documents that they exchanged with Attorney General Hood.  While there were strong arguments that such production by third parties was not required under Rule 45, *see Standex Int'l Corp.*, 257 F.R.D. at 19, MPAA and Jenner are voluntarily making those productions.  But, once again, Google has declined to take "yes" for an answer.  Taking the most charitable possible reading of Google's motions to compel, Google appears to argue that the MPAA's or Jenner's production of communications with Attorney General Hood is insufficient because the MPAA and Jenner might, somewhere, possess some document that memorializes an oral statement by the Attorney General.  *See* Mots. at 13-14.  But if this is Google's theory—and it is not at all

27

clear that it is[19]—the demand still falls far short of the standard necessary to force third parties to

undertake massive reviews of privileged documents.

First, even documents that would reflect Hood's oral statements are of collateral

importance at best to the Mississippi litigation.  As Google recently re-emphasized in its Motion

for a Protective Order in that case, *see* Tompkins Decl. ¶ 8, Ex. 5 at 13, the Mississippi District

Court's preliminary injunction order explicitly stated that the litigation turns on questions of law,

not of fact:  "Since the parties agreed upon the relevant facts, and since they viewed this matter

primarily as a dispute of law, neither party called any live witnesses but, instead, relied upon

documentary exhibits."  MS Dkt. 88 at 6.  The preliminary injunction inquiry is closely similar to

the ultimate inquiry; at the preliminary injunction stage, Google must show a *likelihood* of

success on the merits, and at the permanent injunction stage it must show *actual* success on the

merits.  *See Nichols v. Truscott*, 424 F. Supp. 2d 124, 143 (D.D.C. 2006).  It is unlikely that

disputes of law at the preliminary injunction phase would transform into disputes of fact at the

permanent injunction phase that would require additional evidentiary development.

Moreover, Google's primary argument at the preliminary injunction stage—which the

Court adopted in its preliminary injunction order—was its preemption argument, which

contended that Attorney General Hood is not permitted to investigate Google at all.  MS Dkt. 88

---

[19] In any event, Google's subpoena asks for far more than this category of hypothetical
"transcription" documents.  Google seeks, among others, "ALL DOCUMENTS that relate to or
refer to both GOOGLE and ATTORNEY GENERAL HOOD" and "ALL DOCUMENTS that
refer or relate to any actual or potential investigation, enforcement action, agency proceeding, or
litigation against GOOGLE by ATTORNEY GENERAL HOOD."  *See* Rubin Decl. ¶ 2, Exs. 1,
2 (requests 1 and 3).  Far from being directed at Attorney General Hood's own statements, these
requests cover any attorney-client communication or other communication even commenting on
Attorney General Hood's proposed or actual investigation.  Such an overbroad subpoena is
impermissible. *Alexander v. FBI*, 186 F.R.D. 21, 35 (D.D.C. 1998) (denying discovery of non-
party evidence that is "clearly over broad" and "not limited to materials that may be relevant or
lead to the production of admissible evidence").  Google has had the opportunity to narrow these
requests but has declined.

at 15-18, 20-22; Tompkins Decl. ¶ 6, Ex. 3 at 15, 19-21, 29-33.  Even Google cannot articulate

an argument that Attorney General Hood's state of mind—or any document in the MPAA's or its

counsel's possession—is relevant to preemption.  Given that the Mississippi District Court has

already found a likelihood of success on the merits of Google's preemption claims, it is highly

unlikely that any documents sought by Google will have any effect on the outcome of the

Mississippi litigation.  Google also suggests that Jenner and the MPAA's documents might be

relevant to the bad-faith exception to *Younger* abstention, Mots. at 12-13, but the Mississippi

District Court has already concluded that *Younger* abstention would not apply for a separate

reason, namely that there is not an ongoing state enforcement proceeding.  MS Dkt. 88 at 13.

     Against a strikingly weak theory of relevance, the *burden* of the review remains

overwhelming.  As noted, Jenner has collected over 24,000 documents that would likely need to

be reviewed to respond to Google's overly broad subpoena, and the MPAA's initial searches

have revealed over 100,000 documents requiring review.  Reviewing all of these documents, and

preparing a privilege log with thousands of entries would be extraordinarily burdensome.  Unlike

the production of documents actually exchanged with the Attorney General's office, which could

be identified from a larger universe by filtering documents that were sent to or received from

certain parties, a search for documents transcribing oral conversations would require a much

more painstaking document-by-document review.  When Google could learn the Attorney

General's views "from some other source that is more convenient, less burdensome, or less

expensive," Fed. R. Civ. P. 26(b)(2)(C)(i)—namely, from discovery of the Attorney General's

office itself—the severe burden imposed here is unwarranted.  *See Standex Int'l Corp.*, 257

F.R.D. at 19 ("[E]ven modifying the subpoena to seek this limited information is unduly

burdensome because of the absence of any showing that the information sought is not available from other sources").

Nonetheless, Google demands that the MPAA and Jenner conduct a time-consuming search of all of these documents, and prepare a privilege log with thousands of entries, simply to satisfy Google's curiosity as to whether the MPAA and Jenner might have recorded some oral statement by the Attorney General.  That burden is excessive, especially given that the MPAA and Jenner are already producing their written communications with the Attorney General and are not even parties to the case.  *See Watts*, 482 F.3d at 509 ("The Rule 45 'undue burden' standard requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties."); *Leake*, 231 F.R.D. at 52 (finding subpoena to be excessively burdensome "particularly in light of the fact that Pew is neither a party, nor even an amicus, in the underlying action").  The Federal Rules would not impose such an unsupported burden on a *litigant*, let alone a non-party party.

