# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GOOGLE, INC., | Case No. 15-mc-707-JEB-DAR |
| *Petitioner,* | Case in Other Court:<br>No. 3:14-cv-981-HTW-LRA (S.D. Miss.) |
| v. | |
| DIGITAL CITIZENS ALLIANCE, ET AL., | Judge James E. Boasberg |
| *Respondents.* | Magistrate Judge Deborah A. Robinson |

## DECLARATION OF CHRISTOPHER TOMPKINS IN OPPOSITION TO GOOGLE INC'S RULE 45 MOTION TO COMPEL COMPLIANCE WITH SUBPOENA

I, CHRISTOPHER TOMPKINS, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am a partner with the law firm Jenner & Block LLP ("Jenner"), attorneys for Respondent Motion Picture Association of America, Inc. ("MPAA") and a subject of a subpoena issued by Petitioner Google Inc. ("Google"). I, and others at Jenner, have worked diligently to respond to the subpoenas Google served on the MPAA and Jenner in connection with Google's case against Mississippi Attorney General Jim Hood in *Google, Inc. v. Hood*, No. 3:14-cv-00981-HTW-LRA (S.D. Miss.) ("*Google Inc. v. Hood*"). I submit this affidavit in opposition to Google's Federal Rule of Civil Procedure 45 Motion To Compel Compliance with the Subpoenas.

2.     In response to the subpoena Google served on Jenner, we identified custodians at the firm reasonably likely to possess documents and communications potentially responsive to that subpoena, asked those custodians to identify the physical locations, electronic file directories, or email archives where those documents were reasonably likely to be stored, and

collected documents from those locations.  These efforts resulted in the collection and processing of 24,704 documents.  Given the targeted manner in which documents were collected, it is likely that this entire collection of documents will require attorney review if Jenner were required to respond to the production requests as set forth in Google's subpoena.

3.      I further understand that, in response to the subpoena Google served on MPAA, Jenner attorneys identified custodians reasonably likely to possess documents and communications responsive to that subpoena, and that they conducted interviews with custodians to determine locations where these documents were reasonably likely to be stored.  After processing Microsoft Exchange data for each custodian and the contents of two hard drives and share drives, Jenner attorneys ran search terms to capture the universe of documents potentially responsive to the production requests as set forth in Google's subpoena.  The search uncovered over 100,000 documents (search hits and their attachments) that will likely require attorney review if the MPAA were required to respond to the production requests as set forth in Google's subpoena.

4.      Attached hereto as Exhibit 1 is a true and correct copy of the searches that the MPAA ran to identify the universe of documents potentially responsive to the production requests as set forth in Google's subpoena.

5.      Attached hereto as Exhibit 2 is a true and correct copy of Plaintiff Google Inc's Motion To Compel the Production of Documents by Defendant Jim Hood, the Attorney General of the State of Mississippi, filed on April 22, 2015 (ECF No. 100) in *Google Inc. v. Hood*.

6.      Attached hereto as Exhibit 3 is a true and correct copy of the Memorandum of Law in Support of Plaintiff Google Inc's Motion for Temporary Restraining Order and Preliminary Injunction, filed on December 19, 2014 (ECF No. 3) in *Google, Inc. v. Hood*.

7.     Attached hereto as Exhibit 4 is a true and correct copy of a screenshot taken on June 12, 2015 at 2:39PM of a Google search for "download Rounders," a 1998 film.  Five of the six top non-advertisement results returned by Google as a result of that search are links to internet domains that have over one thousand requests for removal of search result URLs that link to infringing content according to Google's Transparency Report, which is publicly available at http://www.google.com/transparencyreport/removals/copyright/?hl=en.

8.     Attached hereto as Exhibit 5 is a true and correct copy of Plaintiff Google Inc.'s Memorandum in Support of Motion for a Protective Order with Respect to Notices of Rule 30(b)(6) Depositions of Google Inc., filed on June 8, 2015 (ECF No. 129) in *Google, Inc. v. Hood.*

9.     Attached hereto as Exhibit 6 is a true and correct copy of the title page and pages 68 - 70 of Jenner's privilege treatise, Protecting Confidential Legal Information: A Handbook for Analyzing Issues Under the Attorney-Client Privilege and the Work Produce Doctrine.

*****

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed on June 14, 2015 in Chicago, Illinois.

Christopher Tompkins

# Exhibit 1

| Search Terms--MPAA Documents<br>(01/01/2012-Present) |
| --- |
| "MS AG" OR "Mississippi AG" OR "MS Attorney General" OR "Mississippi Attorney General" |
| Google AND ((Michael OR Mike) w/3 Moore) |
| Google AND "mikemoorelawfirm.com" |
| Google AND (Brian w/3 Moran) |
| Google AND (Digital w/5 citizen* w/5 alliance) |
| Google AND (DCA OR DCAA) |
| Google AND (Tom w/3 Galvin) |
| Google AND (RIAA OR "Recording Ind* Assoc* of Amer*") |
| Google AND (PHRMA OR "Pharma* Research and Manufacturer* of America*") |
| Google AND "illegal conduct" |
| Google AND (all w/3 writs w/3 act) |
| Google AND (Attorney w/4 General w/4 Project) |
| Google AND (AG w/2 Project) |
| Goliath |
| Keystone |
| Google AND "communication* decency act" |
| Google AND CDA |
| Google AND ("stop online piracy act" OR "stop on line piracy act") |
| "Google must change its behavior" |
| "Google can take action" |
| Google AND "public relations backlash" |
| "tangle with Google" |
| "Search engine piracy discussion (MPAA Discussion)" |
| Google AND "a means to an end" |
| (Google) AND (CID OR subpoena* OR "civil investigative demand*") |
| subpoena* AND Hood |
| subpoena* AND ((Michael OR Mike) w/3 Moore) |
| subpoena* AND "mikemoorelawfirm.com" |
| subpoena* AND (Brian w/3 Moran) |
| subpoena* AND (Digital w/5 citizen* w/5 alliance) |
| subpoena* AND (DCA OR DCAA) |
| subpoena* AND (Tom w/3 Galvin) |
| subpoena* AND (RIAA OR "Recording Ind* Assoc* of Amer*") |
| subpoena* AND (PHRMA OR "Pharma* Research and Manufacturer* of America*") |
| subpoena* AND (all w/3 writs w/3 act) |

| |
|---|
| subpoena* AND (Attorney w/4 General w/4 Project) |
| subpoena* AND (AG w/2 Project) |
| subpoena* AND "communication* decency act" |
| subpoena* AND CDA |
| |
| subpoena* AND ("stop online piracy act" OR "stop on line piracy act") |
| subpoena* AND SOPA |
| subpoena* AND "public relations backlash" |
| subpoena* AND "a means to an end" |
| |
| (subpoena*) AND (CID OR "civil investigative demand*") |
| CID AND Hood |
| CID AND ((Michael OR Mike) w/3 Moore) |
| CID AND "mikemoorelawfirm.com" |
| CID AND (Brian w/3 Moran) |
| CID AND (Digital w/5 citizen* w/5 alliance) |
| CID AND (DCA OR DCAA) |
| CID AND (Tom w/3 Galvin) |
| |
| CID AND (RIAA OR "Recording Ind* Assoc* of Amer*") |
| |
| CID AND (PHRMA OR "Pharma* Research and Manufacturer* of America*") |
| CID AND (all w/3 writs w/3 act) |
| CID AND (Attorney w/4 General w/4 Project) |
| CID AND (AG w/2 Project) |
| CID AND "communication* decency act" |
| CID AND CDA |
| |
| CID AND ("stop online piracy act" OR "stop on line piracy act") |
| CID AND SOPA |
| CID AND "public relations backlash" |
| CID AND "a means to an end" |
| |
| "civil investigative demand*" AND "mikemoorelawfirm.com" |
| |
| "civil investigative demand*" AND (Digital w/5 citizen* w/5 alliance) |
| |
| "civil investigative demand*" AND (DCA OR DCAA) |
| |
| "civil investigative demand*" AND (MPAA OR "Motion Picture Assoc* of Amer*") |
| |
| "civil investigative demand*" AND (RIAA OR "Recording Ind* Assoc* of Amer*") |
| |
| "civil investigative demand*" AND (PHRMA OR "Pharma* Research and Manufacturer* of America*") |

| |
|---|
| "civil investigative demand*" AND "illegal conduct" |
| "civil investigative demand*" AND "communication* decency act" |
| "civil investigative demand*" AND CDA |
| "civil investigative demand*" AND ("stop online piracy act" OR "stop on line piracy act") |
| "civil investigative demand*" AND SOPA |
| investigat* AND Hood |
| investigat* AND ((Michael OR Mike) w/3 Moore) |
| investigat* AND (Brian w/3 Moran) |
| investigat* AND (Tom w/3 Galvin) |
| investigat* AND (all w/3 writs w/3 act) |
| investigat* AND (Attorney w/4 General w/4 Project) |
| investigat* AND (AG w/2 Project) |
| investigat* AND "public relations backlash" |
| investigat* AND "a means to an end" |
| (Jim OR James) w/3 Hood |
| "Mary Jo" w/3 (Wood OR Woods) |
| Blake w/3 Bee |
| Melanie w/3 Webb |
| MEREDITH w/3 ALDRIDGE |
| "ago.state.ms.us" |
| Personal email of Jim Hood |
| "jimhood.org" |
| Personal email of Blake Bee |
| |
| **Total Documents, Including Family Members** |
| 141,629 |

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | | |
|---|---|---|
| Google Inc., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| | ) | No. 3:14cv981 HTW-LRA |
| *v.* | ) | |
| | ) | **PLAINTIFF GOOGLE INC.'S** |
| | ) | **MOTION TO COMPEL THE** |
| Jim Hood, Attorney General of the State | ) | **PRODUCTION OF DOCUMENTS BY** |
| of Mississippi, in his official capacity, | ) | **DEFENDANT JIM HOOD, THE** |
| | ) | **ATTORNEY GENERAL OF THE** |
| *Defendant.* | ) | **STATE OF MISSISSIPPI** |
| | ) | |
| | ) | |
| | ) | |

## INTRODUCTION

By order dated April 10, 2015, this Court directed the Attorney General to produce five categories of documents, absent a valid privilege claim.  *See* Order on Ore Tenus Discovery Motion, ECF No. 94 (the "April 10 Order").  The Attorney General has withheld most of the documents called for by the Court's order.  But there is no valid basis to assert privilege.  Most of the documents in question were prepared by third parties lobbying the Attorney General to take action against Google.  Neither the attorney-client privilege nor the work product doctrine permits public officials to shield such interactions from scrutiny.  The privilege log provided by the Attorney General confirms that there is no basis to withhold the documents.  The log fails to provide most of the information required by Local Rule 26(a)(1)(C) and does not come close to satisfying the Attorney General's burden to establish that each document at issue is privileged.  Plaintiff Google Inc. ("Google") moves to compel the Attorney General to produce in full the documents covered by the April 10 Order, as discussed below.

## FACTUAL AND PROCEDURAL BACKGROUND

The April 10 Order directed the Attorney General to produce the following five categories of documents, along with a privilege log, by April 15, 2015:

a. Any draft subpoenas provided to the Attorney General by the third parties identified in Google's request [of January 14, 2015].

b. Attorney General Hood's November 13, 2013 email to [MPAA lobbyist] Vans Stevenson, and any replies or responses thereto;

c. Attorney General Hood's August 28, 2014 letter to the Attorneys General in all 50 states regarding setting up a working group;

d. The Word files listed in item (6) of Google's January 14, 2015 request ("Google can take action" "Google must change its behavior" "Google's illegal conduct" "CDA"), and any emails from the third parties attaching those word files; and

e. Any documents already gathered in connection with the Techdirt Mississippi Public Records Act request that are responsive to Google's requests.

The April 10 Order also directed the Attorney General to respond to the remainder of Google's document requests by April 27, 2015.

On April 15, the Attorney General served his responses and objections for the five priority document categories, along with a privilege log and 65 pages of heavily redacted documents. *See* Neiman Decl. Ex. 1. He produced no documents at all within the fifth category specified by the Court, later explaining that while documents had been "identified" in relation to the Techdirt Mississippi Public Records Act request, none had been "gathered."[1] He also refused to produce much of the responsive material in his possession, claiming that the documents are protected by the attorney-client privilege, the work product doctrine, the common interest doctrine, or some combination thereof. *Id.* The Attorney General's privilege log, however, did not substantiate his claims. It failed to provide the author of withheld documents, the names of the individuals who sent or received withheld communications, the names of documents, and offered vague descriptions of withheld material, such as "Email with Legal Memoranda." *Id.*

After a written and telephonic consultation between the parties, the Attorney General agreed to cease withholding some information and provided a supplemental privilege log. The new log, provided by the Attorney General on April 21, includes more information about who sent and received certain communications; it also provides email subject lines and attachment names for some of the withheld documents. *See* Neiman Decl. Ex. 2. It also concedes that the Attorney General does not know who drafted many of the withheld documents and instead states, "on information and belief," that they "were prepared by or at the direction of" one of two or three named lawyers in private practice, at the law firms Jenner & Block LLP ("Jenner"), Orrick,

---

[1] That distinction is spurious. We do not ask for any relief in this motion on this ground, however, because under the Court's order the Attorney General remains obligated to produce responsive documents in this category by April 27, whether or not previously gathered.

Herrington & Sutcliffe LLP ("Orrick"), and SNR Denton US LLP ("Denton"). *Id.* The Attorney General confirmed that he had no attorney-client relationship with these firms. Published accounts indicate that, in connection with lobbying activities, Orrick represents Microsoft and Jenner represents the MPAA. *See* Neiman Decl. Ex. 5, Joe Mullin, *Hollywood v. Goliath: Inside the Aggressive Studio Effort to Bring Google to Heel*, Ars Technica, Dec. 19, 2014 (hereinafter Mullin, *Hollywood*).

On April 21, the Attorney General also provided the engagement letter governing his relationship with the Mike Moore Law Firm ("Moore"). *See* Neiman Decl. Ex. 3. The letter is dated June 29, 2012, two months *after* the date of one of the documents the Attorney General withheld based on an alleged privileged relationship with Moore. The letter states that the Attorney General retained Moore "to assist in its investigation of whether Google's practices [REDACTED]." *Id.* (The Attorney General claimed that the redacted material constituted work product.) *See* Neiman Decl. Ex. 2 (Supplemental Privilege Log Entry 11). The letter provided that "[i]f the [Attorney General] decides to proceed with litigation, the [Attorney General] will enter into a Retainer Agreement with [Moore]." Neiman Decl. Ex. 3. It stated that the retainer agreement "will provide . . . for the payment of reasonable fees and expenses to [Moore] from any recovery in this matter, which will include fees and expenses incurred during the Investigation." *Id.*

Despite conferring in good faith, the parties have not resolved their differences.

## ARGUMENT

The Court should order the Attorney General to produce the withheld documents discussed below because he has not met his burden to demonstrate that they are protected from disclosure. "A party asserting a privilege exemption from discovery bears the burden of

3

demonstrating its applicability." *In re Santa Fe Intl. Corp.*, 272 F. 3d 705, 710 (5th Cir. 2001) (assessing claim of common legal interest extension of attorney-client privilege); *see also King v. University Healthcare Sys., L.C.*, 645 F.3d 713, 720-21 (5th Cir. 2011) (party claiming attorney-client privilege bears burden of proof); *Hodges, Grant & Kaufmann v. IRS*, 768 F.2d 719, 721 (5th Cir. 1985) (party claiming attorney-client privilege or work product doctrine bears burden of proof).

The question of whether a privilege applies "is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents." *Id.* "A simple declaration that the privilege exists is insufficient." *Varo Inc. v. Litton Sys., Inc.*, 129 F.R.D. 139, 142 (N.D. Tex. 1989). The Fifth Circuit has thus repeatedly held that "the privilege claimant's burden extends to proof of preliminary facts showing that the matter is eligible for protection." *Santa Fe*, 272 F.3d at 710 n.7. "A failure of proof as to any element causes the claim of privilege to fail." *Varo*, 129 F.R.D. at 142.

This Court's Local Rules in turn require that privilege logs include at least the following information: "name of the document . . . description of the document . . . , which description must include[ ] each requisite element of the privilege or protection asserted; date; author(s); recipient(s); and nature of the privilege." L. U. Civ. R. 26(a)(1)(C). The failure to provide this information "may be viewed as a waiver of the privilege or protection." *Id.* The Attorney General's initial and amended privilege logs plainly violate this rule. Because the Attorney General has not otherwise met his evidentiary burdens, nor could he, the Court should compel the immediate production of each of the document categories discussed below.

## I. THE COURT SHOULD COMPEL PRODUCTION OF THE DRAFT SUBPOENAS AND CIDS

The Attorney General refused to produce any documents in the first category specified by the Court's April 10 Order: "[a]ny draft subpoenas provided to the Attorney General by the third parties identified in Google's request." In his privilege log, he acknowledges receiving three draft subpoenas and two draft CIDs. He admits these documents were *not* prepared by an attorney representing the Attorney General. Instead, he states that, "on information and belief," the subpoenas were prepared at the direction of lawyers at Jenner, Orrick, and Denton—firms that he has conceded do not represent him. The Attorney General nonetheless claims that all the draft subpoenas and CIDs are protected work product, and that the three which were transmitted through Moore are also covered by the attorney-client privilege. The Attorney General cannot meet his burden, and should be ordered to produce all five documents.

### A. Attorney-Client Privilege Does Not Protect The Draft Subpoenas

To assert the attorney-client privilege, a party "must prove: (1) that he made a *confidential* communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding." *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997) (emphasis in original). "The privilege does not protect 'everything that arises out of the existence of an attorney-client relationship.'" *United States v. Nelson*, 732 F.3d 504, 518 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2682 (2014) (quoting *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir.1976)). Indeed, "[i]t shields communications from the lawyer to the client only to the extent that these are based on, or may disclose, confidential information provided by the client or contain advice or opinions of the attorney." *United States v. Neal*, 27 F.3d 1035, 1048 (5th Cir. 1994); *see also In re Grand Jury*

*Proc. in re Fine*, 641 F.2d 199, 204 n. 5 (5th Cir. 1981) ("[T]he attorney-client privilege should be confined within the narrowest limits consistent with its purpose.").

The supplemental privilege log entries for the three draft subpoenas withheld as privileged fail to meet the Attorney General's burden and violate Local Rule 26(a)(1)(C). *See* Neiman Decl. 2 (Supplemental Privilege Log Entries 1, 2, & 5) (reproduced in relevant part below).

| Name | Description | Date(s) | Author(s) | Recipient(s) | Privilege(s) |
|------|-------------|---------|-----------|--------------|--------------|
| PL000001-PL000067 | Draft Subpoena (Request No. 1) | Received on or about Oct. 17, 2014 | ["On information and belief, this document was prepared by or at the direction of Tom Perrelli and/or Brian Moran."] | From Mike Moore Law Firm to Blake Bee, Special Assistant Attorney General with the Office of the Mississippi Attorney General | Attorney-Client<br><br>Work Product |
| PL000075-PL000119 | Draft Subpoena (Request No. 1) | Received on or about Sept. 11, 2014 | ["On information and belief, this document was prepared by or at the direction of Tom Perrelli and/or Brian Moran."] | From Mike Moore Law Firm to Bridgette Williams, Special Assistant Attorney General with the Office of the Mississippi Attorney General | Attorney-Client<br><br>Work Product |
| PL000167-PL000176 | Draft Subpoena (Request No. 1) | Received on or about April 3, 2012 | ["On information and belief, this document was prepared by or at the direction of Jeff Modisett and/or Anthony Eliseuson (SNR Denton US LLP)."] | From Mike Moore Law Firm to Bridgette Williams, Special Assistant Attorney General with the Office of the Mississippi Attorney General | Attorney-Client<br><br>Work Product |

These entries violate Local Rule 26(a)(1)(C) because the description of the documents fails to demonstrate that "each requisite element" of the privilege is met. The log does not show, and the Attorney General has not otherwise proven, that the draft subpoenas fell within the scope of his attorney-client relationship with Moore,[2] that he had an attorney-client relationship with the potential authors, that he made a confidential communication to a lawyer for the primary purpose of obtaining legal services, or that production of the subpoena would disclose confidential information provided by the Attorney General or the advice or opinions of his counsel. The log also does not explain how the draft subpoena received on or about April 3,

---

[2] Indeed, the Attorney General has redacted from the engagement letter the very information necessary to determine the scope of Moore's representation.