## IV.    The Court Should Enter a Protective Order.

Rule 26(c) of the Federal Rules of Civil Procedure permits the court to issue protective orders "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  *Alexander v. FBI*, 186 F.R.D. 54, 57 (D.D.C. 1998).  Because "discovery also may seriously implicate privacy interests of litigants and third parties," *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984), courts have recognized that entry of a protective order may be proper to "protect[ ] the information of parties and non-parties from improper disclosure." *Peskoff v. Faber*, 230 F.R.D. 25, 33 (D.D.C. 2005), *order clarified by*, 233 F.R.D. 207 (D.D.C. 2006).

Here, public disclosure of the confidential documents sought by Google is not just a risk; it is Google's all-but-stated objective.  Google's own conduct to date shows that its primary goal in issuing its Subpoenas to the MPAA and Jenner is to reveal documents publicly as part of its ongoing public relations war with the MPAA.  For the past two months, the MPAA and Jenner have offered to produce responsive, non-privileged and not otherwise protected communications exchanged with Attorney General Hood on the condition that Google agree to request a protective order.  *See* Rubin Decl. ¶ 9, Ex. 27 at 1; Ex. 28 at 1; ¶ 17, Ex. 45 at 1.  Yet Google has refused this agreement.  *See, e.g.*, Rubin Decl. ¶ 16, Ex. 41 at 2-3; ¶ 16, Ex. 42 at 2.  Instead, it has engaged in motion practice to preserve its ability to publicize MPAA's and Jenner's documents.  In opposing a protective order, Google's motion openly states that the documents at issue are "directed to a matter of significant public concern."  Mots. at 25.  Jenner and the MPAA strongly disagree that their private communications with Attorney General Hood on behalf of victims of Google's Internet misconduct are of any "public concern," any more than any person's efforts to seek assistance from government officials should be disclosed publicly as a matter of course.  Nor has Google provided any indication that it would agree to a protective order even to cover the purely internal communications the disclosure of which it now seeks to compel.

Google's present motion leaves little doubt about its intent to publicize the documents it receives, to the detriment of the MPAA and Jenner.  Moreover, Google has not and cannot articulate any reason why the entry of a protective order would impede its litigation in Mississippi or otherwise harm its interests.  Given the significant evidence that Google has served its Subpoenas based on its ulterior motive of harming MPAA, the Court should bar Google from disseminating any information it receives. *See Klayman v. Judicial Watch, Inc.*, 247

F.R.D. 19, 22-23 (D.D.C. 2007) (imposing such a protective order when party's prior actions had established intent to use information received in discovery against producing party).

*          *          *

There is little basis here on which the Court, or even Google, could conclude that the documents in dispute are relevant to the Mississippi litigation.  The purpose of these Subpoenas is to gather information—beyond the information that was already stolen via the Sony hack on which it relies—on the MPAA's strategies to protect its members' copyrighted material and address violations of law on the Internet affecting its members' copyrights and the rights of others.  Moreover, Google openly admits that it opposes any order to keep these discovery materials in confidence, revealing its goal to disseminate these documents publicly as part of its ongoing public relations war.  But the most fundamental purpose of these Subpoenas is to send a message to anyone who dares to seek government redress for Google's facilitation of unlawful conduct:  If you and your attorneys exercise their First Amendment right to seek redress from a government official, Google will come after you.  The Court should not allow Google's abuse of the litigation process.

Dated: June 15, 2015

Respectfully submitted,

/s/ David Handzo
David Handzo
JENNER & BLOCK LLP
1099 New York Avenue NW, Ste. 900
Washington, DC 20001
Tel. (202) 639-6000
Fax (202) 639-6060
dhandzo@jenner.com

*Counsel for Respondents Motion Picture Association of America, Inc. and Jenner & Block LLP*

Jeremy Creelan (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10002-3908
Tel. (212) 891-1600
Fax (212) 891-1699
jcreelan@jenner.com

*Counsel for Respondent Motion Picture
Association of America, Inc.*

Norman Hirsch (*pro hac vice* forthcoming)
Christopher Tompkins (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654
Tel. (312) 222-9350
Fax (312) 527-0484
nhirsch@jenner.com
ctompkins@jenner.com

*Counsel for Respondent Jenner & Block LLP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 15, 2015, a true and correct copy of the foregoing:

**1.) MOTION PICTURE ASSOCIATION OF AMERICA'S AND JENNER & BLOCK'S MEMORANDUM OPPOSING PETITIONER GOOGLE INC.'S RULE 45 MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS;**

**2.) PROPOSED ORDER;**

**3.) DECLARATION OF CHRISTOPHER TOMPKINS IN OPPOSITOIN TO GOOGLE INC.'S RULE 45 MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS;**

**4.) EXHIBITS 1 – 6 THERETO**

was filed via electronic court notification with the Clerk's office and served on all

counsel of record as indicated below:

Veronica S. Ascarrunz                    ☐ Via Hand Delivery
WILSON SONSINI GOODRICH & ROSATI         ☑ Via Electronic Court Notification
1700 K Street, NW, Fifth Floor           ☐ Via U.S. Mail
Washington, DC 20006
*Counsel for Google, Inc.*

David M. Kramer                          ☐ Via Hand Delivery
Michael H. Rubin                         ☑ Via Electronic Court Notification
WILSON SONSINI GOODRICH & ROSATI         ☐ Via U.S. Mail
650 Page Mill Road
Palo Alto, CA 94304
*Counsel for Google, Inc.*

Eli Kay-Oliphant                         ☐ Via Hand Delivery
MASSEY & GAIL LLP                        ☐ Via Electronic Court Notification
50 East Washington Street                ☐ Via U.S. Mail
Chicago, IL 60602                        ☑ Via Email
*Counsel for Digital Citizens Alliance*

                              /s/ Micah Cogen
                              Micah Cogen