2012—which pre-dates the June 29, 2012 engagement letter—is nonetheless privileged.  On this record, the Attorney General has thus failed to carry his burden.

   Indeed, the documents are plainly not privileged.  *First*, the draft subpoenas could not have been based upon confidential information provided by the Attorney General to his counsel because he had no attorney-client relationship with any of the suspected authors.  *Second*, disclosing the draft subpoenas would not reveal the advice of the Attorney General's counsel because, as the Attorney General admits, his counsel did not author them.  *Third*, just as "documents do not become cloaked with the lawyer-client privilege merely by the fact of their being passed from client to lawyer," *Robinson*, 121 F.3d at 975, having one's attorney serve as a mere conduit for documents prepared by outside parties does not transform them into privileged material.  *See Buford v. Holladay*, 133 F.R.D. 487, 491 (S.D. Miss. 1990) ("[I]nformation which an attorney secures from a third party while acting on behalf of his client is not shielded from disclosure by the privilege."); *cf.* David A. Greenwald et al., Jenner & Block Practice Series: Protecting Confidential Legal Information at 13 (2011) ("Although many communications from a lawyer to a client are protected by the privilege, there is an exception in instances where the lawyer acts merely as conduit for a third party's message to the client.").

   *Fourth*, there is good cause to doubt the confidentiality of the Attorney General's claimed relationship with the Mike Moore Law Firm.  According to the New York Times' Pulitzer Prize-winning reporting, Mr. Moore disclosed in an interview that he was advising the Attorney General and "was then hired . . . by the Digital Citizen Alliance" to advise on the same subject matter.  Neiman Decl. Ex. 4, Nick Wingfield & Eric Lipton, *Google's Detractors Take Their Fight to the States*, N.Y. Times, Dec. 16, 2014.  The paper further reported that "Mr. Moore then became a critical source for the movie industry . . . telling them how [the Attorney General's]

7

inquiry was progressing and even alerting industry executives that Google had been sent a subpoena—before it said it had been told." *Id.* Both Mr. Moore's unusual parallel representations and his dissemination of otherwise confidential information about the Attorney General's inquiry call into question the confidentiality of his communications with the Attorney General and suggest that any privilege has been waived. The Court need not reach these issues, however, as the Attorney General cannot meet his burden of showing that the draft subpoenas— which were not authored by Moore, but drafted by others who do not represent the Attorney General and merely passed through Moore on their way to the Attorney General—are protected by the attorney-client privilege.

**B.** **Work Product Doctrine Does Not Protect The Draft Subpoenas And CIDs**

To qualify as work product, a document must be "prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R .Civ. P. 26(b)(3)(A). To determine if a document is prepared in anticipation of litigation, Fifth Circuit courts look to the "primary motivating purpose behind [its] creation." *In re Kaiser Aluminum and Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000) (citations omitted). A document is prepared "for [a] party or its representative" if it is prepared by an agent of the party or its counsel. *See United States v. Nobles*, 422 U.S. 225, 238-39 (1975) (holding that "[work product] doctrine protect[s] material prepared by agents for the attorney as well as those prepared by the attorney himself").

Just as for attorney-client privilege, the entries for the five draft subpoenas and CIDs claimed as work product do not meet the Attorney General's burden and violate local rules. *See* Neiman Decl. Ex. 2 (Supplemental Privilege Log Entries 1-5) (reproduced in relevant part below).

8

| Name | Description | Date(s) | Author(s) | Recipient(s) | Privilege(s) |
|------|-------------|---------|-----------|--------------|--------------|
| PL000001-PL000067 | Draft Subpoena (Request No. 1) | Received on or about Oct. 17, 2014 | ["On information and belief, this document was prepared by or at the direction of Tom Perrelli and/or Brian Moran."] | From Mike Moore Law Firm to Blake Bee, Special Assistant Attorney General with the Office of the Mississippi Attorney General | Attorney-Client<br><br>Work Product |
| PL000075-PL000119 | Draft Subpoena (Request No. 1) | Received on or about Sept. 11, 2014 | ["On information and belief, this document was prepared by or at the direction of Tom Perrelli and/or Brian Moran."] | From Mike Moore Law Firm to Bridgette Williams, Special Assistant Attorney General with the Office of the Mississippi Attorney General | Attorney-Client<br><br>Work Product |
| PL000068-PL000074 | Draft CID (Request No. 1) | Received on or about Nov. 26, 2013 | ["On information and belief, this document was prepared by or at the direction of Tom Perrelli and/or Brian Moran."] | From Orrick (Brian Moran) to Blake Bee, Special Assistant Attorney General with the Office of the Mississippi Attorney General | Work Product |
| PL000120-PL000166 | Draft CID (Request No. 1) | Received on or about Apr. 22, 2014 | ["On information and belief, this document was prepared by or at the direction of Tom Perrelli and/or Brian Moran."] | From Orrick (Brian Moran) to Mary Jo Woods, Special Assistant Attorney General with the Office of the Mississippi Attorney General | Work Product |
| PL000167-PL000176 | Draft Subpoena (Request No. 1) | Received on or about April 3, 2012 | ["On information and belief, this document was prepared by or at the direction of Jeff Modisett and/or Anthony Eliseuson (SNR Denton US LLP)."] | From Mike Moore Law Firm to Bridgette Williams, Special Assistant Attorney General with the Office of the Mississippi Attorney General | Attorney-Client<br><br>Work Product |

The document descriptions fail to show that the elements of the work product doctrine are met: they offer no basis to conclude that the documents were prepared by the Attorney General, his attorney, or one of their agents or that the author of the materials anticipated litigation. The log also fails to describe the Attorney General's relationship, if any, with the law firms and private attorneys it references. The Attorney General has thus failed to meet his burden to show that the materials are work product.

Indeed, for multiple reasons it is clear the Attorney General cannot do so. *First*, having conceded that he had no attorney-client relationship with the suspected authors, the Attorney General cannot argue that the materials constitute *his* work product. They were not prepared by him, by his attorney, or by anyone retained to assist the Attorney General or his counsel in preparing for litigation. *See Nobles*, 422 U.S. at 238-39 (extending work product to the agents of

9

a client or its counsel).[3]  *Second*, having conceded that he does not even know who prepared the materials, the Attorney General cannot prove that the unknown author had the motive— preparation for anticipated litigation—required to establish the work product protection.

*Third*, if (as seems likely) the materials were created by counsel for a private client that did not itself anticipate litigation as a party, they are not protected because documents created at the direction of someone who does not anticipate being (or representing) a party to litigation is not work product.  *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 924 (8th Cir. 1997) ("The essential element . . . is that the attorney was preparing for or anticipating some sort of adversarial proceeding involving his or her client . . . we know of no authority allowing a client . . . to claim work product immunity for materials merely because they were prepared while some other person . . . was anticipating litigation.").

*Fourth*, even if the materials did somehow constitute third-party work product, the third-party surrendered that protection by sharing the materials with the Attorney General.  "[W]ork product immunity is lost when a party simply makes a voluntary submission of material to a government agency to incite it to attack the informant's adversary."  *Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc.*, No. CIV.A. 11-2777, 2013 WL 3367137, at *12 (E.D. La. July 5, 2013).

*Finally*, the Attorney General has not demonstrated that he is authorized to *assert* work product as to these documents, as he is neither the attorney who prepared the material nor the client that attorney represented.  *See In re Grand Jury Proc.*, 43 F.3d 966, 972 (5th Cir. 1994)

---

[3] During the meet-and-confer process, the Attorney General identified *Boyer v. Gildea*, 257 F.R.D. 488 (N. D. Ind. 2009), as authority for classifying materials received from third-parties as work product.  That case is inapposite.  In it, the "third-party" at issue was the former representative of the party and was functioning in that capacity.  *See id.* at 492 ("[I]t is significant that Werling served as the Trustee's prior counsel in this litigation and that [the communication at issue] was directed to the Trustee's current counsel.").  The Attorney General does not contend that Jenner, Orrick, or Denton represented him in the past.

("[T]he work product privilege belongs to both the client and the attorney, either one of whom may assert it.").

Because the Attorney General has failed to meet his burden to show that the withheld material is protected by the work product doctrine, nor could he carry that burden, the Court should compel production of the documents.

## II.   THE COURT SHOULD COMPEL PRODUCTION OF THE REQUESTED WORD FILES

The Attorney General also failed to produce any documents responsive to the fourth category of documents required to be produced under the Court's April 10 Order: "The Word files listed in item (6) of Google's January 14, 2015 request ('Google can take action' 'Google must change its behavior' 'Google's illegal conduct' 'CDA'), and any emails from the third parties attaching those word files."  Instead, he withheld three "Email with Legal Memoranda" based on a claim that they were work product.  The Attorney General's supplemental privilege log entries for these items violate Local Rule 26(a)(1)(C) and do not meet his burden to show that the documents are work product.  *See* Neiman Decl. Ex. 2 (Supplemental Privilege Log Entries 8-10) (reproduced in relevant part below).

| Name | Description | Date(s) | Author(s) | Recipient(s) | Privilege(s) |
|------|-------------|---------|-----------|--------------|--------------|
| PL000202 - PL000222 | Email with Legal Memoranda (Request No. 4). ["The subject of the email is entitled 'Draft memos.'  The attachments listed on the email are as follows: 'AG Memo 3 – Google Must Change Its Behavior'; 'AG Memo 4 – CDA'; 'AG Memo 2 – Google Can Clamp Down'; AG Memo 1 – Google Illegal Conduct.' The titles of the four legal memoranda are as follows: 'Google Can Take Action to Stop Illegal Behavior'; 'The Communications Decency Act Does Not Immunize Google From Liability For Facilitating Illegal Conduct'; 'Google Must Reform Its Behavior'; 'How Google Facilitates Illegal Conduct.'"] | Received on or about Jan. 14, 2014 | ["The email with the attached memorandum was sent from Rob McKenna.  On information and belief, this document was prepared by or at the direction of Tom Perrelli, Rob McKenna, and/or Brian Moran."] | From Orrick (Rob McKenna) to Blake Bee, Special Assistant Attorney General with the Office of the Mississippi Attorney General | Work Product |
| PL000223 - | Email with Legal Memoranda (Request No. 4). ["The subject of the email is entitled 'January | Received on or | ["The email with the attached | From Jenner & Block (Thomas | Work Product |

| PL000245 | Meeting.' The attachments listed on the email are as follows: 'AG Memo 1 – Google Illegal Conduct'; 'AG Memo 3 – Google Must Change Its Behavior'; 'AG Memo 2 – Google Can Take Action'; 'AG Memo 4 – CDA'. The titles of the four legal memoranda are as follows: 'How Google Facilitates Illegal Conduct'; 'Google Can Take Action to Stop Illegal Behavior'; 'Google Must Reform Its Behavior'; 'The Communications Decency Act Does Not Immunize Google From Liability For Facilitating Illegal Conduct.'] | about Jan. 9, 2014 | memorandum was sent from Thomas Perrelli. On information and belief, this document was prepared by or at the direction of Tom Perrelli, Rob McKenna, and/or Brian Moran."] | Perrelli) to Blake Bee, Special Assistant Attorney General with the Office of the Mississippi Attorney General | |
| PL000177 - PL000201 | Email with Legal Memoranda (Request No. 4) ["The subject of the email is entitled 'January Meeting.' The attachments listed on the email are as follows: 'AG Memo 1 – Google Illegal Conduct'; 'AG Memo 3 – Google Must Change Its Behavior'; 'AG Memo 2 – Google Can Take Action'; 'AG Memo 4 – CDA'. The titles of the four legal memoranda are as follows: 'How Google Facilitates Illegal Conduct'; 'Google Can Take Action to Stop Illegal Behavior'; 'Google Must Reform Its Behavior'; 'The Communications Decency Act Does Not Immunize Google From Liability For Facilitating Illegal Conduct.'] | Received on or about Jan. 9, 2014 | ["The email with the attached memorandum was sent from Thomas Perrelli. On information and belief, this document was prepared by or at the direction of Tom Perrelli, Rob McKenna, and/or Brian Moran."] | From Jenner & Block (Thomas Perrelli) to Mary Jo Woods, Special Assistant Attorney General with the Office of the Mississippi Attorney General | Work Product |

The work product assertions over these Word documents suffer from the same deficiencies as those over the draft subpoenas and CIDs. Though listing the file names and titles of the attachments, the supplemental log's document descriptions fail to show that the "requisite elements" of the work product doctrine are met. Reading the entries, it is clear that the documents were not prepared by the Attorney General, his attorney, or one of their agents at all, but instead are traced to Jenner and Orrick, who represent Microsoft and the MPAA in their lobbying activities, not the Attorney General. Nor were the documents prepared for the Attorney General; rather, the documents appear to be generic advocacy pieces, which Jenner and Orrick disseminated to multiple Attorneys General (and maybe other recipients) in hopes of generating hostility towards Google. *See* Neiman Decl. Ex. 5, Mullin, *Hollywood* (reporting that Jenner's Perrelli intended to provide the documents to Connecticut's Attorney General, who was looking for a "small number of tangible things" to request from Google). Nor does the information

12

provided suggest that the documents were prepared in anticipation of litigation. Indeed, many of the document titles do not even appear to relate to litigation, such as "Google Can Take Action to Stop Illegal Behavior" or "Google Must Reform Its Behavior." And, for the reasons discussed above, *see supra* at 10, even if the materials were originally prepared by or for a party in anticipation of litigation, any work product protection was waived when the materials were shared with the Attorney General in an effort to incite him to attack Google.

## III. THE COURT SHOULD COMPEL PRODUCTION OF THE REDACTED PORTIONS OF THE ATTORNEY GENERAL'S LETTERS TO STATE ATTORNEYS GENERAL

The third category of documents in the Court's April 10 Order was "Attorney General Hood's August 28, 2014 letter to the Attorneys General in all 50 states regarding setting up a working group." In response, the Attorney General provided 31 copies of a letter transmitted to state attorneys general around the country, redacting approximately half the letter on the grounds that it was protected by the work product doctrine and common-interest doctrine. The Attorney General failed to support either of these claims. *See* Neiman Decl. Ex. 2 (Supplemental Privilege Log Entry 7) (reproduced in relevant part below).

| Name | Description | Date(s) | Author(s) | Recipient(s) | Privilege(s) |
|------|-------------|---------|-----------|--------------|--------------|
| D000004-D000065 | Redacted Portion of Letters from Attorney General Hood | August 28, 2014 | Attorney General Hood | Attorneys General in Other States | Work Product Common Interest Doctrine |

*First*, with respect to work product, the Attorney General's privilege log again fails to comply with Local Rule 26(a)(1)(C) or offer a basis for finding that the information is protected. Most importantly, the log entry fails to describe how preparation for litigation was the "primary motivating purpose" for preparing the letters. And indeed, the unredacted portion of the letters makes no reference to litigation of any kind. It instead describes a voluntary program that Google offered to state attorneys general to allow them to flag illicit content on YouTube for

priority review and (if appropriate) removal.  *See* Neiman Decl. Ex. 1 (D000004).  If the

"*primary* motivating purpose" of the Attorney General's letter was to persuade Google to alter

this program or make additional voluntary policy changes—rather than prepare for litigation—

the document cannot be work product.  *See United States v. El Paso Co.*, 682 F.2d 530, 543 (5th

Cir. 1982) (declining to extend work product protection to tax pool analysis where "[t]he primary

motivating force behind the tax pool analysis . . . is not to ready El Paso for litigation over its tax

returns [, but] . . . to anticipate, for financial reporting purposes, what the impact of litigation

might be on the company's tax liability.")

   *Second*, the Attorney General's privilege log fails to show that these letters are

encompassed within the claimed "Common Interest Doctrine."  The Fifth Circuit has warned that

the common legal interest privilege "must be construed narrowly" because it is "an obstacle to

truth-seeking."  *Santa Fe*, 272 F.3d at 710.  The Fifth Circuit recognizes it only for "(1)

communications between co-defendants in actual litigation and their counsel; and (2)

communications between potential co-defendants and their counsel."  *Id.* (internal citations

omitted); *see also Power-One, Inc. v. Artesyn Techs., Inc.*, 2007 WL 1170733, at *2 n.2 (E.D.

Tex. April 18, 2007) (Love, J.) ("Of course, the common legal interest doctrine is not itself a

privilege, but merely extends a recognized privilege, often the attorney-client privilege, to

communications with parties with a common legal interest.").

   Here, the Attorney General has offered no basis to find that his letter falls within the

narrow scope of the Fifth Circuit's common legal interest doctrine, nor could he.  The attorneys

general are neither co-defendants nor potential co-defendants (nor potential co-plaintiffs) in

litigation related to the letter.

# CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court compel the

Attorney General to immediately produce the requested documents.


DATED this 22nd day of April, 2015.


Respectfully submitted,




OF COUNSEL:
Jamie S. Gorelick
Patrick J. Carome
Blake C. Roberts
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
jamie.gorelick@wilmerhale.com
patrick.carome@wilmerhale.com
blake.roberts@wilmerhale.com

Peter G. Neiman
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone:  (212) 230-8000
Facsimile:  (212) 230-8888
peter.neiman@wilmerhale.com

____s/Fred Krutz_____
Fred Krutz, MSB#4270
Daniel J. Mulholland, MSB#3643
FORMAN PERRY WATKINS
    KRUTZ & TARDY LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201
Post Office Box 22608
Jackson, Mississippi 39225-2608
Phone:  (601) 960-8600
Facsimile:  (601) 960-8613
fred@fpwk.com
mulhollanddj@fpwk.com

*Attorneys for Plaintiff Google Inc.*

## **GOOD FAITH CERTIFICATE**

A Good Faith Certificate executed by counsel for the parties is filed with this motion pursuant to Local Rule 37(a).

## **CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Mississippi by using the Court's CM/ECF system on April 22, 2015. I further certify that all parties are represented by attorneys who are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 s/Fred Krutz
Fred Krutz, MSB#4270

# Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
FILED
DEC 19 2014
ARTHUR JOHNSTON
BY _____ DEPUTY

Google Inc.,

    *Plaintiff,*

     *v.*

Jim Hood, Attorney General of the State
of Mississippi, in his official capacity,

    *Defendant.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 3:14cv981 HTW-LRA

**MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFF GOOGLE
INC.'S MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

[ORAL ARGUMENT REQUESTED]

# TABLE OF CONTENTS

Page

Table of Authorities .................................................................................................. ii

I. INTRODUCTION ........................................................................................... 1

II. STATEMENT OF FACTS .............................................................................. 5

    A. Google's Services ............................................................................... 5

    B. How Google Enforces Its Content Policies ........................................ 6

    C. Google's Approach to Copyright and Prescription Drugs................... 7

    D. The Attorney General's Threats and Demands................................... 9

    E. The Subpoena.................................................................................... 13

III. GOVERNING STANDARD .......................................................................... 14

IV. ARGUMENT ................................................................................................. 14

    A. Google Will Succeed on the Merits of Its Claims ............................ 15

        1. The Communications Decency Act Immunizes the Conduct Under Scrutiny ............................................................................ 15

        2. Google's Activities Are Protected By the First and Fourteenth Amendments of the United State Constitution ........................... 22

        3. Defendant's Subpoena Violates the Fourth and Fourteenth Amendments of the United State Constitution ........................... 28

        4. Individual Federal Laws Preempt Several Aspects of the Subpoena ........ 29

    B. Google Faces A Substantial Threat Of Irreparable Injury ................ 33

    C. The Attorney General Will Suffer No Harm From Complying With a Temporary Restraining Order and Preliminary Injunction................... 34

    D. Issuance of a Temporary Restraining Order and Preliminary Injunction Furthers the Public Interest ........................................................... 34

V. CONCLUSION............................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Income Life Insurance Co. v. Google Inc.*,
    No. 2:11-CV-4126-SLB, 2014 WL 4452679 (N.D. Ala. Sept. 8, 2014) ...........................18, 20

*Backpage.com, LLC v. McKenna*,
    881 F. Supp. 2d 1262 (W.D. Wash. 2012)............................................................................17

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963)................................................................................................................24

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ...............................................................................................4

*Ben Ezra, Weinstein, & Co. v. America Online, Inc.*,
    206 F.3d 980 (10th Cir. 2000) ..................................................................................16, 18, 19

*Blumenthal v. Drudge*,
    992 F. Supp. 44 (D.D.C. 1998) ............................................................................................21

*Buckman Co. v. Plaintiffs' Legal Committee*,
    531 U.S. 341 (2001)..............................................................................................................32

*Canal Authority of Florida v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ...............................................................................................14

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) .............................................................................................16

*Cohen v. Coahoma County, Mississippi*,
    805 F. Supp. 398 (N.D. Miss. 1992)....................................................................................33

*Colson v. Grohman*,
    174 F.3d 498 (5th Cir. 1999) ...............................................................................................24

*Dart v. Craigslist, Inc.*,
    665 F. Supp. 2d 961 (N.D. Ill. 2009) ..................................................................................17

*Doe v. Bates*,
    No. 5:05-CV-91-DF-CMC, 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006)...........................19

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ...........................................................................................2, 16

*Donovan v. Lone Steer, Inc.*,
    464 U.S. 408 (1984) .................................................................................................28

*Elrod v. Burns*,
    427 U.S. 347 (1976) .................................................................................................33

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) (en banc) ................................................................21

*Gavra v. Google Inc.*,
    No. 5:12-CV-06547-PSG, 2013 WL 3788241 (N.D. Cal. July 17, 2013) ........20, 21

*Getachew v. Google, Inc.*,
    491 F. App'x 923 (10th Cir. 2012) .........................................................................21

*GlobeRanger Corp. v. Software AG*,
    691 F.3d 702 (5th Cir. 2012) ...............................................................................3, 30

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ..................................................................20

*Green v. America Online (AOL)*,
    318 F.3d 465 (3d Cir. 2003) ..............................................................................16, 18

*Harrell v. St. John*,
    792 F. Supp. 2d 933 (S.D. Miss. 2011) ..................................................................31

*Hartman v. Moore*,
    547 U.S. 250 (2006) .................................................................................................24

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
    804 F.2d 1390 (5th Cir. 1986) .................................................................................33

*Incubus Investments, L.L.C. v. City of Garland*,
    No. CIV.A. 303CV2039-K, 2003 WL 23095680 (N.D. Tex. Dec. 17, 2003) ........35

*Izen v. Catalina*,
    398 F.3d 363 (5th Cir. 2005) .............................................................................24, 25

*Jian Zhang v. Baidu.com Inc.*,
    10 F. Supp. 3d 433, 436, 438 (S.D.N.Y. 2014) ...........................................2, 22, 23

*Jones v. Dirty World Entertainment Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) ...................................................................................16

*Jurin v. Google, Inc.*,
    695 F. Supp. 2d 1117 (E.D. Cal. 2010) .............................................................20, 21

*Kaepa, Inc. v. Achilles Corp.*,
   76 F.3d 624 (5th Cir. 1996) ...................................................................35

*Lacey v. Maricopa County*,
   693 F.3d 896 (9th Cir. 2012) (*en banc*) ...............................................24

*Langdon v. Google, Inc.*,
   474 F. Supp. 2d 622 (D. Del. 2007)...............................................20, 22

*Leathers v. Medlock*,
   499 U.S. 439 (1991)...............................................................................22

*Little v. City of North Miami*,
   805 F.2d 962 (11th Cir. 1986) ...............................................................25

*Lofton v. McNeil Consumer & Specialty Pharmaceuticals*,
   672 F.3d 372 (5th Cir. 2012) ...........................................................32, 33

*Major League Baseball v. Butterworth*,
   181 F. Supp. 2d 1316 (N.D. Fla. 2001), *aff'd*, 331 F.3d 1177 (11th Cir. 2003).....................15

*Major League Baseball v. Crist*,
   331 F.3d 1177 (11th Cir. 2003) ...............................................3, 29, 34

*MANual Enterprises, Inc. v. Day*,
   370 U.S. 478 (1962)...............................................................................27

*Marcus v. Search Warrants*,
   367 U.S. 717 (1961)...............................................................................29

*Miami Herald Publishing Co. v. Tornillo*,
   418 U.S. 241 (1974)...........................................................................22, 23

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)...........................................................................3, 34

*Morris v. PLIVA, Inc.*,
   713 F.3d 774 (5th Cir. 2013) ...............................................................32

*Nasser v. WhitePages, Inc.*,
   Civil Action No. 5:12CV-097, 2013 WL 6147677 (W.D. Va. Nov. 22, 2013).....................21

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ...............................................................19

*O'Kroley v. Fastcase, Inc.*,
   No. 3-13-0780, 2014 WL 2881526 (M.D. Tenn. June 25, 2014) ...........................20

*Obado v. Magedson,*
No. CIV. 13-2382 (JAP), 2014 WL 3778261 (D.N.J. July 31, 2014) ...................................20

*Oklahoma Press Publishing Co. v. Walling,*
327 U.S. 186 (1946).................................................................................................................28

*Opulent Life Church v. City of Holly Springs, Mississippi,*
697 F.3d 279 (5th Cir. 2012) ..............................................................................................33, 34

*Parker v. Google, Inc.,*
422 F. Supp. 2d 492 (E.D. Pa. 2006), *aff'd,* 242 F. App'x 833 (3d Cir. 2007) .....................20

*Pendleton v. St. Louis County,*
178 F.3d 1007 (8th Cir. 1999) ...............................................................................................25

*People v. Williams,*
920 N.E.2d 446 (Ill. 2009) ....................................................................................................30

*Perfect 10, Inc. v. CCBILL LLC,*
488 F.3d 1102 (9th Cir. 2007) ..............................................................................................18

*Reno v. ACLU,*
521 U.S. 844 (1997)...............................................................................................................17

*Richemont International S.A. v. Tony Chen,*
No. 12-CV-6689-WHP, Dkt. No. 51 (S.D.N.Y. Mar. 1, 2013) ............................................23

*Riley v. Cordis Corp.,*
625 F. Supp. 2d 769 (D. Minn. 2009) ...................................................................................32

*Rosetta Stone Ltd. v. Google, Inc.,*
732 F. Supp. 2d 628 (E.D. Va. 2010), *aff'd,* 676 F.3d 144 (4th Cir. 2012).............................20

*Schouest v. Medtronic, Inc.,*
13 F. Supp. 3d 692, 700 (S.D. Tex. 2014) ............................................................................32

*Search King, Inc. v. Google Technology, Inc.,*
No. CIV-02-1457-M, 2003 WL 21464568 (W.D. Okla. May 27, 2003)................................22

*See v. City of Seattle,*
387 U.S. 541 (1967)...............................................................................................................28

*Smith v. People of California,*
361 U.S. 147 (1959)...............................................................................................................26

*Sprint Communications Inc. v. Jacobs,*
134. S. Ct. 584 (2013).............................................................................................................15

*State v. Perry*,
   697 N.E.2d 624 (Ohio 1998) ................................................................30

*Stayart v. Google, Inc.*,
   783 F. Supp. 2d 1055 (E.D. Wis. 2011), *aff'd*, 710 F.3d 719 (7th Cir. 2013) ....................21

*Texas Medical Providers Performing Abortion Services v. Lakey*,
   667 F.3d 570 (5th Cir. 2012) .............................................................14

*Universal Communications Systems, Inc. v. Lycos, Inc.*,
   478 F.3d 413 (1st Cir. 2007) .......................................................16, 17, 20

*Watkins v. City of Arlington*,
   No. 4:14-CV-381-O, 2014 WL 3408040 (N.D. Tex. July 14, 2014) ..................35

*White v. Baker*,
   696 F. Supp. 2d 1289 (N.D. Ga. 2010) .................................................34

*Wicks v. Mississippi State Employment Services*,
   41 F.3d 991 (5th Cir. 1995) ...............................................................19

*Wilson v. Thompson*,
   593 F.2d 1375 (5th Cir. 1979) ............................................................25

*Zeran v. America Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ..........................................................16, 17

*Zieper v. Metzinger*,
   392 F. Supp. 2d 516 (S.D.N.Y. 2005), *aff'd on other grounds*, 474 F.3d 60 (2d Cir. 2007) ..22

*Zieper v. Metzinger*,
   474 F.3d 60 (2nd Cir. 2007) ............................................................2, 23

*Zurcher v. Stanford Daily*,
   436 U.S. 547 (1978) .......................................................................29

**Constitutional Provisions, Statutes, and Legislative Materials**

17 U.S.C. § 301(c) ..............................................................................30

17 U.S.C. § 501(b) ..............................................................................30

17 U.S.C. § 506 ..................................................................................30

17 U.S.C. § 512 ....................................................................................7

17 U.S.C. § 512(c)(1) ..........................................................................31

17 U.S.C. § 512(d) ..............................................................................31

17 U.S.C. § 512(m) .................................................................................................31

18 U.S.C. § 2319 ....................................................................................................30

21 U.S.C. §§ 301-399f ...........................................................................................31

21 U.S.C. § 331 ................................................................................................31, 33

21 U.S.C. § 337 ................................................................................................3, 32

21 U.S.C. § 337(b)(1) .............................................................................................32

21 U.S.C. § 384 ................................................................................................31, 33

47 U.S.C. § 230 ...................................................................................1, 2, 6, 15

47 U.S.C. § 230(a)(1) .........................................................................................1, 16

47 U.S.C. § 230(a)(3) .............................................................................................16

47 U.S.C. § 230(b) ..................................................................................................16

47 U.S.C. § 230(b)(2) ...................................................................................1, 16, 34

47 U.S.C. § 230(c)(1) ........................................................................................16, 19

47 U.S.C. § 230(c)(2) .............................................................................................16

47 U.S.C. § 230(e)(1) .............................................................................................17

47 U.S.C. § 230(e)(3) ........................................................................................16, 17

141 Cong. Rec. H8460-01 (Aug. 4, 1995) .............................................................17

Miss. Code Ann. § 75-24-7 ....................................................................................27

Miss. Code Ann. § 97-23-3 ....................................................................................27

U.S. CONST. amend. I .......................................................................................... passim

U.S. CONST. amend. IV ......................................................................................... passim

**Other Authorities**

Nick Wingfield & Eric Lipton, *Google's Detractors Take Their Fight to the States*,
N.Y. Times, Dec. 16, 2014 ...............................................................................10

*Rhode Island Attorney General Turns Attorney General Lobbyist*, N.Y. Times, Oct. 28, 2014, *available at* http://www.nytimes.com/interactive/2014/10/28/us/5-Rhode-Island-Attorney-General-Turned-Attorney-General-Lobbyist.html...................................................................13

*Emails Show Hollywood Worked With A State Attorney General To Push Its Anti-Piracy Agenda*, The Huffington Post, Dec, 18, 2014, *available at* http://www.huffingtonpost.com/2014/12/18/movie-piracy_n_6348256.html........................11

*Project Goliath: Inside Hollywood's Secret War Against Google*, The Verge, Dec. 12, 2014, *available at* http://www.theverge.com/2014/12/12/7382287/project-goliath..........................11

## I.    INTRODUCTION

Congress broadly immunized interactive computer service providers from state regulation for displaying information created by others. *See* 47 U.S.C. § 230. Congress determined that "[t]he rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance," and granted this immunity in order to "preserve the vibrant and competitive free market that presently exists for the Internet . . . , unfettered by . . . State regulation." *Id.* at § 230(a)(1), (b)(2).

For the last eighteen months, the Mississippi Attorney General has threatened to prosecute, sue, or investigate Google unless it agrees to block from its search engine, YouTube video-sharing site, and advertising systems, third-party content (*i.e.*, websites, videos, or ads not created by Google) that the Attorney General deems objectionable. When Google did not agree to his demands, the Attorney General retaliated, issuing an enormously burdensome subpoena and asserting that he now has "reasonable grounds to believe" that Google has engaged in "deceptive" or "unfair" trade practice under the Mississippi Consumer Protection Act (MCPA), which allows for both civil and criminal sanctions. The Attorney General did so despite having publicly acknowledged in a letter to Congressional leaders that "federal law prevents State and local law enforcement agencies from prosecuting" Internet platforms.[1] The Attorney General took these actions following a sustained lobbying effort from the Motion Picture Association of America.

---

[1] Forty-six other state attorneys general joined the Attorney General in this acknowledgement of the limits federal law imposes on the ability of individual states to regulate the inherently national Internet. *See* Declaration of Peter Neiman in Support of Plaintiff Google's Motion for Temporary Restraining Order and Preliminary Injunction ("Neiman Decl.") Ex. 12 at 1.

The Attorney General's efforts to force Google to severely limit third-party information accessible through Google's services violates federal law in several ways.

*First*, Section 230 of the Communications Decency Act ("CDA") precludes state regulation of Google based upon the third-party content available on its services or the manner in which Google moderates that content.[2] "Congress provided broad immunity under the CDA to Web-based service providers for all claims stemming from their publication of information created by third parties." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

*Second*, the First Amendment protects Google's organization and display of third-party information (*e.g.*, search results), prohibits retaliation for how it organizes and displays such content, and bars state action that limits public access to constitutionally-protected speech. As multiple courts have found, the state can no more tell a search engine what results to publish than it can tell a newspaper what editorials to run. *See, e.g., Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 436, 438 (S.D.N.Y. 2014). Nor can the state "encourag[e] the suppression of speech in a manner which can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Zieper v. Metzinger*, 474 F.3d 60, 65-66 (2d Cir. 2007) (internal quotation marks omitted).

_____

[2] While generally immunizing Internet platforms from state regulation based on their transmission or display of third-party content, Section 230 does not turn the Internet into a law-free zone. Rather, it permits state regulation of the creators of content disseminated through the Internet. Thus, states remain free to prosecute the operators of unlawful Internet gambling or payday loan sites, for example. The statute also permits some federal regulation of interactive computer services related to third-party content, including through enforcement of federal criminal law. For instance, Google entered into a Non-Prosecution Agreement ("NPA") with the Justice Department in 2011 for its decision in 2004 to permit advertisements from Canadian pharmacies targeting U.S. customers, in potential violation of federal law. It agreed to a number of remedial actions, including a forfeiture of $500 million.

*Third*, the subpoena violates the Fourth Amendment by demanding information about conduct that is plainly lawful. "[I]nvestigations premised solely upon *legal* activity are the very type of 'fishing expeditions' that" the Supreme Court has held violate the Fourth Amendment and "do[] not pass muster under *any* standard." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187-88 (11th Cir. 2003) (citations omitted).

*Fourth*, much of the Attorney General's subpoena is preempted by the Copyright Act or the Food, Drug and Cosmetics Act ("FDCA"). Many of the Attorney General's inquiries concern copyright infringement—but copyright is exclusively a matter of federal law, which the Attorney General may not enforce and with which Google fully complies. *See GlobeRanger Corp. v. Software AG*, 691 F.3d 702, 705-06 (5th Cir. 2012). Similarly, the Subpoena seeks information about Google's practices *ten years ago* with regard to advertisements relating to the importation of prescription drugs. But the FDCA regulates importation of prescription drugs and preempts enforcement actions not brought "by and in the name of the United States." 21 U.S.C. § 337.

Google seeks to enjoin the Attorney General's ongoing violation of its rights under well-established federal law. This Court has clear authority to do so. *See, e.g., Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-84 (1992) (enjoining state attorneys general from bringing suit under consumer protection law for conduct protected by federal law); *Crist*, 331 F.3d at 1186-88 (affirming injunction against enforcement of state attorney general's subpoena where federal law preempted state theory of liability).

To be clear, Google agrees that much of the third-party content about which the Attorney General complains is objectionable. And with great care, Google voluntarily strives to exclude content that violates either federal law or Google's own policies, by blocking or removing

hundreds of millions of videos, web pages, advertisements, and links in the last year alone. These extensive efforts comply with and go well beyond Google's legal obligations.

But if a state Attorney General can punish, irrespective of well-established federal law, any search engine or video-sharing platform whenever he finds third-party content he deems objectionable, search engines and video-sharing platforms cannot operate in their current form. They would instead have to pre-screen the trillions of websites and millions of videos on the Internet, blocking anything they had not yet reviewed from being publicly accessible so as to avoid the ire of even a single state or local regulator. This would "severely restrict the information available on the Internet," *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003), precisely the opposite of the "unfettered" Internet the CDA and the First Amendment protect. The Attorney General may prefer a pre-filtered Internet—but the Constitution and Congress have denied him the authority to mandate it.

Google is likely to succeed on the merits and preliminary relief is warranted. The Attorney General's threat of prosecution or civil enforcement litigation is causing ongoing injury: it forces Google to choose between being charged improperly or changing its services to screen out content per the Attorney General's demands, irrespective of what the law actually requires. The subpoena is causing ongoing injury as well, because it denies Google the broad immunity granted in the CDA, subjects Google to an unreasonable search in violation of the Fourth Amendment, and punishes Google for constitutionally protected speech.

To prevent these irreparable harms from continuing while this case is pending, this Court should temporarily restrain and preliminarily enjoin the Attorney General from (a) enforcing the pending subpoena (returnable January 5, 2015) or (b) bringing a civil or criminal charge (as

threatened) against Google under Mississippi law for making accessible to Internet users third-party content.

## II. STATEMENT OF FACTS

### A. Google's Services

Google Search is the most popular search engine in the world. Built upon a constantly updated index reflecting information from trillions of web pages, Google's search engine processes approximately 3.5 billion queries per day. Declaration of Brian Downing in Support of Plaintiff Google Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction, ("Downing Decl.") ¶¶ 4-5. Google provides Search for free to over a billion users around the world. *Id.* It displays advertisements alongside search results through a separate service called "AdWords." Declaration of Sheily Chhabria in Support of Plaintiff Google Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction ("Chhabria Decl.") ¶ 4. Over 40 million ads are created by AdWords users every day. *Id.* ¶ 5. These ads appear on Search, YouTube, and on third-party websites through a service called "AdSense." *Id.*

Search includes an Autocomplete feature that uses algorithms to statistically predict a user's query as the user types it in the search field, permitting the user to complete the search by selecting a prediction. Downing Decl. ¶ 16. Like similar services on other search engines, Autocomplete seeks to anticipate the query being entered, giving users a shortcut for conducting search queries more quickly. *Id.*

YouTube is a web-based platform that lets users upload, view, and share videos instantly. Declaration of Victoria Grand in Support of Plaintiff Google Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction ("Grand Decl.") ¶ 2. Users upload nearly 300 hours of video onto YouTube every minute. *Id.* YouTube is also a free service where ads are displayed for many videos. *Id.* ¶ 14. In some cases, YouTube shares ad revenue with the

uploader of the video against which the ad runs. *Id.* ¶¶ 14-15. In others, YouTube shares the ad revenue with the owner of copyrighted audio or video contained in the uploaded video. *Id.* ¶ 18.

### B.  How Google Enforces Its Content Policies

The Internet lets people around the world instantly publish content in many formats on many platforms. The scale and diversity of information online is unprecedented and has contributed to an explosion of art, culture, and commerce in the United States and around the world. Inevitably, some tiny fraction of Internet content relates to offensive or unlawful activity.

Section 230 of the CDA provides Internet service providers like Google with broad immunity from state regulation for their display of such content created and developed by others. That immunity affords Internet service providers the space to innovate without facing frequent and burdensome litigation and potentially ruinous liability, whenever any third parties misuse their services to disseminate inappropriate content. And it permits an Internet service provider to make judgments about what third-party content is or is not appropriate for its service, without fear that by excluding some content, the service provider will have exposed itself to liability for not excluding other content.

Consistent with Section 230, Google has adopted different content policies for its various services, reflecting the different purposes of those services. Google expects to spend upwards of $100 million on enforcing its content policies in 2014 alone, and it is the industry leader in efforts to fight illegal activities online. Chhabria Decl. ¶ 3.

Search is Google's least restrictive service because it merely assists users in locating third-party web pages that are publicly available. Downing Decl. ¶ 11. Google restricts search results under very limited circumstances, such as web pages it has identified as a source of child pornography; content found by a court to be unlawful; spam; malware; sensitive personally

identifying information (*e.g.*, credit card and social security numbers); and shocking images that Google can identify automatically. *Id.* ¶¶ 13-14; *see also id.*, Ex. 4.

YouTube, unlike Search, hosts third-party videos on Google servers; it is more restrictive than Search and is subject to Community Guidelines, which prohibit certain types of content on the site. Grand Decl. ¶ 3; *see also id.* Ex. 1. YouTube enforces these Guidelines both through crowdsourcing (leveraging its billions of users to flag content that violates the Community Guidelines), *id.* ¶¶ 5-7 and Ex. 2, and through sophisticated automated systems that attempt to identify offending content. *Id.* ¶¶ 9-10 & Ex. 4. In 2014 alone, YouTube has removed or blocked over 180 million videos for violating the Community Guidelines. *Id.* ¶ 12.

Google's advertising services are even more restrictive because they are used to promote third-party products, services, and websites. In 2014, Google has disapproved over 428 million advertisements, prevented ads from linking to over one million websites, suspended or terminated over 900,000 AdWords advertiser accounts, and terminated over 200,000 websites from AdSense, all based on violations of Google policies. Chhabria Decl. ¶¶ 14, 26.

## C.    Google's Approach to Copyright and Prescription Drugs

Google's policies exclude advertising from websites offering the unauthorized downloads of copyrighted works and prohibit the uploading of infringing content to YouTube. Chabbria Decl. Ex. 3 at 5-6, Ex. 18 at 3; Downing Decl. Ex. 5; Grand Decl. Ex. 1 at 1-2, *id.* ¶¶ 5-7, 9-13. With regard to Search, the Digital Millennium Copyright Act ("DMCA") creates a safe harbor from copyright infringement liability for information location tools like Google that remove infringing content upon receiving an appropriate takedown request from the copyright holder. 17 U.S.C. § 512. Based on takedown notices, Google removed 222 million web pages from the Search index in 2013 alone. Downing Decl. Ex. 5 at 13. Google has reasonably made the judgment that going further—removing entire sites from search results (as opposed to removing

only content identified as infringing), without a judicial finding of illegality—is not appropriate unless mandated by law. Congress came to the same conclusion. Declaration of Peter G. Neiman in Support of Plaintiff Google Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction ("Neiman Decl.") Ex. 23 at 4. But Google has taken other significant steps to hinder the efforts of third parties to promote websites that include material appearing to infringe copyrights. *See* Downing Decl. ¶ 14, Ex. 4 at 1-3; *id.* ¶ 15, Ex. 5; Chhabria Decl. ¶ 21, Ex. 14 at 1; Neiman Decl. Ex. 23 at 4-5.

Google has also focused on combating pharmacies that illegally sell drugs without prescriptions. Although some rogue pharmacy sites advertised with Google many years ago, leading to a 2011 non-prosecution agreement with the U.S. Department of Justice, *see* p. 5, n.1 *supra*, no other Internet company does more to address this issue today. Chhabria Decl. ¶ 16, Ex. 9; *id.* ¶ 17, Ex. 10; *id.* ¶ 18, Ex. 11. In 2014, Google has already blocked more than 7.1 million ads that violate its pharmacy and related content policies, the vast majority of which were never seen. *Id.* ¶ 19. Google has also removed or blocked over 200,000 videos in 2014 for violating YouTube's policies concerning the unauthorized sale of pharmaceuticals. Grand Decl. ¶ 12. Rather than censoring Search results relating to pharmaceuticals, Google displays important information to users about the hazards of some Internet pharmacies, including running no-cost ads linking to a pharmacy checker tool helping users investigate the legitimacy of online pharmacies. And Google promotes content from DrugFree.org for search queries related to drugs and addiction, providing answers to questions parents might have in these areas.[3]

---

[3] *See also* Chhabria Decl. ¶ 18, Ex. 11. ¶ 20, Ex. 12(A)-(Q).

### D.     The Attorney General's Threats and Demands

Notwithstanding Google's extensive and largely voluntary efforts to address illegal and offensive third-party content, the Attorney General believes Google "hasn't done enough." Neiman Decl. Ex. 28 at 1.  Over the last eighteen months, he has made increasingly strident allegations of illicit conduct by Google and threats of civil and criminal action against it.  *See id.* Exs. 1, 2, 5, 6, 8-10, 13-15, 17, 19, 20, 22, & 25-30.  He has done so despite acknowledging on more than one occasion that any legal action against Google is barred by the "immunity provided by" the CDA as "broadly interpreted" by the courts of the United States.  *Id.* Ex. 12 at 1.  *See also, e.g., id.* Ex. 12 at 1-2; *id.* Ex. 13 at 2:16-20, 4:3-5.

In several letters to Google, the Attorney General has falsely accused it of, among other things, "aiding and abetting" and even "encourag[ing] . . . illegal activity."  *Id.* Ex. 5 at 3.  He has characterized Google as an "accessory before the fact" in criminal conduct, *id.* Ex. 2 at 1, asserted it has "no corporate conscience for the safety of its customers," *id.* Ex. 17 at 1, and claimed that Google "facilitates and profits from numerous illegal online activities," *id.* Ex. 17 at 2.  *See also id.* Ex. 15 at 3 (page 1 of the draft letter).  He has threatened to "take legal action to change [Google's] behavior," *id.* Ex. 2 at 3, outlining "[p]ossible [c]auses of [a]ction" against Google in a presentation to the National Association of Attorneys General ("NAAG"), *id.* Ex. 10 at 53-57, sending numerous requests for information, *see, e.g., id.* Exs. 1, 5, & 22, and a broad litigation hold notice, *id.* Ex. 8.  The Attorney General has demanded in several meetings that Google pre-screen or block third-party content and search results that merely may involve illegal activity, even at the cost of burdening lawful, protected speech.  *See, e.g., id.* Ex. 2 at 2; *id.* Ex. 22 at 2; *id.* Ex. 27 at 5:13-6:24, 7:16-8:14.  He has even sought a "24-hour link through which attorneys general[]" can request that links to particular websites be removed from search results

"within hours," presumably without judicial review or an opportunity for operators of the target websites to be heard. *Id.* Ex. 5 at 3.

The Attorney General has criticized Google in public appearances, even publicizing a letter to Google under his signature, but largely written by lawyers for the movie industry, that inaccurately claimed "overwhelming evidence shows that Google facilitates and profits from numerous illegal online activities . . . ." *Id.* Ex. 17 at 2. *See also* Nick Wingfield & Eric Lipton, *Google's Detractors Take Their Fight to the States*, N.Y. Times, Dec. 16, 2014. He has repeated these allegations and threats at public meetings of the NAAG, *see, e.g.*, Neiman Decl. Ex. 9 at 9:6-19, 24:8-23; *id.* Ex. 27 at 3-9, at one point falsely accusing Google of intentionally "manipulat[ing]" its algorithm to include and promote sites with allegedly infringing content in search results, and calling upon other attorneys general to "issue civil investigative demands" if Google did not change its policies in the ways he was proposing, *id.* Ex. 9 at 8:12-16. *See also id.* Ex. 9 at 24:14-23.

The Attorney General has cited no evidence at all of misconduct by Google to back up these inflammatory allegations. He has instead identified a handful of web pages among the trillions reflected in Google's index, and a smattering of videos amongst the millions of hours watched every month on YouTube, and asserted that some of the content of those websites and videos (all created by third parties) is unlawful. *See, e.g.*, *id.* Ex. 10 at 4-11, 14-20, 23-26, 30-34, 38-40, 45-52; *id.* Ex. 20; *id.* Ex. 25 at 1-9; *id.* Ex. 26. He has noted that advertising occasionally appears alongside the videos about which he complains. *See, e.g.*, *id.* Ex. 5 at 3; *id.* Ex. 6 at 1; *id.* Ex. 9 at 9:14-19; *id.* Ex. 14 at 1; *id.* Ex. 17 at 7, 9, & 11; *id.* Ex. 19 at 1; *id.* Ex. 22 at 2. And he has criticized some of Autocomplete's algorithmically-generated predictions. *See, e.g.*, *id.*

Ex. 2 at 2; *id.* Ex. 5 at 2; *id.* Ex. 8 at 2; *id.* Ex. 9 at 5:17-6:3, 6:11-13, 11:22-25, 16:19-17:6, 23:4-13; *id.* Ex. 13 at 3:9-17; *id.* Ex. 17 at 5-6, 10.

Whatever that says about the actions of those who created and developed the content about which the Attorney General complains, it in no way implies that Google has violated the law. Given the vast quantity of third-party content available on the Internet, it is no surprise that some small percentage of the information found via Search or posted on YouTube is inappropriate or unlawful. Statutes such as the CDA and DMCA accept the inevitability of problematic content online as the cost of a free and open Internet, and squarely immunize Google and other interactive service providers from liability arising from such third-party content.

The Attorney General has been particularly focused on websites containing allegedly infringing content protected by copyright. He has demanded that Google promote in its search results sites that have been endorsed by Hollywood, display an icon alongside such favored sites in its results, and de-index sites "substantially dedicated to intellectual property infringement." *Id.* Ex. 17 at 5. While these changes might suit the business interests of certain copyright holders,[4] the Attorney General has never explained the source of *his* authority to pursue alleged

---

[4] According to recent press reports, the Motion Picture Association of America (MPAA) launched a "multi-pronged" campaign against Google, including encouraging state attorneys general to investigate Google and retaining Jenner & Block to provide legal support. *Project Goliath: Inside Hollywood's Secret War Against Google*, The Verge, Dec. 12, 2014, *available at* http://www.theverge.com/2014/12/12/7382287/project-goliath (hereinafter "The Verge, Project Goliath"). *See also Emails Show Hollywood Worked With A State Attorney General To Push Its Anti-Piracy Agenda*, The Huffington Post, Dec. 18, 2014, *available at* http://www.huffingtonpost.com/2014/12/18/movie-piracy_n_6348256.html (hereinafter "HuffPo, Hollywood Worked With AG"). Jenner & Block drafted a letter the Attorney General sent to Google in November 2013. *See* Neiman Decl. Ex. 15; *id.* Ex. 16. In advance of a meeting with Google in January 2014, Jenner & Block Partner Thomas J. Perrelli prepped the Attorney General and "got him focused on the key issues and the asks." HuffPo, Hollywood Worked With AG. Press reports further indicate the MPAA knew of the Subpoena before it was served on Google and planned to leverage it to obtain concessions from Google. *See* HuffPo, Hollywood Worked With Attorney General; The Verge, Project Goliath.

copyright infringement, an area regulated exclusively by federal law, or to demand a remedy—whole site removal—Congress explicitly rejected. Nor, more generally, has he explained how his demands can be reconciled with the "unfettered" Internet the CDA mandates.

Nevertheless, Google has worked to address the Attorney General's concerns. *See, e.g.,* Neiman Decl. Exs. 3, 4, 7, 11, 18, 21, & 23. In response to his questions, Google provided over one-hundred pages of written answers detailing its policies and practices for voluntarily combating abuse across its services, and voluntary shared nearly 100,000 pages of supporting documents. YouTube engineers even created a custom reporting tool and trained the Attorney General's office on how to use it so that they could report for expedited review and possible removal videos they deemed objectionable. *See* Grand Decl. ¶ 21. To date, over half a year later, the Attorney General has used this tool to report only seven videos.[5] *See id.* Nor, to the best of Google's knowledge, has the Attorney General filed any legal action against any of the actual creators of the specific underlying content to which he has objected. Google has also explained the applicability of CDA immunity and the DMCA safe-harbor provisions to services like Google, as well as the constitutional concerns raised by his demands. *See, e.g.,* Neiman Decl. Ex. 3 at 1, 3-4, 6; *id.* Ex. 7; *id.* Ex. 11 at 2-5, 8, 10-13; *id.* Ex. 18; *id.* Ex. 23 at 3-4, 7.

Ignoring both the law and the evidence Google has presented, the Attorney General has continued to target Google by, amongst other things: (1) making and fulfilling threats to serve Google with a retaliatory civil investigative demand, *see id.* Ex. 9 at 8:8-16, 24:18-23; *id.* Ex. 30, (2) threatening to encourage and actively encouraging other state attorneys general do likewise,

---

[5] That represents less than 0.000004% of the YouTube videos on which Google independently took action for policy violations in 2014.

*see id.* Ex. 5 at 3; *id.* Ex. 9 at 8:8-16, 24:14-23,[6] and (3) threatening to prosecute Google, and

encouraging other state attorneys general to do so. *See id.* Ex. 10 at 53-57; *id.* Ex. 30 at 1-2.

### E.     The Subpoena

On October 27, 2014, the Attorney General followed through on his long-stated threat to

serve Google with a punitive and burdensome subpoena (the "Subpoena")—79 pages

propounding 141 document requests and 62 interrogatories. *See* Neiman Decl. Ex. 30.[7] The

Subpoena asserts that the Attorney General has "reasonable grounds to believe" that Google has

violated the MCPA. *Id.* at 1. But it takes a sweeping view of what third-party content

potentially gives rise to liability for Google. Specifically, the Subpoena demands extensive

information about "Illegal Content," which the Subpoena defines as not just content that violates

Mississippi law, but also "*any* information that . . . has *indicia* that it *could*, either directly,

indirectly or *tangentially*, promote, facilitate, encourage, aid or abet activity that *could be* in

violation of any criminal or civil law of the United States or that of any state or territory." *Id.* at

7 ¶ 9 (emphases added). The Subpoena further demands information about all "Dangerous

Content," which includes not only information that actually causes harm, but also "information

that . . . has *indicia* that it *could*, in *any way*, either directly, indirectly or *tangentially*, aid, abet,

assist, facilitate, encourage or promote activity that *could lead* to physical harm or injury." *Id.* at

4 ¶ 3 (emphases added).

---

[6] In October 2013, Patrick Lynch, a lobbyist representing Google's competitors, emailed state
attorneys general to urge them to press Google. He wrote that "the voice and authority of
Attorneys General, either individually or collectively, are key to changing Google shift behavior
[sic]—to put them under real pressure via CIDs [civil investigative demands] and depositions."
*See Rhode Island Attorney General Turns Attorney General Lobbyist*, N.Y. Times, Oct. 28,
2014, *available at* http://www.nytimes.com/interactive/2014/10/28/us/5-Rhode-Island-Attorney-
General-Turned-Attorney-General-Lobbyist.html (pages 62, 63 of PDF).

[7] The Subpoena is long enough to require a table of contents.

The Subpoena makes crystal clear that it demands information about activities immunized by the CDA. The Subpoena's first definition states that "aiding and abetting"—a term incorporated into most other requests—includes any conduct "regardless of whether or not the act or acts would be protected or immunized under the [CDA]." *Id.* at 4 ¶ 1.

The Subpoena demands the production of an extraordinarily broad array of information. In order to respond to the Subpoena in full, Google would have to produce millions of documents, at great expense and disruption to its business.[8]

### III. GOVERNING STANDARD

An applicant for a preliminary injunction or temporary restraining order must show: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of an irreparable injury without preliminary relief; (3) threatened injury that outweighs potential harm to the preliminarily-enjoined party; and (4) that granting preliminary relief will not disserve the public interest. *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012). Where the party seeking the injunction "will be more severely prejudiced by a denial of the injunction than defendant would be by its grant," a lower probability of success suffices. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576-77 (5th Cir. 1974).

### IV. ARGUMENT

The Attorney General's course of conduct violates federal law and burdens the constitutional rights of Google and millions of Americans (including Mississippians) who use Google services to help access publicly available content on the Internet. Google seeks a temporary restraining order and preliminary injunction to enjoin the Attorney General from

---

[8] The Attorney General has declined requests to narrow the subpoena to exclude conduct immunized by the CDA or pre-empted by other federal law. *See* Neiman Decl. ¶¶ 32 & 34.

taking retaliatory action to enforce the Subpoena and pursuing the threatened enforcement action against Google until Google's statutory and constitutional claims can be fully briefed and heard. Google would be irreparably injured in the absence of preliminary injunctive relief, while the Attorney General's legitimate interests would not be measurably prejudiced by the resulting delay. The public interest in a free and open Internet overwhelmingly weighs in favor of relief.

### A. Google Will Succeed on the Merits of Its Claims

The Subpoena and threatened civil or criminal charges violate multiple constitutional and statutory provisions, each of which offers an independent basis to issue the requested order and injunction. Google need only have a substantial likelihood of success on *one* of its claims. As discussed below, the Subpoena and threatened enforcement action should be enjoined under the CDA, the First Amendment, and the Fourth Amendment, and are in large part preempted by the Copyright Act and by the Food, Drug, and Cosmetic Act.[9]

#### 1. The Communications Decency Act Immunizes the Conduct Under Scrutiny

Section 230 of the CDA grants interactive computer services broad immunity from state regulation with respect to their role in making accessible content created and developed by others. Because Google did not create or develop the third-party content on which the Attorney General focuses, the CDA precludes the Attorney General's inquiry.

---

[9] There is no basis for the Court to abstain from exercising jurisdiction here. *Sprint Comm'ns Inc. v. Jacobs*, 134. S. Ct. 584, 588 (2013) ("In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter."). Here, there is not even a state proceeding pending. *Major League Baseball v. Butterworth,* 181 F. Supp. 2d 1316, 1321 n.2 (N.D. Fla. 2001) (Attorney General's CID not a state proceeding for abstention purposes), *aff'd*, 331 F.3d 1177 (11th Cir. 2003).

### a. The CDA Provides "Broad Immunity"

In 1996, Congress created CDA immunity to preserve the "extraordinary advance in the availability of educational and informational resources" brought by the Internet and interactive computer services. 47 U.S.C. § 230(a)(1); *see also id.* § 230(b) (articulating the "policy of the United States"). Congress sought to ensure that the Internet remained a "forum" for free-ranging intellectual inquiry and diverse political and cultural discourse, and a "vibrant and competitive free market . . . unfettered by Federal or State regulation." *Id.* § 230(a)(3), (b)(2). CDA immunity was—and is—essential to the Internet's status as an open, democratized forum for the world.

The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). It declares that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). And to promote voluntary efforts to address inappropriate content, the CDA protects interactive computer services that, like Google, filter out some third-party content from a claim that doing so creates a duty to filter out other types of content. *Id.* § 230(c)(1)-(2).

Courts throughout the country, including the Fifth Circuit, have held that "Congress provided broad immunity under the CDA to Web-based service providers for all claims stemming from their publication of information created by third parties . . . ." *MySpace*, 528 F.3d at 418; *see also Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 406 (6th Cir. 2014); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123-24 (9th Cir. 2003); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007); *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003); *Ben Ezra, Weinstein, & Co. v. Am. Online, Inc.*, 206 F.3d 980, 984-86 (10th Cir. 2000); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir.

1997).  Congress deliberately chose "not to deter harmful online speech" by "imposing tort

liability on companies that serve as intermediaries," *Lycos*, 478 F.3d at 418, because the risk of

such liability posed a "threat . . . to freedom of speech in the new and burgeoning Internet

medium," *Zeran*, 129 F.3d at 330.

Given the expansion of the Internet since 1996, that threat is even greater today.  When

the CDA was passed, "commercial online services had almost 12 million individual subscribers,"

*Reno v. ACLU*, 521 U.S. 844, 850-51 (1997), which led to a "staggering" quantity of information

being shared online, *Zeran*, 129 F.3d at 331.  As one Member of Congress noted, companies

would have to deal with content "far larger than our daily newspaper . . . thousands of pages of

information a day."   141 Cong. Rec. H8460-01, H8471 (Aug. 4, 1995).  As a result:

> The specter of tort liability in an area of such prolific speech would
> have an obvious chilling effect.  It would be impossible for service
> providers to screen each of their millions of postings for possible
> problems.   Faced with potential liability for each message
> republished by their services, interactive computer service
> providers might choose to severely restrict the number and type of
> messages posted.  *Congress considered the weight of the speech
> interests implicated and chose to immunize service providers to
> avoid any such restrictive effect.*

*Zeran*, 129 F.3d at 331 (emphasis added).  With the exponential growth in Internet users and

content, *see supra* 6-8, these considerations have only grown more compelling.

The CDA's "broad immunity" includes protection from enforcement actions under state

law. *Compare* 47 U.S.C. § 230(e)(3) (barring action under "any State or local law") *with id.* §

230(e)(1) (permitting enforcement of "Federal" criminal statutes); *see, e.g., Backpage.com, LLC

v. McKenna*, 881 F. Supp. 2d 1262, 1275 (W.D. Wash. 2012) (immunity applies to state law

criminal action); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 967-68 (N.D. Ill. 2009) (state law

nuisance action).  Indeed, in a 2013 letter to congressional leaders, the Attorney General, along

with 46 other state attorneys general, conceded that "[f]ederal courts have broadly interpreted the

immunity provided by the CDA" and acknowledged that "the [CDA] prevents State and local law enforcement agencies from prosecuting [Internet platforms]." Neiman Decl. Ex. 12 at 1. *See also id.* Ex. 10 at 54.

Numerous courts have held that CDA immunity bars actions under state consumer protection laws like the MCPA. *See, e.g., Perfect 10, Inc. v. CCBILL LLC*, 488 F.3d 1102, 1119, 1121 (9th Cir. 2007); *Green*, 318 F.3d at 473; *see also Am. Income Life Ins. Co. v. Google Inc.*, No. 2:11-CV-4126-SLB, 2014 WL 4452679, at *15 (N.D. Ala. Sept. 8, 2014) (holding CDA immunized Google from claim under Alabama consumer law).

This broad immunity against state enforcement actions protects Internet service providers from facing possibly conflicting demands from multiple state regulators as to content that "may be viewed across the Internet, and thus in more than one state at a time." *Perfect 10*, 488 F.3d at 1118. Requiring providers to conform with such conflicting demands would be "contrary to Congress's expressed goal of insulating the development of the Internet from the various state-law regimes." *Id.*

The CDA also bars subpoenas pertaining to immunized conduct. The immunity Congress provided would be hollow if state officials could coerce Internet service providers by making endless burdensome demands for information about immunized conduct.[10] Courts have recognized that requiring service providers to respond to discovery demands can itself "deny an interactive service provider the immunity authorized by the [CDA]." *Ben Ezra*, 206 F.3d at 986

---

[10] A subpoena limited to seeking the facts necessary to determine whether immunity exists would be a different matter. Google has already voluntarily provided the Attorney General with information sufficient to establish that Google did not create or develop any of the content to which the Attorney General has objected. *See* Neiman Decl. ¶ 33; *id.* Ex. 3; *id.* Ex. 4; *id.* Ex. 7; *id.* Ex. 11; *id.* Ex. 18; *id.* Ex. 21; *id.* Ex. 23. The Attorney General, however, has declined to withdraw or narrow the Subpoena. *See* Neiman Decl. ¶¶ 32, 34.

(internal quotation marks omitted); *see also Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 995 n.16 (5th Cir. 1995) ("[I]mmunity means more than just immunity from liability; it means immunity from the burdens of defending a suit, including the burdens of pretrial discovery"). As the Fourth Circuit explained:

> Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process. As we have often explained in the qualified immunity context, 'immunity is an immunity from suit rather than a mere defense to liability' and 'it is effectively lost if a case is erroneously permitted to go to trial.' We thus aim to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254-55 (4th Cir. 2009) (citations omitted). *See also Doe v. Bates*, No. 5:05-CV-91-DF-CMC, 2006 WL 3813758, at *10 (E.D. Tex. Dec. 27, 2006) (holding that delay in ruling on CDA immunity would "defeat one of the fundamental purposes of the immunity, namely to insulate service providers . . . from the burdens of litigation, including . . . discovery"). Enforcement of the Subpoena—which, as discussed below, is aimed almost entirely at immunized conduct—would strip away the very protections Congress provided to interactive computer services like Google.

### b.     The CDA Immunizes Google's Conduct

CDA immunity generally exists when (1) the defendant claiming immunity is "a provider . . . of an interactive computer service," (2) the allegedly unlawful content was "provided by another information content provider," and (3) the plaintiff's claims seek to "treat[]" the defendant as the "publisher or speaker" of that information. 47 U.S.C. § 230(c)(1). *See also Ben Ezra*, 206 F.3d at 984-85. All three elements are met here.

*First*, as federal courts have repeatedly held, Google—as the provider of a search engine service, the operator of online advertising platforms, and content host on YouTube—is a

provider of an "interactive computer service" under the CDA. *See, e.g., Am. Income Life Ins. Co.*, 2014 WL 4452679, at *8; *O'Kroley v. Fastcase, Inc.*, No. 3-13-0780, 2014 WL 2881526, at *2 (M.D. Tenn. June 25, 2014); *Rosetta Stone Ltd. v. Google, Inc.*, 732 F. Supp. 2d 628, 632 (E.D. Va. 2010), *aff'd*, 676 F.3d 144 (4th Cir. 2012); *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117, 1122-23 (E.D. Cal. 2010); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198 (N.D. Cal. 2009); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 630-31 (D. Del. 2007); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 500-01 (E.D. Pa. 2006), *aff'd*, 242 F. App'x 833 (3d Cir. 2007); *Gavra v. Google Inc.*, No. 5:12-CV-06547-PSG, 2013 WL 3788241, at *1 (N.D. Cal. July 17, 2013).

*Second*, all of the third-party content that is targeted by the Attorney General's Subpoena and threatened enforcement actions against Google was created and developed by "another information content provider." Google simply does not create or develop the third-party content that the Attorney General deems objectionable. *See Am. Income Life Ins. Co.*, 2014 WL 4452679, at *8 (dismissing complaint where the plaintiff "fail[ed] to allege that defendant Google created the [web page] content" at issue); *Obado v. Magedson*, No. CIV. 13-2382 (JAP), 2014 WL 3778261, at *6 (D.N.J. July 31, 2014) ("suggested search terms auto-generated by a search engine do not remove that search engine from the CDA's broad protection"); *see also* Grand Decl. ¶ 20; Downing Decl. ¶ 19; Chhabria Decl. ¶ 28; Neiman Decl. Ex. 10; *id.* Ex. 20; *id.* Ex. 25; *id.* Ex. 26. That is true even if Google provided neutral tools that were used to create the objectionable content. *See Gavra*, 2013 WL 3788241, at *2 (YouTube "[m]erely provid[ed] third parties with neutral tools to create web content"); *Goddard*, 640 F. Supp. 2d at 1198 ("Google's Keyword Tool is a neutral tool. It does nothing more than provide options that advertisers may adopt or reject at their discretion."). And that would be true even if Google was on notice of objectionable content. *Lycos*, 478 F.3d at 420.

*Third*, the Attorney General's theory—that it is an unfair trade practice for Google to make this third-party content accessible—treats Google as the publisher or speaker of the third-party content. *See, e.g.*, Neiman Decl. Ex. 2 at 2; *id.* Ex. 5 at 3; *id.* Ex. 10 at 53-60; *id.* Ex. 30 at 2. The Attorney General seeks to penalize Google for failing to screen out all disfavored third-party content. *See, e.g., id.* Ex. 2 at 2; *id.* Ex. 5 at 2-3; *id.* Ex. 8 at 2; *id.* Ex. 9 at 12, 13:19-14:8; *id.* Ex. 10 at 53-60; *id.* Ex. 17 at 3-8; *id.* Ex. 22 at 2; *id.* Ex. 27 at 5:18-6:24. But the CDA immunizes "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc). Federal courts have consistently rejected actions that seek to impose liability on Google for third-party content. *See, e.g., Getachew v. Google, Inc.*, 491 F. App'x 923, 925-26 (10th Cir. 2012) (Search); *Gavra*, 2013 WL 3788241, at *2 (YouTube); *Stayart v. Google, Inc.*, 783 F. Supp. 2d 1055, 1056-58 (E.D. Wis. 2011) (Autocomplete), *aff'd*, 710 F.3d 719 (7th Cir. 2013); *Jurin*, 695 F. Supp. 2d at 1122-23 (Ads). Nor does the fact that YouTube sometimes shares advertising revenue with third-party content providers change the analysis. *See Nasser v. WhitePages, Inc.*, Civil Action No. 5:12CV-097, 2013 WL 6147677, at *4 (W.D. Va. Nov. 22, 2013) ("Neither is immunity lost when the interactive service provider pays a third party for the content at issue, and essentially becomes a 'distributor' of the content." (footnote omitted)); *Blumenthal v. Drudge*, 992 F. Supp. 44, 49-53 (D.D.C. 1998) (AOL's immunity extended to statements by Drudge, despite AOL paying Drudge a monthly fee to disseminate his content, having the right to edit that content, and promoting that content to users).

### 2. Google's Activities Are Protected By the First and Fourteenth Amendments of the United State Constitution

The First Amendment stands as a bulwark against government efforts to control the availability of information. The Attorney General's actions violate the First Amendment in three distinct ways: (1) by regulating Google's speech based on its content; (2) by retaliating against Google for its protected speech; and (3) by seeking to place unconstitutional limits on the public's access to information.

### a. The Attorney General Is Regulating Google's Protected Speech Based on Its Content

Every court to consider the issue has concluded that search results lie at the core of the First Amendment's free speech protections. *See Jian Zhang*, 10 F. Supp. 3d at 436. Search results are a form of editorial judgment—"opinions of the significance of particular web sites as they correspond to a search query." *Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457-M, 2003 WL 21464568, at *4 (W.D. Okla. May 27, 2003); *see also Jian Zhang* 10 F. Supp. 3d at 437-41 (search engine rankings are protected speech); *Langdon*, 474 F. Supp. 2d at 630 (same). In the same way that a newspaper publisher's selection of what third-party speech to print is protected by the First Amendment, *see Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241 (1974), so too does the First Amendment protect Google's selection and ordering of third-party web content in its search results. And just as the First Amendment protects a cable television provider's supply of a system for delivering third-party "news, information, and entertainment," *see Leathers v. Medlock*, 499 U.S. 439, 444 (1991), so too is YouTube's provision of a platform for viewing third-party "news, information, and entertainment" protected by the First Amendment. *See also Zieper v. Metzinger*, 392 F. Supp. 2d 516, 530-32 (S.D.N.Y. 2005) (First Amendment protects a website hosting third-party video content), *aff'd on other grounds*, 474 F.3d 60 (2d Cir. 2007).

- 22 -

The Attorney General has made clear that he disagrees with how Google exercises editorial judgment in the composition of its search results and YouTube content, and wishes to force Google to adopt editorial judgments that he would prefer. For content he disfavors, he asks that Google censor from search results links to websites that are readily available on the Internet, regardless of whether any court has found them unlawful, and has even gone so far as to demand that certain search terms themselves be banned.[11] *See, e.g.*, Neiman Decl. Ex. 2 at 2; *id.* Ex. 5 at 2-3; *id.* Ex. 9 at 12, 13:19-14:8; *id.* Ex. 10 at 58-60; *id.* Ex. 17 at 3-8; *id.* Ex. 22 at 2; *id.* Ex. 27 at 5:18-6:24. The Attorney General has also demanded that links to disfavored content be demoted in search rankings and marked with a warning to users. *See, e.g.*, *id.* Ex. 9 at 12; *id.* Ex. 17 at 5; *id.* Ex. 22 at 2. Conversely, he has asked Google to promote favored content (*e.g.*, Hollywood-approved websites) by raising its standing in search results and indicating its favored status with an icon. *See, e.g*, *id.* Ex. 9 at 12, 23:4-13; *id.* Ex. 17 at 5. Such demands by a government official to displace a private party's editorial judgment in order to favor certain speech or speakers over others strike at the heart of the First Amendment. *See Tornillo*, 418 U.S. at 254-58; *Jian Zhang*, 10 F. Supp. 3d at 437-41.

There is no doubt that threats of civil and criminal liability for disfavored speech are sufficient to sustain a claim for injunctive and declaratory relief. "[T]he First Amendment prohibits government officials from encouraging the suppression of speech in a manner which can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Zieper*, 474 F.3d at 65-66

---

[11] Google will remove links to a website from its search results upon receipt of a valid court order, an option that others have used. *See, e.g.*, *Richemont Int'l S.A. v. Tony Chen*, No. 12-CV-6689-WHP, Dkt. No. 51 (S.D.N.Y. Mar. 1, 2013) (order to disable and transfer Defendants' newly-detected domains).

(internal quotation marks omitted). *See also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-69

(1963) ("the threat of invoking legal sanctions and other means of coercion, persuasion, and

intimidation" can violate the First Amendment); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917

(9th Cir. 2012) (*en banc*) (valid First Amendment claim where defendant allegedly issued

"broad" subpoenas and took other threatening steps).

Here, the Attorney General has repeatedly threatened Google with prosecution if it does

not accede to his content-based demands for altering its constitutionally-protected judgments as

to the selection and organization of third-party content (*e.g.*, search results). The Attorney

General has already acted on these threats, issuing his enormously burdensome subpoena after

Google did not "make some of these changes that [he has] been suggesting." Neiman Decl. Ex.

9 at 8:10-11. The Attorney General's efforts to regulate the content of Google's speech through

threats and investigative burdens violates the First Amendment and must be enjoined.

        **b.**    **The First Amendment Forbids Retaliation For Protected Speech**

"Official reprisal for protected speech offends the Constitution" because it "threatens to

inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal

quotation marks omitted). "Any form of official retaliation for exercising one's freedom of

speech, including prosecution, threatened prosecution, bad faith investigation, and legal

harassment, constitutes an infringement of that freedom." *Izen v. Catalina*, 398 F.3d 363, 367

n.5 (5th Cir. 2005)[12]; *see also Lacey*, 693 F.3d at 917 (retaliation claim based on investigation

---

[12] Plaintiffs alleging retaliation who are public employees or public officials in the hurly-burly of the political arena must show an injury amounting to an adverse employment action. *See, e.g.*, *Colson v. Grohman*, 174 F.3d 498, 514 (5th Cir. 1999) (dismissing retaliation claim where "allegedly retaliatory crusade amounted to no more than the sort of steady stream of false accusations and vehement criticism that any politician must expect to endure"). Google need not

and arrest); *Pendleton v. St. Louis Cnty.*, 178 F.3d 1007, 1011 (8th Cir. 1999) (retaliation claim premised in part on "fabricated" investigation); *Little v. City of N. Miami*, 805 F.2d 962, 968 (11th Cir. 1986) (retaliation claim based on "subjecting [plaintiff] to official investigation"). To enjoin retaliatory conduct, a plaintiff must show (1) that the speech retaliated against was constitutionally protected, and (2) that the retaliatory conduct "was motivated at least in part by a purpose to retaliate for" that speech; if these burdens are met, the defendant must show it would have taken the same action "even had the impermissible purpose not been considered." *See Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979). In assessing the final factor, a court should consider if "the State prosecution [or action] was undertaken with no hope of a valid conviction [or success]." *Id.* at 1387 n.22.

The Attorney General's conduct falls squarely within this prohibition. *First*, as discussed above, the Google practices at issue are clearly protected by the First Amendment and federal law. *Second*, there is no doubt that the Attorney General has been "motivated in part" by retaliation—he has overtly expressed his intent to use every available means to punish Google for failing to comply with his demands. For example, at the June 18, 2013, NAAG meeting the Attorney General explained that he "told [Google] if you don't . . . work with us to make some of these changes that we've been suggesting since November, then I'm going to call on my colleagues to issue civil investigative demands or subpoenas." Neiman Decl. Ex. 9 at 8:8-13.

The Attorney General did that and more. He called upon other attorneys general to "issue civil investigative demands" at the June 18, 2013 NAAG meeting, *id.* Ex. 9 at 24:19; called for divestment in Google, including by Mississippi's "public employees retirement system," *id.* Ex.

---

satisfy this standard, *see Izen*, 398 F.3d at 367 n.5, though the retaliatory conduct described above is sufficiently punitive under any standard.

9 at 25:3-10; encouraged his fellow attorneys general to blacklist Google through calls for

divestment, *id.*; sent messages to Google's advertisers encouraging them to "pull their ads," *id.*

Ex. 9 at 25:16-17; and repeatedly threatened prosecution and civil litigation, *see, e.g., id.* Ex. 9;

*id.* Ex. 10 at 53-57; *id.* Ex. 30 at 1-2. The Attorney General's subpoena is the latest step in this

sustained campaign being urged so aggressively by Hollywood.[13]

      The Attorney General cannot show that he would have taken these actions absent a

retaliatory motive. He has admitted a retaliatory purpose. And any civil or criminal action under

the MCPA "has no hope of a valid conviction" or successful verdict—Google's conduct is

clearly immunized by the CDA and protected by the First Amendment. The Attorney General's

retaliatory Subpoena and enforcement threats should be enjoined.

> ### c. The Attorney General Would Limit Access To Constitutionally Protected Content

      State enforcement actions targeting unprotected speech can violate the First Amendment

by limiting the "public's access to constitutionally protected matter." *Smith v. People of*

*California*, 361 U.S. 147, 153 (1959). A state may not penalize a bookseller for unknowingly

offering obscene material because he would then "tend to restrict the books he sells to those he

has inspected," and the limits on his ability to inspect content would "tend to restrict the public's

access to [content] which the State could not constitutionally suppress directly." *Id.* at 153-54.

Similarly, a state may not sanction a magazine for unknowingly publishing unlawful

advertisements because "publishers cannot practicably be expected to investigate each of their

---

[13] There is evidence that the Attorney General coordinated this campaign with the Digital Citizens Alliance (the "DCA"), an anti-Google group used by lobbyists to further the agendas of their business clients. *See* Neiman Decl. Ex. 24 (lobbyist inquiring as to whether the DCA and "industry folks" should attend a February 24, 2014, meeting in advance of the Attorney General's meeting with Google that same day); *id.* Ex. 25 (draft DCA report provided to Google by the Attorney General at the February 24, 2014, meeting).

advertisers," and the risk of sanction could lead a publisher to reject advertisements that "could conceivably be deemed objectionable by the [government]," which would deprive the public of access to protected speech, and the potential advertisers an "avenue of access to the public." *MANual Enters., Inc. v. Day*, 370 U.S. 478, 493 (1962).

Federal and state laws echo this constitutional principle. As discussed above, the CDA immunizes Internet platforms from state regulation over third-party content in order to avoid chilling the free flow of information to the public. And the DMCA requires removal only of infringing content specifically, not the entire page or site on which it appears. Similarly, the MCPA itself immunizes from liability "a newspaper, periodical, printing shop, directory or radio or television station [for] the publication or dissemination of an advertisement, when [it] did not have knowledge of the false, misleading or deceptive character of the advertisement and did not have a direct financial interest in the sale or distribution of the advertised product or service." Miss. Code Ann. § 75-24-7. *See also* Miss. Code Ann. § 97-23-3 (immunizing publishers from criminal liability where they lacked knowledge of the false or deceptive character of the advertisement).

This First Amendment principle applies even more strongly to Internet platforms like Google, which provide the public an "avenue of access" to not just a store's worth of books or a magazine's worth of advertisements, but links to trillions of web pages, billions of advertisements, and millions upon millions of hours of video. The Attorney General's efforts to coerce Google to pre-screen all speech, if successful, would inevitably restrict the flow of protected speech to the public.

That unconstitutional restriction would result even if the Attorney General were targeting only unprotected speech. However, the Subpoena makes clear that his intended reach is much

broader. It demands information regarding any display of "Dangerous Content" or "Illegal Content," categories it defines with extraordinary breadth. "Dangerous Content," for example, as defined in the Subpoena would include YouTube videos of high school football games, cheerleading competitions, and countless other activities that "could lead to physical harm or injury." Neiman Decl. Ex. 30 at 4 ¶ 3. Similarly, "Illegal Content" would encompass search results listing sales of fishing equipment or radar detectors permitted in some states but not others, and YouTube videos discussing upcoming civil protests because such videos may "indirectly or tangentially[] promote[] . . . [or] encourage[] . . . activity that could be in violation of [the] . . . law of . . . [a] state . . . ." *Id.* at 7 ¶ 9. Additionally, the Attorney General's demand that Google Search block entire websites because of a *portion* of their hosted content would, if met, necessarily limit access to protected speech. The Attorney General may be willing to padlock the library door rather than pull the objectionable books from the shelves, but the First Amendment denies him that option. On this record, there can be no doubt that his efforts to coerce Google unconstitutionally endanger the public's access to protected speech.

### 3. Defendant's Subpoena Violates the Fourth and Fourteenth Amendments of the United State Constitution

An administrative subpoena for records is a search subject to Fourth Amendment reasonableness limitations and must be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *See v. City of Seattle*, 387 U.S. 541, 544 (1967); *see also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (Fourth Amendment requirements allow subpoena recipient "to question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court."); *Oklahoma Press Publ'g Co. v. Walling*, 327

U.S. 186, 208 (1946) ("The gist of the protection is in the requirement . . . that the disclosure sought shall not be unreasonable.").

These requirements must be applied with "scrupulous exactitude" where "the materials sought to be seized *may* be protected by the First Amendment." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (internal quotation marks omitted) (emphasis added). Otherwise, as the Supreme Court has long cautioned, the "unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Marcus v. Search Warrants*, 367 U.S. 717, 729 (1961). Here, where the Attorney General's subpoena overtly demands detailed information about the protected speech of both Google and many individual Internet users, *see supra* §§ II.B & IV.A.2, exacting Fourth Amendment scrutiny is warranted.

The Subpoena fails Fourth Amendment standards. It is vastly overbroad. It seeks information pertaining to conduct protected by both the CDA and the First Amendment. A subpoena probing such lawful conduct is unreasonable *per se*. *See Crist*, 331 F.3d at 1187 ("[I]nvestigations premised solely upon *legal* activity are the very type of 'fishing expeditions' that" the Supreme Court has held violate the Fourth Amendment and "do[] not pass muster under any standard") (citations omitted). The Attorney General has cast his net unreasonably wide as well, for the Subpoena contains no overall time limits and requires the production of millions of documents having nothing to do with Google's current practices and is thus unlikely to lead to relevant information.

### 4. Individual Federal Laws Preempt Several Aspects of the Subpoena

#### a. The Federal Copyright Act, including the DMCA, Preempts Much of the Subpoena

The Court should also enjoin the Subpoena and threatened prosecution insofar as it pertains to alleged MCPA violations that would be preempted by the federal Copyright Act,

including the DMCA. The Copyright Act "completely preempts the substantive field" such that "it converts an ordinary state common-law complaint into one stating a federal claim[.]" *GlobeRanger Corp.*, 691 F.3d at 705-06.[14]

Much of the Attorney General's investigation is preempted because it rests upon alleged violations of federal copyright law. *See People v. Williams*, 920 N.E.2d 446 (Ill. 2009) (affirming appellate court's reversal of conviction because Copyright Act pre-empted state antipiracy law); *State v. Perry*, 697 N.E.2d 624 (Ohio 1998) (holding that Copyright Act pre-empted prosecution of state charges of unauthorized use of computer software ). The Subpoena includes a substantial section titled "Stolen Intellectual Property"—thirteen document requests and two interrogatories seeking information premised upon direct or contributory copyright infringement. Neiman Decl. Ex. 30 at 71-76. For example, the Attorney General demands the production of "documents . . . concerning the use of Google Services . . . to commit, promote, or facilitate copyright infringement." *Id.* at 72, Document Request No. 119; *see also id.* at 72, Document Request No. 120 (demanding "all documents concerning how Google Search, including search algorithms, . . . promote . . . sites that offer infringing or allegedly infringing content[.]"). More generally, the Subpoena defines "Illegal Content or Conduct/Unlawful Content" as including "content or conduct that violates . . . state or federal laws governing intellectual property," and then incorporates this definition into demands throughout the Subpoena. *Id.* at 7-8, ¶ 9. The Attorney General lacks the authority to enforce the Copyright Act through criminal or civil actions. *See* 17 U.S.C. §§ 501(b), 506; 18 U.S.C. § 2319. And he cannot demand evidence of copyright infringement throughout the Subpoena and then evade

_____

[14] Copyright preemption does not reach pre-1972 sound recordings. 17 U.S.C. § 301(c).

- 30 -

copyright preemption by labeling his investigation as arising under the MCPA. *See Harrell v. St. John*, 792 F. Supp. 2d 933, 942 (S.D. Miss. 2011).

The Subpoena also contains numerous requests for information and documents relating to alleged intellectual property concerns for which Google is immunized under the safe harbor provisions of the DMCA. *See, e.g.*, Neiman Decl. Ex. 30 at 72, Interrogatory No. 60 ("Describe why infringing sites identified in Google's Transparency Report, including 'Specified Domains' that have received hundreds of thousands or millions of takedown notices, still regularly appear on the top of search results."). The DMCA governs the liability of a service provider for copyright infringement by "linking users to an online location containing infringing material . . . using information location tools." 17 U.S.C. § 512(d). The DMCA provides a safe harbor for online service providers, like Google, that remove or disable access to allegedly infringing material upon receiving a qualifying request. *Id.* § 512(c)(1).[15] Permitting states to investigate and prosecute conduct within the federal safe harbor would defy congressional intent and turn copyright preemption on its head. This Court should enjoin the Subpoena and threatened prosecution as preempted insofar as they relate to alleged copyright infringement.

### b. The Federal Food, Drug, and Cosmetic Act Preempts Much of Defendant's Investigation

The Attorney General has also demanded information to support claims that are preempted by the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-399f. The FDCA governs the importation and introduction of prescription drugs into interstate commerce. *See* 21 U.S.C. §§ 331, 384. States may enforce the FDCA in a limited set of circumstances, none of

---

[15] The DMCA makes clear that the safe harbor does not depend "on a service provider monitoring its services or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m).

which apply here. *See* 21 U.S.C. § 337(b)(1) (allowing states to bring actions under the FDCA for violations of the misbranded food provisions of the Act). All other proceedings to enforce the FDCA must be brought "by and in the name of the United States." 21 U.S.C. § 337. This reservation of enforcement authority preempts state actions based upon alleged FDCA violations. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001); *Morris v. PLIVA, Inc.*, 713 F.3d 774, 777 (5th Cir. 2013).

State actions premised on violations of federal law deprive the federal agency of the ability to use its enforcement authority to achieve a "delicate balance of statutory objectives." *Buckman Co.*, 531 U.S. at 348. *See also Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 376 (5th Cir. 2012) (same). Claims based upon traditional tort law principles may not be preempted, but one that "exist[s] solely by virtue" of the regulatory scheme will not proceed. *Lofton*, 672 F.3d at 379. Thus, to avoid preemption, a claim must be based upon conduct "that would give rise to liability under state law even if the FDCA had never been enacted." *Riley v. Cordis Corp.*, 625 F. Supp. 2d 769, 777 (D. Minn. 2009); *Schouest v. Medtronic, Inc.*, 13 F. Supp. 3d 692, 700 (S.D. Tex. 2014).

Here, the Attorney General demands information that could only support claims resting upon an alleged violation of the FDCA. For example, the Attorney General is concerned with the allegation that "Google . . . 'was on notice that most Canadian online pharmacy advertisers . . . geo-targeted their advertisements to consumers in the United States and *imported into the United States* . . . controlled prescription drugs, *in violation of Title 21, United States Code, Section 331(a) and (d)*' . . . ." Neiman Decl. Ex. 30, at 14, Document Request No. 2 (emphasis added); *see also id.*, Document Request No. 3 (requesting documents related to benefits Google allegedly received by aiding Canadian pharmacies). Both of these requests necessarily implicate

two FDCA provisions, 21 U.S.C. §§ 331, 384, which govern the importation and introduction of

drugs into interstate commerce and are enforced solely by the federal government. The

Subpoena and threatened prosecution should be enjoined insofar as they are preempted by the

FDCA.

### B. Google Faces A Substantial Threat Of Irreparable Injury

To demonstrate irreparable injury, a party "need show only a significant threat of injury

from the impending action, that the injury is imminent, and that money damages would not fully

repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir.

1986). A "violation of constitutional rights constitutes irreparable harm[.]" *Cohen v. Coahoma

Cnty., Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992). Specifically, "[t]he loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012)

(internal quotation marks omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Attorney General has already violated Google's First Amendment rights by seeking

to regulate, through coercion, the content of its protected speech (*e.g.*, the creation and ranking of

search results) and by retaliating for its failure to change its practices. Google is imminently

threatened with further injury that will occur if it is forced to choose between (1) conforming its

constitutionally-protected practices to the Attorney General's preferences; and (2) standing on its

rights, and risking a Subpoena enforcement action and prosecution under the MCPA. The

Attorney General also threatens Google's Fourth Amendment rights through an unreasonable,

retaliatory, and burdensome Subpoena.

The Attorney General also causes irreparable injury by violating Google's immunity

under the CDA, similarly forcing Google either to forego immunized conduct or risk prosecution

by the Attorney General. Courts have enjoined subpoenas from and prosecution by attorneys

general in precisely this circumstance, including where only statutory rights were at issue. *See Morales*, 504 U.S. at 381 (upholding injunction against attorneys general when threatened enforcement of preempted state laws forced airlines to choose whether to continually violate the state laws and risk huge liability or violate them once and "suffer the injury of obeying the law" while a test case was pending); *Crist*, 331 F.3d at 1186-89 (enjoining enforcement of attorney general civil investigative demand where league's conduct was immunized by federal law and demand thus violated the Fourth Amendment).

### C. The Attorney General Will Suffer No Harm From Complying With a Temporary Restraining Order and Preliminary Injunction

The injuries facing Google outweigh any harm to the Attorney General from preliminary relief. Google's substantial injuries are described above. In contrast, preliminary relief would only briefly delay this aspect of the Attorney General's course of dealings with Google over the last eighteen months in order to allow Google's claims to be heard. In light of Google's existing practices (which meet or exceed industry standards), its long-running discussions with the Attorney General, and the Subpoena's admittedly punitive purpose, that delay is inconsequential. Importantly, preliminary relief will not prevent the Attorney General from prosecuting actual third-party wrongdoers who created the websites and videos to which he objects.

### D. Issuance of a Temporary Restraining Order and Preliminary Injunction Furthers the Public Interest

In this action, Google seeks to vindicate its own constitutional rights, the First Amendment rights of millions of Internet users to easily publish and access information online, and federal policy favoring an open and accessible Internet. *See* 47 U.S.C. § 230(b)(2). These goals undoubtedly serve the public interest. *See Opulent Life Church*, 697 F.3d at 298 ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (alteration in the original); *White v. Baker*, 696 F. Supp. 2d 1289, 1313 (N.D. Ga. 2010)

("because a constitutional right is at issue, the entry of an injunction would not be adverse to the public interest but would in fact advance it").[16] The failure to issue preliminary relief would harm these interests, while granting preliminary relief will not materially hinder any discernable public interest.

## V. CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court grant its motion for a temporary restraining order and preliminary injunction.

---

[16] Finally, this Court should exercise its discretion not to require Google to post a bond. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). The Attorney General "will not suffer any significant . . . damages if the injunction is granted and later dissolved." *Watkins v. City of Arlington*, No. 4:14-CV-381-O, 2014 WL 3408040, at *14 (N.D. Tex. July 14, 2014). And a bond is unwarranted for an action to vindicate constitutional rights. *See Incubus Invs., L.L.C. v. City of Garland*, No. CIV.A. 303CV2039-K, 2003 WL 23095680, at *4 (N.D. Tex. Dec. 17, 2003) ("[T]o require a bond [for a constitutional challenge] would have a negative impact on [the plaintiff's] constitutional rights, as well as the constitutional rights of the members of the public.").

DATED this 19th day of December, 2014.

Respectfully submitted,

_Fred Krutz_

Fred Krutz, MSB No. 4270
Daniel J. Mulholland, MSB No. 3643
FORMAN PERRY WATKINS
   KRUTZ & TARDY LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201
Post Office Box 22608
Jackson, Mississippi 39225-2608
Phone:  (601) 960-8600
Facsimile:  (601) 960-8613
fred@fpwk.com
mulhollanddj@fpwk.com

*Attorneys for Plaintiff Google Inc.*

OF COUNSEL:
Jamie S. Gorelick
Patrick J. Carome
Paul N. Lekas
Blake C. Roberts
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
jamie.gorelick@wilmerhale.com
patrick.carome@wilmerhale.com
paul.lekas@wilmerhale.com
blake.roberts@wilmerhale.com

Peter G. Neiman
Violetta G. Watson
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone:  (212) 230-8000
Facsimile:  (212) 230-8888
peter.neiman@wilmerhale.com
violetta.watson@wilmerhale.com

# Exhibit 4

**Screen grab of Google search for "download rounders" as of June 12, 2015 at 2:39 PM**



Google     download rounders                                    🔍

Web     Images     Videos     News     Shopping     More ▾     Search tools

About 465,000 results (0.45 seconds)

Ads  Watch Rounders                                    ⓘ

🎮  **Amazon** with free trial

▶  **Google Play** from $2.99

vudu  **VUDU** from $2.99

Download Rounders (1998) YIFY Torrent for 720p mp4 ...
https://www.yify-torrent.org/.../download-rounders-1998-mp4-yify-torre... ▾
**Rounders** (1998):A young man is a reformed gambler who must return to playing big
stakes poker to help a friend pay off loan sharks.

Amazon.com: Rounders: Matt Damon, Edward Norton, Paul ...
www.amazon.com/**Rounders**-Matt.../B00AYB1EY6 ▾  Amazon.com, Inc. ▾
Details. Purchase rights, Stream instantly and **download** to 2 locations Details.
Format, Amazon Instant Video (streaming online video and digital **download**) ...

Rounders[1998]DvDrip[Eng]-Shadow (download torrent) - TPB
https://thepiratebay.la/torrent/.../**Rounders**[1998]DvDrip[Eng]-Shadow ▾
**Download Rounders**[1998]DvDrip[Eng]-Shadow torrent or any other torrent from the
Video Movies. Direct download via magnet link.

Rounders (1998) Torrents | Torrent Butler
https://torrentbutler.eu/10220-**rounders** ▾
**Rounders** 1998. HD. Torrents. To **download** and stream torrents with your iPad, we
recommend Subliss Subliss enables you to torrent directly on your iPad, ...

Watch Movie Rounders (1998) Online Free - SolarMovie
www.solarmovie.ws/watch-**rounders**-1998-online.html ▾
A young man is a reformed gambler who must return to playing big stakes poker to
help a friend pay off loan sharks. **Download " Rounders (1998) "** in HD Quality ...

Rounders (1998) Download YIFY movie torrent - YTS
https://yts.to/movie/**rounders**-1998 ▾
Nov 28, 2012 - A young man is a reformed gambler who must return to playing big
stakes poker to help a friend pay off loan sharks.

Where can I free download the Movie "Rounders" with Matt ...
https://answers.yahoo.com/question/?qid=20080805091756AArL1ju ▾
Aug 5, 2008 - Poker movie, with Matt Damon and Edward Norton from '98.

iTunes - Movies - Rounders
https://itunes.apple.com/us/movie/**rounders**/id436116284 ▾  iTunes ▾
Watch the trailer, read customer and critic reviews, and **download Rounders** directed
by John Dahl for $7.99.

# Exhibit 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | | |
|---|---|---|
| Google Inc., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| | ) | No. 3:14cv981 HTW-LRA |
| *v.* | ) | |
| | ) | **PLAINTIFF GOOGLE INC.'S** |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| Jim Hood, Attorney General of the State | ) | **MOTION FOR A PROTECTIVE** |
| of Mississippi, in his official capacity, | ) | **ORDER WITH RESPECT TO** |
| | ) | **NOTICES OF RULE 30(B)(6)** |
| *Defendant.* | ) | **DEPOSITIONS OF GOOGLE INC.** |
| | ) | |
| | ) | ORAL ARGUMENT REQUESTED |
| | ) | |

# INTRODUCTION

At the March 2, 2015 conference, the Attorney General represented to the Court that it expected its deposition discovery to be "very limited." The Attorney General thereafter served Google with six separate Rule 30(b)(6) deposition notices of extraordinary breadth, requesting testimony and all documents relating to everything from the location of Google's millions of servers to the details of its proprietary search algorithms. This appears to be nothing more than an effort to impose through discovery the very same burdens on Google that this Court has already enjoined the Attorney General from imposing via his 79-page administrative subpoena.[1]

During meet-and-confer discussions, Google explained the vast overbreadth of the notices and the disconnect between the Attorney General's prior representations to this Court and the scope of discovery the Attorney General now seeks; Google also proposed a reasonable compromise. Specifically, Google offered:

1. To make available for deposition under Rule 30(b)(1) the five declarants whose declarations supported the preliminary injunction motion;

2. To provide a Rule 30(b)(6) witness who could describe and explain at a reasonable level of detail the workings of the various Google services described in the Complaint: Search, Autocomplete, YouTube, AdWords, and AdSense, along with a service not described in the Complaint about which the Attorney General had expressed interest: Instant Search;

---

[1] The Attorney General also served extraordinarily burdensome document requests, seeking largely the same information sought by the subpoena that the Court enjoined. After Google objected, the Attorney General abandoned most of these requests. *See* Declaration of Peter G. Neiman in Support of Plaintiff Google Inc.'s Motion for a Protective Order With Respect to Notices of Rule 30(b)(6) Depositions of Google Inc. ("Neiman Decl."), Ex. 10 at Plaintiff Google Inc.'s Responses and Objections to Defendant's First Request for Production of Documents.

3. In connection with that Rule 30(b)(6) deposition, to provide documents sufficient to describe those services at a reasonable level of detail;

4. To include within the scope of the Rule 30(b)(6) deposition the factual basis for Google's position that it did not create the identifiable content about which the Attorney General has complained; and

5. To include within the scope of the Rule 30(b)(6) deposition testimony describing and explaining at a reasonable level of detail the various measures taken by Google to address third-party content that are described in paragraphs 19-24, 26-29, and 31 of the Complaint, including how Google uses data in connection with those activities.

After several discussions, the Attorney General withdrew the six prior deposition notices, but replaced them with three revised notices that would also impose unnecessary discovery burdens still not aimed at information bearing on the few disputed factual issues in this case.

For example, the Attorney General demands that Google prepare a witness to identify "all uses" and "monetization" of user and advertiser "content or data" for Search, Autocomplete, Instant Search, YouTube, AdSense, and AdWords, along with any related "content and data collection, storage, and retention policies and practices," *and* that it produce "All DOCUMENTS RELATING TO" the same. *See* Declaration of Peter G. Neiman in Support of Plaintiff Google Inc.'s Motion for a Protective Order With Respect to Notices of Rule 30(b)(6) Depositions of Google Inc., Ex. 9, Revised Notice 3 ("Neiman Decl.").[2] Similarly, the Attorney General demands a witness to discuss all versions of all agreements (dating back to 2010) that "define[] the obligations, duties, interests, and rights of Google and [a] third party concerning . . . third

---

[2] The Attorney General's original notice "only" requested this mind-boggling amount of information for Search, YouTube, and AdWords. *See* Neiman Decl. Ex. 4, Notice 4. In the spirit of "compromise," he added Autocomplete, Instant Search, and AdSense.

party content" and to provide an explanation for every change that has been made in such

agreements since January 1, 2010. *See* Neiman Decl. Ex. 7, Revised Notice 1. The Attorney

General also seeks a witness to describe the details of Google's search algorithms, and all

documents relating to those algorithms. *See* Neiman Decl. Ex. 8, Revised Notice 2.

But this case is about whether the Attorney General can regulate Google's making

accessible a specific type of content—content created by third parties that the Attorney General

deems objectionable. This is a legal question, squarely answered by the Constitution and the

Communications Decency Act ("CDA"). Congress granted interactive service providers like

Google broad immunity from state regulation of their display of third-party content. That

immunity, as our preliminary injunction briefs showed, simply does not depend on the intricacies

of Google's agreements with users, or how Google personalizes accounts for its users, or the

technical inner workings of its proprietary algorithms and source code. That is why, in litigating

the preliminary injunction motion, "[t]he parties agreed upon the relevant facts, and . . . viewed

this matter primarily as a dispute of law." Order of March 27, 2015, ECF No. 88, at 6.

Seeking to justify his sudden demands for expansive discovery, the Attorney General

offers three general rationales.

*First*, the Attorney General claims that he needs extensive discovery to test whether

Google is a "provider of an interactive computer service" under Section 230 of the CDA. That

proposition is not seriously in dispute. Federal courts have repeatedly held that Google is a

provider of an interactive computer service; the Attorney General did not contest that issue when

opposing Google's motion for preliminary relief; and *he has previously acknowledged that

Google is a provider of an interactive computer service.* Requiring companies like Google—

which courts around the country have on numerous occasions concluded is indeed "provider of

3

an interactive computer service"—to nonetheless submit to burdensome and unnecessary discovery every time they invoke Section 230 would defeat the very purpose of CDA immunity.

*Second*, the Attorney General claims that he needs extensive discovery to examine whether Google complies with its terms of service. Google's compliance with its own terms of service is not at issue in this case. Google has sought relief from the Attorney General's subpoena and specific threats of prosecution. It has *not* sought to enjoin the Attorney General from ever investigating it in good-faith, including for supposed violations of its own terms of service. Rather, the core issue in this case concerns whether the Attorney General's subpoena (aimed squarely at Google's display of third-party content) and specific threats to prosecute Google (again aimed directly at Google's display of third-party content) violated Google's rights under federal law—*not* whether his lawyers can now identify alternative hypothetical bases for investigating Google about something other than third-party content accessible via Google's services.

*Third*, the Attorney General states that he is entitled to probe the factual allegations of the Complaint. That is not disputed. But the core allegations of the Complaint, ECF No. 1, ¶¶ 32-81, are simply a narration of the Attorney General's threats and demands, which require no discovery from *Google* to probe. The Complaint also provides information about when and how Google takes action against problematic third-party content; this is primarily background—none of Google's claims (nor any of the Attorney General's defenses) turns on these steps Google

voluntarily takes.[3]  Indeed, the Good Samaritan clause of the CDA *explicitly* rejects any state

efforts to impose liability based on an interactive computer service provider's voluntary removal

of certain third-party content, including on a theory that doing so creates an obligation to remove

other content.  *See* 47 U.S.C. § 230(c); *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008)

(interactive service providers are shielded from liability under the CDA for "decisions relating to

the monitoring, screening, and deletion of content from its network") (internal quotation marks

omitted).  In any event, Google does not object to reasonable discovery on these allegations of

the Complaint, and the discovery offered by Google during the meet-and-confer process should

more than satisfy any legitimate interest in these topics.  But there is no basis for the Attorney

General to probe the technical engineering details of Google's proprietary systems and

algorithms.

Because the Attorney General's extraordinary demands are clearly unjustified, Google

seeks a protective order against the deposition notices to the extent they require discovery

beyond what Google has in good-faith offered to provide (described above).  Google should not

have to endure harassing, burdensome, and unnecessary discovery (substantially similar in

character to the information sought in the Attorney General's 79-page administrative subpoena

and already preliminarily enjoined by this Court) in order to vindicate Google's constitutional

and statutory rights in this case.

---

[3] Google's claim that the "safe harbor" provision of the Digital Millennium Copyright Act, 17
U.S.C. § 512, requires the preemption of state law actions seeking to impose liability for conduct
eligible for the safe harbor does *not* rest on showing that Google complies with the safe harbor
provision.  Instead, the existence of the safe harbor—along with the availability of a federal right
of action to the copyright holder if the safe harbor requirements are not met—precludes remedies
under state laws like the Mississippi Consumer Protection Act ("MCPA").

## FACTUAL AND PROCEDURAL BACKGROUND

The Court concisely summarized what this case is about in its March 27, 2015, Order granting Google's motion for a preliminary injunction: "Google petitions this court for declaratory and injunctive relief on the basis that the Attorney General's threatened action and subpoena under the MCPA are impermissible under both federal statutory and constitutional law, as applied to Google." ECF No. 88, at 15-16. This case is thus about the Attorney General's alleged misconduct. And few—if any—of the Attorney General's defenses require discovery, as they pertain to issues such as standing, ripeness, justiciability, immunity, and the scope of Google's constitutional rights. For that reason, when appearing before this Court to present argument on Google's motion for preliminary relief, "the parties agreed upon the relevant facts, and . . . viewed this matter primarily as a dispute of law." *Id.* at 6.

Consequently, with the consent of all parties, this Court's Order setting a schedule contemplated targeted discovery and rapid determination of Google's claims. It provided "90 days for discovery from the date of the filing of the defendant's answer" and explained that "[t]his matter will be adjudicated quickly." ECF No. 82, at 4. Google proposed only "a targeted amount of discovery," that went largely to its claims that the Attorney General acted in bad faith. ECF No. 84 at 5:10-12, 7:7-10. When the Court asked counsel for the Attorney General whether he intended to take any depositions, counsel responded:

> I think it is going to depend on the documents. I think it is going
> to be primarily document-related discovery, and I think as [counsel
> for Google] has pointed out, I think it would be limited in terms of
> the number of depositions at this point, very limited. Primarily
> document requests and interrogatories.

*Id.* at 8:7-12. The Attorney General's counsel later stated that the Attorney General "also desires to have this matter 'adjudicated quickly.'" ECF No. 92, at 1.

The Attorney General has not identified any documents or other new information that has prompted him to change course. But after retaining at least seven new lawyers from at least four different private law firms, many of whom have a history of bringing cases against Google,[4] the Attorney General issued six wide-ranging Rule 30(b)(6) deposition notices, which he subsequently withdrew, substituting the three revised (but still wide-ranging) notices that are the subject of this motion:

- Revised Notice 1 seeks testimony for all agreements between Google and third parties that control their relationship or "define[] the obligations, duties, interests, and rights" of the parties with respect to third-party content related to Search, Autocomplete, YouTube, AdWords, AdSense; it also seeks all versions of such documents (going back to 2010), the effective dates of those versions, an explanation for any changes made between each version, and all information regarding Google's "basis, interpretation, enforcement, and implementation" of those agreements. *See* Neiman Decl. Ex. 7, Revised Notice 1 at 8.

- Revised Notice 2 seeks testimony "describ[ing] and explain[ing] the workings of Search *to include the algorithms*;" the workings of Autocomplete, Instant Search, YouTube, AdWords, and AdSense; "the factual basis for the assertion that Google is merely a 'provider' of an 'interactive computer service;'" "the factual basis for the assertion [not actually made in the Complaint] that 'Google [does] not create or develop any content accessible via Google;" Google's policies for accepting

---

[4] *E.g.*, *In re: Google Inc. Gmail Litigation*, No. 5:13-md-02430, MDL No. 2430 (N.D. Cal. 2013) (Mr. Tapley is listed as Plaintiffs' Co-Lead Counsel, and Messrs. Lutz, Rommel and Wyly are also listed as counsel for individual plaintiffs); *Sheppard v. Google, Inc.*, No. 4:12-cv-04022 (W.D. Ark. 2012) (same attorneys are counsel for plaintiff).

advertisements; and "how Google attempts to comply with legal requirements and Google's own internal policies" referenced in the Complaint.  Neiman Decl., Ex. 8, Revised Notice 2 at 8 (fourth alteration in original).

- Revised Notice 3 seeks testimony for "all uses Google makes of . . . user content or data, advertiser content or data, [and] the content or data of a YouTube user opting to advertise" in relation to either certain actions described in the Complaint *or* Search, Autocomplete, Instant Search, YouTube, AdSense, and AdWords; testimony for "the monetization Google makes of . . . all user content or data, advertiser content or data, and the content or data of [a] YouTube user opting to advertise" in relation to the same subjects; and testimony regarding "Google's content and data collection, storage, and retention policies and practices" relating to the use of user or advertiser content or data in relation to the same subjects.  Neiman Decl. Ex. 9, Revised Notice 3 at 8.

Each of the revised notices also demands "All DOCUMENTS RELATING TO" the areas of examination described above.  "Relating to" is defined to mean "in whole or in part analyzing, commencing upon, constituting, containing, concerning, consisting of, dealing with, describing, discussing, embodying, evidencing, identifying, involved with, memorializing, mentioning, referring to, reflecting, showing, stating, summarizing or in any way pertaining to the referenced matter or thing."  Neiman Decl. Ex. 8, Revised Notice 2 at 4.  These demands for production call for unfathomable quantities of data wholly irrelevant to this case.

The revised notices seek to frustrate the Court's March 2 Order and far exceed the scope of the claims and defenses at issue.  And many of the demands therein echo the very subpoena

that the Attorney General has been preliminarily enjoined from enforcing.[5]  A protective order is

appropriate.

## ARGUMENT

Under Rule 26(c) of the Federal Rules of Civil Procedure, a party presented with

discovery requests causing "annoyance, embarrassment, oppression, or undue burden or

expense," Fed. R. Civ. P. 26(c)(1), may, upon a showing of good cause, obtain an order of

protection from the court.  That order may "forbid[] the disclosure or discovery," "prescribe[e] a

discovery method other than the one selected by the party seeking discovery," "forbid[] inquiry

into certain matters," "limit[] the scope of disclosure or discovery to certain matters," or fashion

other relief as appropriate.  *Id*.  A court "must" intervene when a party seeks discovery that is

"unreasonably cumulative or duplicative" or where "the burden or expense of the proposed

discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(2)(C)(i), (iii).

## I.     GOOD CAUSE EXISTS TO PROHIBIT THE DISCOVERY CALLED FOR BY THE FIRST REVISED NOTICE

The Court should prohibit the discovery called for by the First Revised Notice because

Google's agreements with users and advertisers have no bearing on this case and the

extraordinary burden and expense of the proposed discovery outweighs its likely benefit.  *See*

Fed. R. Civ. P. 26(b)(2)(C)(iii).

During the meet and confer process, the Attorney General claimed that he is entitled to

---

[5] For example, the Attorney General's Second Revised Notice attempts to discover Google's
algorithms, which mirrors at least seven specific document requests contained in the subpoena.
*Compare* Neiman Decl. Ex. 8, Revised Notice 2, Topic 1 *with* Declaration of Peter Neiman in
Support of Plaintiff Google's Motion for Temporary Restraining Order and Preliminary
Injunction, ECF No. 17, Ex. 30, Subpoena Request Nos. 25, 60, 63, 66, 120, 129, 131 ("Neiman
TRO/PI Mot. Decl.").

seek deposition testimony to probe whether Google may be in violation of Mississippi state law by not complying with its own terms of service. That issue has no bearing on this case. The injunction Google has sought would not block inquiry into Google's compliance with its own terms of service. Rather, Google seeks an injunction against (1) threatened prosecution for making accessible third-party content, and (2) enforcement of a subpoena aimed squarely (from the very first definition) at third-party content.

As Google has previously explained, it is settled law that Section 230 immunity applies— and renders the Attorney General's threats and subpoena unlawful—even if Google failed to "enforce its own voluntary policies concerning third-party content, and even if it advised the public of those policies." ECF No. 55, at 23-24 (citing *Doe*, 528 F.3d at 420; *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003)).

Inquiry into Google's terms of service, and the adequacy of its compliance with those terms, is clearly beyond the scope of proper discovery in this case. *See Volvo Trucks N. Am., Inc. v. Crescent Ford Truck Sales, Inc.*, No. 02-3398, 2005 WL 1400463, at *4 (E.D. La. June 1, 2005) (quashing Rule 30(b)(6) deposition notice where the plaintiff "failed to demonstrate that these areas of inquiry are relevant to its breach of contract claims"). Discovery, including Rule 30(b)(6) testimony, "must be kept within workable bounds on a proper and logical basis for the determination of the relevancy of that which is sought to be discovered." *Carlson Cos. v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080, 1088-89 (D. Minn. 1973) (citing *Jones v. Metzger Dairies, Inc.*, 334 F.2d 919, 925 (5th Cir. 1964)). That is particularly true where, as here, the proposed discovery would impose great burden without any discernible benefit.

## II.   GOOD CAUSE EXISTS TO LIMIT THE DISCOVERY CALLED FOR BY THE THIRD REVISED NOTICE TO THAT OFFERED BY GOOGLE

Similarly, the Court should limit the discovery called for by the Third Revised Notice. Google's uses and monetization of user and advertiser content or data have nothing to do with what this case is about: whether Google's constitutional and statutory rights and immunities were violated by the Attorney General's threats to prosecute Google for making third-party content accessible or by his retaliatory subpoena regarding Google's making accessible third-party content.  Google's "content and data collection, storage, and retention policies and practice" similarly has no bearing on this case.  These topics amount to fishing expeditions imposing burdens far exceeding their nonexistent benefit.  Notwithstanding that, Google has offered to provide a Rule 30(b)(6) witness who could describe and explain at a reasonable level of detail Google's use of data in connection with the various measures taken by Google to address third-party content that are described in paragraphs 19-24, 26-29, and 31 of the Complaint.  The Court should limit discovery under the Third Revised Notice to that offered by Google.

## III.   GOOD CAUSE EXISTS TO LIMIT THE DISCOVERY CALLED FOR BY THE SECOND REVISED NOTICE TO THAT OFFERED BY GOOGLE

Google does not seek to prohibit all the discovery proposed in the Second Revised Notice, and has already offered to provide much of it to the Attorney General.  However, the Attorney General has refused this compromise proposal, instead insisting to maintain several of his unreasonable demands.  The Court should limit the discovery proposed in the Second Revised Notice as described below.

## A.     Areas of Examination 1-6, 11, and 12[6]

The first six areas of examination proposed in the Second Revised Notice seek Rule 30(b)(6) testimony to "[d]escribe and explain the workings of" six listed Google services, including the Search "algorithms" referenced in the Complaint, along with all documents relating to the workings of those services.  Neiman Decl. Ex. 8, Revised Notice 2 at 8.  The eleventh area of examination similarly seeks testimony to "describe and explain how Google attempts to comply with legal requirements and Google's own internal policies as alleged in paragraphs 19-31 of Google's Complaint," which describe measures taken by Google to address third-party content.  *Id.*  The twelfth area of examination seeks testimony to "[d]escribe and explain Google's policies for accepting advertisements."  *Id.*

Google has offered to provide a Rule 30(b)(6) witness who could describe and explain at a reasonable level of detail the workings of the six named Google services, as well as documents sufficient to describe those services at a reasonable level of detail.  It has also offered to provide a Rule 30(b)(6) witness who could describe and explain at a reasonable level of detail the various measures taken by Google to address third-party content that are described in paragraphs 19-24, 26-29, and 31 of the Complaint, which include the only paragraphs of the Complaint describing Google's policies on advertising.  Such discovery is sufficient to allow the Attorney General to probe the factual background for Google's claims.[7]  The Attorney General, however, insists upon much broader discovery, including collection of many more documents and testimony about Google's search algorithms, which has nothing to do with the lawsuit pending before this Court.

---

[6] When enumerating the areas of examination, the Second Revised Notice skips numbers nine and ten.

[7] In addition, Google informed the Attorney General that it would not object to him conducting Rule 30(b)(1) depositions of the five employees who submitted declarations in support of Google's motion for a temporary restraining order and preliminary injunction.

The Attorney General's position is wrong for at least two reasons.  *First*, a Rule 30(b)(6) deposition is not designed to force a witness to provide testimony on every facet of an entity. *See Bowers v. Mortg. Elec. Registration Sys., Inc.*, No. 10-4141, 2011 WL 6013092, at *7 (D. Kan. Dec. 2, 2011) ("[T]he burden . . . of producing a representative to testify to . . . far-reaching 22 topics contained [in a] Rule 30(b)(6) deposition notice outweighs the likely benefit of the discovery sought."); *Alexander v. F.B.I.*, 186 F.R.D. 137, 143 (D.D.C. 1998) (holding that targeted interrogatories and requests for production were more appropriate discovery mechanisms than a Rule 30(b)(6) deposition that would be a "memory contest"); *Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70, 79 (D. Conn. 2010) (granting protective order where certain topics were better suited for individual Rule 30(b)(1) depositions).

*Second*, and more fundamentally, the Attorney General's position reflects a deep misunderstanding of what this case is about.  This case turns largely on questions of law, and what little fact development needs to be done pertains primarily to the Attorney General's own conduct and motivation.  The Attorney General previously seemed to recognize that point.  *See* ECF No. 84, at 8:7-12 ("I think it would be limited in terms of the number of depositions at this point, very limited."); Order of March 27, 2015, ECF No. 88, 6 ("[T]he parties agreed upon the relevant facts, and . . . viewed this matter primarily as a dispute of law . . . .").  Now, the Attorney General has reversed course, apparently taking the position that, regardless of the facts and legal issues going to the heart of this case, he is entitled to far-ranging discovery on Google's operations, including probing of its proprietary algorithms.  The Attorney General is wrong. And the Court should not allow his clear end run of this Court's Order enjoining the Attorney General's subpoena by permitting discovery going beyond what is necessary to resolve this case. *See Frasca v. NCL (Bah.) Ltd.*, No. 12-20662-CIV, 2014 WL 979062, at *4 (S.D. Fla. Mar. 13,

13

2014) (holding that Rule 30(b)(6) notice was improper "end-run around" court's prior discovery order) (citation omitted); *ViaSat, Inc. v. Space Sys./Loral, Inc.*, No. 12-CV-0260-H, 2013 WL 3467413, at *5 (S.D. Cal. July 10, 2013) (same).

### B.    Area of Examination 8

In the eighth area of examination proposed in the Second Revised Notice, the Attorney General demands that Google provide a witness to "[d]escribe and explain the factual basis for the assertion that 'Google [does] not create or develop any content accessible via Google.'" Neiman Decl. Ex. 8, Revised Notice 2 at 8 (alteration in original).  Google never made that assertion.  Instead, in an allegation that the Attorney General misleadingly excerpts, Google's Complaint asserts that "Google did not create or develop any of the content accessible via Google *that is the subject of the Attorney General's Inquiry*."  ECF No. 1, Complaint ¶ 89 (emphasis added).  Google has already provided the Attorney General with information confirming that each specific item of content about which he has complained (to the extent identifiable) was created by third parties, not Google.  Google also offered to provide Rule 30(b)(6) testimony regarding the factual basis for its position that it did not create such content. The Attorney General's demand to probe more broadly into the basis for an assertion that Google has not made and that has no bearing on this case makes no sense.

### C.    Area of Examination 7

The seventh area of examination in the Second Revised Notice demands testimony to "[d]escribe and explain the factual basis for the assertion that Google is merely a 'provider' of an 'interactive computer service,'" along with all related documents.  Neiman Decl. Ex. 8, Revised Notice 2 at 8.  This proposed discovery should be prohibited to the extent that it exceeds the substantial related information that Google has already agreed to provide.  During the meet-and-confer process, the Attorney General claimed that this topic is merely an attempt to determine

14

whether Google is a "provider of an interactive computer service" under the CDA.  The Attorney

General, however, has never challenged Google's status as a provider of an interactive computer

service, including in his opposition to the preliminary relief ordered in this case.  Nor could he:

Google plainly satisfies the statutory definition, as many courts have held.[8]

The Attorney General's assertion that Google's status under the CDA is now in doubt is

difficult to credit.  Indeed, in a November 27, 2013 letter to Google General Counsel Kent

Walker, the Attorney General acknowledged that Google is an interactive computer service

provider.  He stated, "It is undoubtedly true that courts have interpreted Section 230 to protect

service providers, including Google."  The Attorney General also wrote: "Computer service

providers like Google are protected from certain forms of liability where they publish

information provided by another information content provider."[9]  Neiman TRO/PI Mot. Decl.,

ECF No. 17, Ex. 17 at 9.

Permitting the Attorney General to conduct sweeping and burdensome discovery on the

dubious proposition that he is unsure of Google's status under the CDA undermines the very

---

[8] *See, e.g.*, *Am. Income Life Ins. Co. v. Google, Inc.*, No. 2:11-CV-4126-SLB, 2014 WL
4452679, at *8 (N.D. Ala. Sept. 8, 2014); *O'Kroley v. Fastcase, Inc.*, No. 3-13-0790, 2014 WL
2881526, at *2 (M.D. Tenn. June 25, 2014); *Gavra v. Google, Inc.*, No. 5:12-CV-06547-PSG,
2013 WL 3788241, at *1 (N.D. Cal. July 17, 2013); *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117,
1122-23 (E.D. Cal. 2010); *Rosetta Stone Ltd. v. Google, Inc.*, 732 F. Supp. 2d 628, 632 (E.D. Va.
2010), *aff'd*, 676 F.3d 144 (4th Cir. 2012); *Goddard v. Google, Inc.*, No. C. 08-2738, 2008 WL
5245490 (N.D. Cal. Dec. 17, 2008); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 631 (D. Del.
2007); *Parker v. Google*, 422 F. Supp. 2d 492, 500-01 (E.D. Pa. 2006), *aff'd*, 242 F. App'x 833
(3d Cir. 2007); *Novak v. Overture Servs., Inc.*, 309 F. Supp. 2d 446, 452 (E.D.N.Y. 2004).

[9] Although this letter was drafted by Jenner & Block, presumably on behalf of the MPAA, the
Attorney General made minor revisions to it, put it on his letterhead, and signed it.  *See* Nick
Wingfield & Eric Lipton, *Google's Detractors Take Their Fight to the States*, N.Y. Times, Dec.
16, 2014, *available at* http://www.nytimes.com/2014/12/17/technology/googles-critics-enlist-
state-attorneys-general-in-their-fight.html; N.Y. Times, Letter to Google From Mississippi's
Attorney General, Dec. 16, 2014, *available at*
http://www.nytimes.com/interactive/2014/12/16/technology/attorney-general-letter-to-
google.html?_r=0.

immunity granted by Congress to interactive computer service providers like Google.  As the

Fourth Circuit has explained:

> Section 230 immunity, like other forms of immunity, is generally
> accorded effect at the first logical point in the litigation process.
> As we have often explained in the qualified immunity context,
> 'immunity is an immunity from suit rather than a mere defense to
> liability' and 'it is effectively lost if a case is erroneously permitted
> to go to trial.'  We thus aim to resolve the question of § 230
> immunity at the earliest possible stage of the case because that
> immunity protects websites not only from 'ultimate liability,' but
> also from 'having to fight costly and protracted legal battles.'

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254-55 (4th Cir. 2009)

(citations omitted).  If a company like Google is obligated to offer volumes of documents and

highly-detailed testimony about every aspect of its services each time it invokes Section 230, the

CDA would offer no real immunity.  That is not what Congress intended.

Consequently, the Court should prohibit discovery on this area of examination to the

extent it goes beyond the description and explanation of its services that Google has already

offered to provide.

# CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court grant Google's

motion and enter an appropriate order of protection.

DATED this 8th day of June, 2015.

Respectfully submitted,

OF COUNSEL:
Jamie S. Gorelick
Patrick J. Carome
Blake C. Roberts
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
jamie.gorelick@wilmerhale.com
patrick.carome@wilmerhale.com
blake.roberts@wilmerhale.com

Peter G. Neiman
Christopher J. Bouchoux
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8000
Facsimile: (212) 230-8888
peter.neiman@wilmerhale.com

Chris Johnstone
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100
chris.johnstone@wilmerhale.com

_____s/ Daniel J. Mulholland_____
Fred Krutz, MSB No. 4270
Daniel J. Mulholland, MSB No. 3643
FORMAN WATKINS
  KRUTZ & TARDY LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201
Post Office Box 22608
Jackson, Mississippi 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613
fred.krutz@formanwatkins.com
daniel.mulholland@formanwatkins.com
*Attorneys for Plaintiff Google Inc.*

17

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Mississippi by using the Court's CM/ECF system on June 8, 2015. I further certify that all parties are represented by attorneys who are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


_____s/ Daniel J. Mulholland_____
Daniel J. Mulholland, MSB No. 3643

# Exhibit 6

JENNER&BLOCK

*Practice Series*

# Protecting Confidential Legal Information

### A Handbook for Analyzing Issues Under The Attorney-Client Privilege And The Work Product Doctrine

## David M. Greenwald

© 2011 Jenner & Block LLP  All Rights Reserved

*SEC v. Thrasher*, No. 92 Civ. 6987 1996 WL 125661, at *1-2 (S.D.N.Y. Mar. 20, 1996). *Finding that defendant was not obligated to provide a detailed privilege log for his communications with counsel after noting that a document-by-document listing would be unduly burdensome and that the documents sought were likely protected by the work product or attorney-client privilege.*

*Durkin v. Shields (In re Imperial Corp. of Am.)*, 174 F.R.D. 475, 478-79 (S.D. Cal. 1997). *Plaintiffs were not required to produce a document-by-document privilege log but could instead prepare a privilege log on a categorical basis when the litigation involved approximately 50 parties, 20 law firms, and at least hundreds of thousands of documents. The court noted that "[t]o force the creation of a document-by-document privilege log of documents of that magnitude is unreasonable and overly burdensome."*

Some courts have provided specific requirements for privilege logs in local rules. *See, e.g.,* Ruran v. Beth El Temple, Inc., 226 F.R.D. 165, 168-69 (D. Conn. 2005); SEC v. Beacon Hill Asset Mgmt. LLC, 231 F.R.D. 134, 141 (S.D.N.Y. 2004). Failure to meet the requirements of such local rules may result in a waiver of the privilege. *See* Dorf & Stanton Commc'ns, Inc. v. Molson Breweries, 100 F.3d 919, 923 (Fed. Cir. 1996) (holding that party waived privilege when it failed to meet requirements of valid local rule and failed to use its best efforts to cure discovery violations); 105 Street Assocs., LLC v. Greenwich Ins. Co., No. 05 Civ. 9938(VM)(DF), 2006 WL 3230292, at *3-4 (S.D.N.Y. Nov. 7, 2006) (noting that judges in that district hold that an "unjustified failure to list privileged documents on the required log of withheld documents in a timely and proper manner" in accordance with Local Rule 26.2 "operates as a waiver of any applicable privilege"). *But see* Dorf & Stanton, 100 F.3d at 928 ("Even if there were inadequate initial compliance with the local rule, if the inadequacy was remedied and absent prejudice the consequence is not automatic loss of the privilege."); Rambus, Inc. v. Infineon Techs. AG, 220 F.R.D. 264, 274 (E.D. Va. 2004) (holding that where party seeking production failed to meet and confer with counsel asserting privilege there was no waiver even where initial privilege log failed to meet requirements of local rule).

Failure to provide sufficient detail in privilege logs may have severe consequences, including waiver of the privilege. For example, in In re General Instrument Corp. Securities Litigation, 190 F.R.D. 527, 532 (N.D. Ill. 2000), the court ordered the defendant to produce 396 documents that the defendant claimed were privileged. The court's decision to compel the production of those documents was based on the fact that the defendant's privilege log contained "sketchy, cryptic, often mysterious descriptions of subject matter" that were insufficient to fulfill the defendant's burden of establishing the elements of the privilege for each document. *Id.; see also* In re Chevron Corp., No. 10 MC 00002, ---F. Supp. 2d---, 2010 WL 4922312 (S.D.N.Y. Nov. 30, 2010) (an attorney's failure to provide a privilege log prior to the return date of a subpoena, an intentional strategic delay, resulted in waiver of any privilege because, while FRCP 26(b)(5) does not explicitly state when a privilege log must be provided, FRCP 45, which applies to subpoenas, requires that a person objecting to a subpoena must serve either written objections or move to quash within the earlier of the time fixed for compliance or fourteen days after service and, if withholding subpoenaed material on grounds of privilege, must provide a privilege log); Felham Enters. (Cayman) Ltd. v. Certain Underwriters at Lloyds, No. Civ. A. 02-3588 C/W 0, 2004 WL 2360159, at *3 (E.D. La. Oct. 19, 2004) (finding a waiver where defendant failed to produce a timely privilege log and the log it ultimately produced failed to sufficiently describe withheld

documents); B.F.G. of Ill., Inc. v. Ameritech Corp., No. 99 C 4604, 2001 WL 1414468, at *2, 5-8 (N.D. Ill. Nov. 13, 2001) (court ordered hundreds of documents produced and imposed sanctions where party failed to provide adequate privilege log and, based on *in camera* review, improperly asserted privilege); ConAgra, Inc. v. Arkwright Mut. Ins. Co., 32 F. Supp. 2d 1015, 1018 (N.D. Ill. 1999) (directing the defendant to produce 54 documents withheld and 10 additional documents initially produced in redacted form because the defendant failed to include sufficient descriptions of the documents in its privilege log to establish the privilege).

A party is required to claim privilege for documents withheld in a timely manner. *See* In re DG Acquisition Corp., 151 F.3d 75, 84 (2d Cir. 1998) (party responding to subpoena must assert privilege within 14 days); Marx v. Kelly, Hart & Hallman, P.C., 929 F.2d 8, 12 (1st Cir. 1991); Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co., 240 F.R.D. 44, 48 (D. Conn. 2007) (party must assert privilege within 14 days, then submit privilege log within "reasonable time"; four-month delay in submitting log was not reasonable). While some courts will permit parties to submit privilege logs sometimes months after documents are produced, leaving it to the parties to work out the when the logs should be exchanged, other courts may demand that the logs be disclosed at the time of the initial production or shortly thereafter. *See* First Savs. Bank, F.S.B. v. First Bank Sys., Inc., 902 F. Supp. 1356, 1360 (D. Kan. 1995), rev'd on other grounds, 101 F.3d 645 (10th Cir. 1996) (Rule 26 "contemplates that the required notice and information is due upon a party withholding the claimed privileged material. Consequently . . . the producing party must provide the [privilege log] at the time it is otherwise required to produce the documents."). Importantly, a party is responsible for logging *all* documents in its possession, custody, or control, which may include documents held by its current and former counsel. *See* CSI Inv. Partners II, L.P. v. Cendant Corp., No. 00 Civ. 1422 (DAB) (DFE), 2006 WL 617983, at *6 (S.D.N.Y. Mar. 13, 2006) (directing defendants to use their best efforts to cause all present and former counsel to produce documents and/or itemized privilege logs).

In the absence of an agreement or court order to the contrary, a party may be required to log documents exchanged with counsel during the litigation. In In re Motor Fuel Temperature Sales Practices Litigation, No. 07-MD-1840, 2009 WL 959491 (D. Kan. Apr. 3, 2009), defendants sought a protective order regarding tens of thousands of post-litigation communications with their attorneys, arguing it would be a waste of money and of little benefit to plaintiffs to review and log them. Plaintiffs objected, arguing that such an order would allow defendants to withhold responsive communications with counsel that were not privileged, for example, communications with in-house counsel acting in a business capacity or where counsel was merely copied on non-privileged communications. The court denied the protective order and ordered defendant to review post-litigation communications. To minimize the burden, the court ordered that defendant would be allowed to log privileged documents "categorically" and not document by document.

Although failure to list documents on a privilege log may result in waiver of the privilege, such waiver is not necessarily automatic, at least where the document at issue is subject to another objection. In United States v. Philip Morris Inc., 347 F.3d 951, 954 (D.C. Cir. 2003), the government moved to compel production of a document not listed on the defendant's privilege log. The lower court held that, notwithstanding any other

applicable objections made by the defendant, the defendant waived the privilege.   The D.C. Circuit reversed, holding that it was error not to consider the defendant's objections to production (other than those based on the attorney-client privilege) prior to finding a waiver. *Id.*   The appellate court held that "if a broad discovery request includes an allegedly privileged document, and if there is an objection to the scope of the request, the court should first decide whether the objection covers the document."   *Id.*   Thus, the court held that only after an objection (other than one based on privilege) is resolved must a party list documents falling within the objection (assuming the objection is allowed).   *Id.*   In a subsequent proceeding, United States v. British American Tobacco (Investments) Ltd., 387 F.3d 884, 891-92 (D.C. Cir. 2004), the D.C. Circuit again reviewed the defendant's objections and failure to log the responsive document.   Although the court concluded that none of the defendant's objections applied, it nonetheless again reversed the lower court and held that, because the defendant had a reasonable expectation that its objection applied, waiver of the attorney-client privilege was an excessive sanction.   *Id.*   It therefore again reversed and directed the lower court to allow the defendant to log the document at issue and further allow the government to challenge the defendant's assertion of privilege.   *Id.*

Privilege logs must be prepared for the litigation at hand.   In Ross v. Abercrombie & Fitch Co., No. 2:05-cv-0819, 2009 WL 779328 (S.D. Ohio Mar. 19, 2009), the court held that defendant's assertions of privilege over documents withheld in an earlier, factually related SEC investigation would be judged not by the privilege log created in the earlier SEC proceeding, but by the log prepared for the litigation before the court.   Plaintiff moved to compel production of documents previously withheld from the SEC, citing alleged inadequacies in the privilege log provided to the SEC.   The court denied the motion, holding that it would be a waste of judicial resources to review a privilege log from a prior, separate proceeding and that privilege determinations would be made based on the log provided by defendant in the case before the court, which defendant had not yet completed.

Describing emails and other electronically stored information ("ESI") on a privilege log presents particular challenges.   In Rhoads Industries, Inc. v. Building Materials Corp. of America, 254 F.R.D. 238 (E.D. Pa. 2008), the court provided guidance on how to log emails on a privilege log in a manner that meets the requirements of Fed. R. Civ. Pro. 26(b)(5).   The court explained that an email "string" or "chain" is actually comprised of several different individual communications.   A relatively simple example would be an initial email between a third party vendor and a company employee ("initial email"), that is forwarded to the company's CEO ("email string #1"), which the CEO then forwards to outside counsel seeking legal advice ("email string #2").   The question is, how should these emails be presented on a privilege log?   The court in Rhoads explained that a separate privilege determination must be made for each of the three communications.   The court explained that the entirety of "string #2" could be privileged, analogizing it to a situation in which a client sends a letter to counsel seeking legal advice in which the client quotes an earlier conversation or document verbatim.   The court's ruling regarding how to log emails was less than clear.   Where a party has produced the initial email and string #1, the court apparently would not require the log description for string #2 to list those underlying emails.   However, if a party claims that the initial email and string #1 become privileged because they were sent to counsel, then each must be logged. *See also* Muro v. Target Corp., 250 F.R.D. 350, 363 (N.D. Ill. 2007) (log need not separately itemize each individual email in an email string);