## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GOOGLE INC. | ) | |
| Petitioner, | ) | |
| | ) | **CASE NO.:** 1:15-mc-00707-JEB-DAR |
| v. | ) | |
| | ) | **CASE IN OTHER COURT:** |
| | ) | No. 3:14-cv-00981-HTW-LRA (S.D. Miss.) |
| DIGITAL CITIZENS ALLIANCE, | ) | |
| MOTION PICTURE ASSOCIATION OF | ) | |
| AMERICA, INC., and | ) | |
| JENNER & BLOCK LLP | ) | |
| | ) | |
| Respondents. | ) | |

## GOOGLE INC.'S REPLY IN SUPPORT OF RULE 45 MOTIONS TO COMPEL COMPLIANCE WITH SUBPOENA

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

Veronica S. Ascarrunz (D.C. Bar No. 494474)
1700 K Street, NW
Fifth Floor
Washington, DC 20006
Email: vascarrunz@wsgr.com
Phone: (202) 973-8800
Fax: (202) 973-8899

David H. Kramer (admitted *pro hac vice*)
Michael H. Rubin (*pro hac vice* forthcoming)
650 Page Mill Road
Palo Alto, CA 94304
Email: dkramer@wsgr.com
Email: mrubin@wsgr.com
Phone: (650) 496-9300
Fax: (650) 493-6811

*Attorneys for Plaintiff*
GOOGLE INC.

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

RESPONSIVE AND ADDITIONAL BACKGROUND .............................................................. 5

ARGUMENT ....................................................................................................................... 8

I.   The Relevance of the Documents Google Seeks is Plain. .................................................. 8

  A.   The Subpoenaed Parties Cannot Rebut Google's Relevance Showing. ................. 8

  B.   The Subpoenaed Parties Internal Documents Are Highly Probative, as the Record Already Shows. ...................................................................................... 12

II.   Google's Subpoenas Do Not Impose an Undue Burden. ................................................ 14

  A.   Google's Requests Are Narrowly Tailored........................................................... 14

  B.   The Subpoenaed Parties Have Not Demonstrated Any Undue Burden................ 15

III.   Google Is Not Seeking Privileged Materials and the Subpoenaed Parties' Failure to Substantiate Their Privilege Assertions Amounts to a Waiver.................................... 19

  A.   The First Amendment Privilege Does Not Apply to the Documents Google Seeks. ................................................................................................................. 19

  B.   The Lobbying Materials Google Seeks Are Not Protected by the Attorney Client or Any Other Privilege. ............................................................................ 21

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A&R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, 2014
U.S. Dist. LEXIS 20859 (D. Conn. Feb. 19, 2014) ............................................................23

*AFSCME v. Scott*, 277 F.R.D. 474 (S.D. Fla. 2011)..............................................................14, 17

*Assured Guar. Mun. Corp. v. UBS Real Estate Secs., Inc.*, 2013 U.S. Dist. LEXIS
41785 (S.D.N.Y. Mar. 25, 2013) ........................................................................................15

*Avirgan v. Hull*, 118 F.R.D. 252 (D.D.C. 1987)........................................................................25

*Blair v. Prof'l Transp., Inc.*, 2015 U.S. Dist. LEXIS 29202 (S.D. Ind. Mar. 9,
2015) ....................................................................................................................................23

*Brock v. Local 375, Plumbers Int'l Union of Am.,* 860 F.2d 346 (9th Cir.1988) ........................19

*Dunhall Pharms., Inc. v. Discus Dental, Inc.*, 994 F. Supp. 1202 (C.D. Cal. 1998)....................17

*FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380 (D.C. Cir. 1981)....................20

*\*Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d
1007 (D.C. Cir. 1997) ..........................................................................................................13

*In re Bisphenol-A (BPA), Polycarbonate Plastic Prods. Liab. Litig.*, 2011 U.S.
Dist. LEXIS 34202 (W.D. Mo. Mar. 25, 2011) ..................................................................23

*\*In re Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010)....................................................20

*\*In re Grand Jury Subpoenas Dated March 9, 2001*, 179 F. Supp. 2d 270
(S.D.N.Y. 2001) ...................................................................................................................23

*In re Heparin Prods. Liab. Litig.*, 273 F.R.D. 399 (N.D. Ohio 2011) ..........................................16

*In re Motor Fuel Temperature Sales Practices Litigation*, 641 F.3d 470 (10th Cir.
2011) ....................................................................................................................................19

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997)......................................................................21

*In re Sealed Case*, 737 F.2d 94 (D.C. Cir. 1984)........................................................................21

*In re Subpoena Duces Tecum Served on the Office of the Comptroller of the
Currency*, 145 F.3d 1422 (D.C. Cir. 1998), *rev'd in part on reh'g*, 156
F.3d 1279 (D.C. Cir. 1998) ..................................................................................................21

*Morton-Norwich Prods., Inc. v. Matthews*, 415 F. Supp. 78 (D.D.C. 1976) ................................17

*N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 110 F.R.D. 511
    (M.D.N.C. 1986) .................................................................................................23

*\*NLRB v. Am. Med. Response, Inc.*, 438 F.3d 188 (2d Cir. 2006) ................................11

*North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49 (D.D.C. 2005) .....................13, 14, 17

*P.& B. Marina, Ltd. Partnership v. Logrande*, 136 F.R.D. 50 (E.D.N.Y. 1991) ...................20, 23

*Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010) ........................................19, 21

*Peskoff v. Faber*, 251 F.R.D. 59 (D.D.C. 2008) ................................................17

*Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992) ........................18

*Simmons, Inc. v. Bombardier*, 221 F.R.D. 4 (D.D.C. 2004) ........................................17

*Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.*, 276 F.R.D. 376
    (D.D.C. 2011) .................................................................................................18

*Tiger Capital, LLC v. PHL Variable Ins. Co.*, 2013 U.S. Dist. LEXIS 121395
    (S.D.N.Y. Aug. 26, 2013) ................................................................................15

*United States v. Bailey (In re Subpoena Duces Tecum)*, 228 F.3d 341, 349 (4th
    Cir. 2000) .................................................................................................11

*United States v. Philip Morris, Inc.*, 347 F.3d 951 (D.C. Cir. 2003) .....................................24, 25

*United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991) ........................................11

*Viacom Int'l, Inc. v. YouTube, Inc.*, 2009 U.S. Dist. LEXIS 4220 (N.D. Cal. Jan.
    14, 2009) .................................................................................................15

*Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449 (D.D.C. 2002) ................................21

## STATUTES

Miss. Code Ann. § 5-8-3(k) ................................................................22

## RULES

Fed. R. Civ. P. 45(e)(2)(A)(ii) ................................................................24

## OTHER AUTHORITIES

Dana Liebelson, "Emails Show Hollywood Worked With A State Attorney
    General To Push Its Anti-Piracy Agenda," *The Huffington Post* (Dec. 19,
    2014) ("Liebelson Emails Show Article"), *available at*

&lt;http://www.huffingtonpost.com/2014/12/18/movie-piracy_n_6348256.html&gt;. ............................................................................11

Dana Liebelson, "How State Attorneys General May Help Hollywood Revive SOPA Anti-Piracy Efforts," *The Huffington Post* (Dec. 16, 2014) ("Liebelson How State AGs Article"), *available at* &lt;http://www.huffingtonpost.com/2014/12/16/attorneys-general-sopa_n_6330298.html&gt;.........................................................................11

David M. Greenwald, Jenner & Block Practice Series: Protecting Confidential Legal Information (2011)..............................................................................20

"Exchanges Between Current and Former Mississippi Attorneys General," *The New York Times* (Dec. 17, 2014) ("Moore Article"), *available at* &lt;http://www.nytimes.com/interactive/2014/12/17/technology/document-exchanges-between-current-and-former-missippippi-attorneys-general.html&gt;. ..................................................................................7

Mike Masnick, "Mississippi Attorney General Jim Hood Demands $2,100 To Reveal The Emails He's Had With The MPAA," *Techdirt* (Mar. 6, 2015) ("Masnick Article"), *available at* &lt;https://www.techdirt.com/articles/20150305/06420930214/mississippi-attorney-general-jim-hood-demands-2100-to-reveal-emails-hes-had-with-mpaa.shtml&gt;.................................................................10

Nick Wingfield and Eric Lipton, "Google's Detractors Take Their Fight to the States," *The New York Times* (Dec. 16, 2014) ("Wingfield and Lipton Article"), *available at* &lt;http://www.nytimes.com/2014/12/17/technology/googles-criticsenlist-state-attorneys-general-in-their-fight.html&gt; ...........................................4, 7, 19

Press Release, Mississippi Attorney General, Attorney General Hood Asking Google to Address Alleged Violations of Intellectual Property Rights (June 6, 2013) ("AG Hood Press Release"), *available at* &lt;http://www.ago.state.ms.us/wp-content/uploads/2013/08/June-6_AG-Asking-Google-to-Address-Alleged-Violations-of-Intellectual-Property-Rights.pdf&gt; ...........................................................................................12

Russell Brandom, "Project Goliath: Inside Hollywood's Secret War Against Google," *The Verge* (Dec. 12, 2014) ("Brandom Article"), *available at* &lt;http://www.theverge.com/2014/12/12/7382287/project-goliath&gt;.......................... *passim*

## INTRODUCTION

Google alleges in this action that Mississippi Attorney General Jim Hood ("AG Hood") unlawfully silenced Google's speech through a series of threats and ultimately a retaliatory civil investigative demand ("CID").  The Honorable Judge Henry Wingate has ruled that Google is likely to succeed on its claims against AG Hood under Constitutional and federal law.  It is undisputed that the parties before the Court on this motion — the Motion Picture Association of America ("MPAA"), its hired lobbyists at Jenner & Block ("Jenner"), and an organization the MPAA  funds called the Digital Citizens Alliance ("DCA") (collectively "the Subpoenaed Parties") — each played starring roles in AG Hood's unlawful scheme.

The present record establishes the basic contours of their secret plan (called "Project Goliath" by the Subpoenaed Parties): spending hundreds of thousands of dollars over three years lobbying *state* attorneys general to pressure Google to alter its search results and other products to serve Hollywood's agenda on *federal* copyright issues.  As part of Project Goliath, the Subpoenaed Parties crafted talking points for AG Hood to use against Google, formulated demands for him to make, fomented negative press and ghostwrote not only AG Hood's letters to Google, but also the retaliatory, burdensome CID that prompted Google's lawsuit.

Despite their undisputed, extensive involvement in AG's Hood's misconduct, the Subpoenaed Parties audaciously claim in their opposition briefs that they: (a) possess no relevant information relating to AG Hood's campaign against Google; (b) should not be burdened to produce whatever they do have; and (c) enjoy some privilege that allows them to shield their role in AG Hood's unlawful activities.  None of these arguments has merit.

Judge Wingate has made clear that AG Hood's state of mind is a critical issue in this case, and has ordered him to produce a variety of communications with the Subpoenaed Parties.[1] These communications will help prove what Judge Wingate has already found likely — that AG Hood's investigation was a bad faith effort aimed at coercing Google to censor protected speech. AG Hood himself demonstrated his impermissible intent when he said: "[I]f you [Google] don't ... work with us to make some of these changes [restricting protected speech] … then I'm going to call on my colleagues to issue civil investigatory demands."[2]   And MPAA lobbyists have confirmed that AG Hood's threats actually had the desired, illicit effect: "[Google] would not be taking a step like this but for the efforts of you and other AGs."[3] But the question of AG Hood's motivation is not, as the Subpoenaed Parties contend, a purely legal question where the parties agree on the facts.  Rather, it will be a hotly debated issue until there is a final ruling on the merits of Google's claims, making it a central focus of discovery in this case.  Given their intimate relationship with AG Hood, the Subpoenaed Parties undoubtedly have documents bearing on the question.

The Subpoenaed Parties contend that only their direct written communications with AG Hood will shed light on his thinking.  Yet the record makes plain that they had numerous, in-

---

[1] *See* Declaration of Michael H. Rubin in Support of Google Inc.'s Rule 45 Motion to Compel Compliance with Subpoena ("Rubin Declaration"), Dkt. No. 3, Exh. 14 (April 10, 2015 Order on *Ore Tenus* Discovery Motion) (requiring AG Hood to produce, *inter alia*, materials gathered in response to a journalist's Mississippi Public Records Act request for emails between AG Hood's office and the MPAA, the DCA, or Jenner concerning online search engines, copyright or piracy; emails from the Subpoenaed Parties to AG Hood attaching position papers they drafted; and drafts of the CID prepared by the Subpoenaed Parties).

[2] Rubin Decl., ¶ 22, Exh. 54 at 8:8-13.

[3] Supplemental Declaration of Michael H. Rubin in Support of Google Inc.'s Rule 45 Motion to Compel Compliance with Subpoena ("Supplemental Rubin Declaration"), Exh. 1, JB_00000473.  All citations formatted "JB_0000…" refer to Bates numbers of documents produced by Jenner to Google on June 12, 2015 in response to Google's subpoena.

person meetings and conversations with AG Hood to discuss their anti-Google "endeavor."[4]   The

Subpoenaed Parties' internal documents discussing those meetings and conversations are highly

probative of AG Hood's state of mind.   In one such internal document, for example, the MPAA's

lobbyist at Jenner reported to the organization that he "spent more time with Hood … and, I

hope, got him focused on the key issues and the asks… .  [He] wants Google to delist pirate sites

and he is going to ask them to do that tomorrow."[5]   And it was in an internal communication that

the same lobbyist declared that because of Google's resistance to AG Hood's censorship

demands, "the time for letter writing is over" and "[s]ome subset of AGs (3-5, but Hood alone if

necessary) should move toward issuing CIDs."[6]   Google's requests calling for these and related

internal documents should yield key insights into AG Hood's thinking, and are reasonably

calculated to lead to the discovery of admissible evidence.

Google's subpoenas are narrowly drawn, seeking only materials that bear directly on the

campaign that AG Hood mounted against Google on the Subpoenaed Parties' behalf.   That

campaign culminated in the oppressive and likely unlawful 79-page CID to Google *that the*

*Subpoenaed Parties drafted*.   Given that, their claim that eight specific and limited documents

requests would create an undue burden rings hollow.   More fundamentally, if the Subpoenaed

Parties truly have over 100,000 documents to review, that merely indicates the extent of their

involvement in AG Hood's misconduct.   After spending hundreds of thousands of dollars and

---

[4] *See* Supp. Rubin Decl. Exh. 2, JB_00000333-34 (AG Hood's office thanking the Subpoenaed Parties for all their input and support in his anti-Google endeavor).

[5] Google Opening Br. at 6.

[6] Google Opening Br. at 2.

years executing their anti-Google operation, they cannot claim burden to excuse production of the relevant documents that same effort generated.

The Subpoenaed Parties also claim here that the documents responsive to the Subpoenas are shielded from disclosure because of legal privileges.  It would be ironic if, after driving AG Hood to violate Google's First Amendment rights, the Subpoenaed Parties could cloak their conduct in a First Amendment privilege.  But the First Amendment does not entitle parties to solicit illegal behavior from a high-ranking government official in the shadows.  Rather, the law overwhelmingly favors bringing such conduct to light.

The Subpoenaed Parties also invoke the attorney-client and work product privileges, but they have come nowhere close to showing that those privileges or any other applies.  Merely hiring lawyers as lobbyists does not transform political machinations into privileged communications.  Documents in which the Subpoenaed Parties planned what AG Hood should do and specifically say are not communications made for the purpose of securing legal advice. And no privilege can persist in documents shared with AG Hood, his agents or others. Regardless, if the Subpoenaed Parties wished to assert some privilege, they have had months to provide a log substantiating that assertion.  They have chosen not to, knowing that discovery deadlines could prevent Google from litigating once over their relevance and burden objections and then again over privilege obstacles they later lay in Google's path.

Google's Subpoenas seek information about the conduct by AG Hood that is under scrutiny in this case.  In light of their role in sponsoring that conduct, the Subpoenaed Parties have failed to establish that it would be unduly burdensome to produce documents relating to it

or that such documents are privileged. Accordingly, Google asks that this Court order the immediate production of the materials requested.

## RESPONSIVE AND ADDITIONAL BACKGROUND

From the beginning, the Subpoenaed Parties' response to Google's subpoenas has been marked by misdirection and delay, a pattern continued in their opposition briefs.

The DCA, for example, argues at length that Google's March 12 Subpoenas were premature because discovery had not opened in the underlying case. DCA Opposition ("DCA Opp."), Dkt. No. 23, at 3-4. It then relegates to a footnote the fact that Judge Wingate has already rejected that contention in an order clearly stating that discovery opened on March 2. DCA Opp. at 4 n.8; Rubin Decl. ¶ 5 & Exh. 14 at 2 ("Discovery commenced for the parties and third parties on March 2, 2015.").

Following that order, and after two months of repeated meet-and-confer efforts that yielded not a single document, Google filed this motion. The Subpoenaed Parties, particularly DCA, contend this too was premature; that Google should have continued the fruitless back-and-forth. But as Google explained from the start, it was given a short window to complete discovery (through July 9, 2015) and could not wait any longer.[7] Further, the Subpoenaed Parties' briefs make plain that they and Google have fundamental disagreements that are ripe for judicial resolution — the very same disagreements that resulted in an impasse during the meet and confer process.[8] Perhaps most importantly, it was only after Google filed its motion that it received even the slightest production of documents from Jenner (fewer than 300 documents in

---

[7] Google's Mem. in Supp. of Unopposed Mot. to Extend Discovery Deadline, MS Dkt. 131. AG Hood represented that his office was unable to timely produce documents that Google requested, because a member of his staff was ill. Accordingly, Judge Wingate recently extended the discovery period by 30 days. MS Dkt. 133 (discovery now closing in the underlying case on August 10, 2015). All citations to MS Dkt. refer to the docket in the underlying action before Judge Wingate.

[8] *See* DCA Opp. at 8-9, 16-17; MPAA/Jenner Opp. at 31; Rubin Decl. Exhs. 15-18.

total, with many heavily redacted).  The MPAA dropped documents on Google for the first time today, guaranteeing they could not be used in this motion. And Google still has received nothing at all from the DCA.

Even the modest self-selection of documents that Jenner has produced make clear why the Subpoenaed Parties are trying so hard to withhold other documents evidencing their influence on AG Hood's thinking and his investigation of Google.

For one thing, Jenner's production confirms the stunning level of access and control that the Subpoenaed Parties had with AG Hood.[9]  The group had an untold number of in-person meetings and conversations regarding AG Hood's investigation.[10]  Their relationship was so intimate that at one point AG Hood, the MPAA, and Microsoft's lobbyists at the law firm of Orrick Herrington & Sutcliffe ("Orrick") proposed they enter some sort of memorandum of understanding ("MOU"), although why or whether they actually did remains hidden from Google's view.  Supp. Rubin Decl. Exh. 5, JB_00000277-280.

The few documents Jenner produced also refute DCA's claim that it was somehow differently situated than the MPAA, which heavily funds the DCA.  They show that Mike Moore, the DCA's lobbyist, was in constant contact (along with other lobbyists for the MPAA

---

[9] Hood's office actively sought the Subpoenaed Parties' help in formulating his positions on Google, spreading that agenda to other state attorneys general, and responding to Google's contentions. Supp. Rubin Decl. Exh. 3, JB_00000082-84 (Oct. 17, 2013 email from Hood to MPAA's outside counsel at Jenner, Tom Perrelli, thanking him "for the excellent draft letter" to Google, which Perrelli had sent ten days earlier as a draft "respon[se] to the letter Google sent you"); *id.* Exh. 2, JB_00000333-34 (Feb. 21, 2014 request from Hood's office to Moore, MPAA, and Orrick for "feedback [and] suggestions" on letter from Google); *id.* Exh. 4, JB_00000364 (Feb. 22, 2014 email from Perrelli providing Hood's office with "some thoughts on responding" to Google; attachment containing those "thoughts" withheld).

[10] *E.g.*, Supp. Rubin Decl. Exh. 3, JB_00000082-84 (Sept. 12, 2013 correspondence between AG Hood and Perrelli attempting to set a time for a call); *id.* Exh. 5, JB_00000277-80 (Feb. 18-19, 2014 email thread attempting to schedule a phone call between Hood staffer and Perrelli in advance of February 24 meeting between Google and state AGs); *id.* Exh. 6, JB_00000134-35 (Jan. 9, 2014 email exchange shortly before a meeting with Google, stating that AG Hood wanted Perrelli to come "brief the attending attorneys general and any designees" in advance).

and Microsoft) with AG Hood regarding his Google investigation.[11]   For example, in February 2014, a mere 90 minutes after Google sent a detailed response to a Jenner-drafted demand letter from AG Hood, AG Hood's office forwarded Google's response to Moore (DCA) and Perrelli (MPAA/Jenner), saying AG Hood would "value any feedback, suggestions, summaries, questions or anything else y'all can contribute so that we can get a joint analysis to Jim as soon as possible. ...  We really appreciate everyone's input and your support in this endeavor."[12]  Two weeks later, Moore and DCA's principal Tom Galvin, along with MPAA and Microsoft lobbyists, discussed that "there has got to be some way to use [the issue of gun safety against Google] both with AGs and media."[13]  Moore forwarded the thread to AG Hood's staffer, saying he hoped New York's Attorney General "will issue the CID" against Google.  In response, she asked Moore about the status of Perrelli's research on the best state to issue a CID, noting that Jenner had "an adaptable draft CID for any of the AG's to use."[14]

These documents and others in Jenner's production also show why Google has asked the Subpoenaed Parties for information regarding AG Hood's unsuccessful effort to enlist other state

---

[11] Moore, Mississippi's prior attorney general, purports to be working for both the DCA and for AG Hood in connection with this matter.  Rubin Decl. Exh. 36 (attaching June 29, 2012 engagement letter between Moore and AG Hood); Moore Article ("Mr. Moore has also been hired by a group called Digital Citizens Alliance — funded in part by the movie industry — to try to push Mr. Hood to investigate Google"); *see also* Wingfield and Lipton Article ("Mr. Moore, in an interview, said he was working pro bono to advise Mr. Hood on how to combat the illegal sale of drugs online. He was then hired, for a fee he would not disclose, by the Digital Citizens Alliance in a similar post."). *The New York Times* highlighted this dual role back in December.  *Id.*  Nevertheless, the DCA claimed during the meet and confer in May (and to this day) that it needs still more time to evaluate the impact of this situation on the discoverability of the documents Google seeks. Supp. Rubin. Decl. ¶ 11.

[12] Supp. Rubin Decl. Exh. 2, JB_00000333-34; *see also* Moore Article, p. 32 (including a copy of Feb. 20, 2014 email to Attorney General Hood from DCA's Tom Galvin, proposing a "pre meeting" on Google.

[13] *See also* Supp. Rubin Decl. Exh. 7, JB_00000462-63 (Oct. 3, 2014 email from Moore to DCA's Tom Galvin, Jenner's Perrelli, MPAA's Vans Stevenson, and others proposing that "[t]he AGs could host a big conference featuring the celebs and all others impacted by Googles mis deeds, all the press would be there and we would be off to the races with this issue [of 'leaked' celebrity nude photos] capturing the attention of the public, policy makers and officials in a way we have not been able to get them to focus so far" [sic]").

[14] Supp. Rubin Decl. Exh. 8, JB_00000390-91; *see also id.* Exh. 9, JB_00000007-09 (following a call with AG Hood, Moore (DCA), Perrelli (Jenner), and McKenna (Microsoft) divided up their lobbying responsibilities for other state AGs in the hopes of getting them to sign on to AG Hood's investigation).

attorneys general to join his CID to Google.  As Google noted in its opening brief, the reasons why other states declined to participate will provide insight into AG Hood's state of mind, particularly if they expressed concern about the legitimacy of the operation.  *See* Google Opening Br., Dkt. No. 1, 4, 5, at 15; see also Supp. Rubin Decl. Exh. 10, JB_00000400-01 (June 2014 email from AG Hood to lobbyists for the MPAA and Microsoft: "If I don't talk [the Connecticut AG] into issuing a CID to Google by Thursday, I will advise my colleagues that I intend to send ours in a couple of weeks."); *id.* (response from Microsoft's lobbyist to AG Hood stating that he would visit the Connecticut AG, and that DCA's lobbyist already had).[15]

The handful of documents that Jenner has produced appears to be the tip of a large iceberg.  It has refused to produce anything other than some of the documents it shared directly with AG Hood.  Much of what it produced is redacted for unknown reasons.  And it has withheld other documents that were shared with him based not on any privilege that Jenner asserts, but simply "at the request of the Mississippi Attorney General."  Supp. Rubin Decl. Exh. 11 (Jenner Privilege Log).  Again, the MPAA produced nothing until today, and DCA still has produced nothing at all.

## ARGUMENT

### I.  The Relevance of the Documents Google Seeks is Plain.

#### A.  The Subpoenaed Parties Cannot Rebut Google's Relevance Showing.

Google demonstrated in its opening brief that the documents it seeks from the parties who drove AG Hood's investigation bear directly on his motivation for the threats and demands he

---

[15] *See also* Rubin Decl. ¶ 26, Exh. 58 at D-000084-85 (Sept. 17, 2013 email from MPAA to AG Working Group noting that California's attorney general, Kamala Harris, had turned down AG Hood's offer for her to host a meeting of states attorneys general with Google and that "she had decided not to sign-on to the AG letter currently being drafted to Google.").

visited upon Google.  Google contends, and Judge Wingate has found it likely, that AG Hood

acted in bad faith to coerce Google into stifling speech.  As Judge Wingate explained:

> [I]t is well-settled that the Attorney General may not retaliate against Google for
> exercising its right to freedom of speech by prosecuting, threatening prosecution,
> and conducting bad-faith investigations against Google. … Google has submitted
> competent evidence showing that the Attorney General issued the subpoena in
> retaliation for Google's likely protected speech, namely its publication of content
> created by third-parties.  Given the gravity of the rights asserted herein, the court
> finds it appropriate to enjoin further action on behalf of the Attorney General until
> a determination on the merits of Google's claims is made.

Rubin Decl. Exh. 53 at 19 (PI Order) (citations omitted).  It is that "determination on the merits"

for which Google seeks the evidence requested here.  If Google can prove that AG Hood's

actions were retaliatory and in bad faith, it will prevail on its claim that AG Hood violated

Google's rights.  And given the critical role the Subpoenaed Parties played in driving AG Hood's

actions, requests for the documents they have relating to those actions clearly seek relevant

information.[16]

   In their opposition briefs, the Subpoenaed Parties make the remarkable claim that AG

Hood's bad faith is effectively a legal issue on which the facts are agreed (MPAA and Jenner

Opposition "MPAA/Jenner Opp." at 1) and that this dispute of law was essentially settled by

Judge Wingate's Preliminary Injunction Order (MPAA/Jenner Opp. at 28; DCA Opp. at 12-13).

That is specious.  Although Judge Wingate has held that there was competent evidence of bad

faith to support his Order, AG Hood certainly has not conceded that he acted in bad faith and

---

[16] The Subpoenaed Parties misleadingly suggest Judge Wingate questioned why their involvement in AG
Hood's conduct was germane to the case.  MPAA/Jenner Opp at. 17; DCA Opp. At 6 n. 20.  Judge Wingate actually
questioned why it was necessarily germane to the preliminary injunction motion, a motion where Google had made
its showing of bad faith and AG Hood offered no evidence in response.  MS Dkt. 83 at 73 (PI hearing transcript).  In
any event, questions about what Judge Wingate had in mind are properly consigned to Judge Wingate, one of
several reasons why Google has moved to transfer this motion to him.  *See* Dkt. No. 5.

undoubtedly will seek to prove otherwise as the case progresses.[17]  Given the high profile nature of this action, Google is entitled to the evidence needed to make as strong a showing on the merits as it can.[18]

Further, this question of relevance does not come to the Court on a blank slate.  Google previously asked AG Hood for much of his correspondence with the Subpoenaed Parties relating to Google, along with drafts of the CID and position papers they sent him.  Although AG Hood demurred, not even he made the outlandish relevance arguments that the Subpoenaed Parties advance here.  On April 10, Judge Wingate ordered AG Hood to produce the documents, subject only to privilege objections.[19]  Given that, there can be no dispute that those documents, indistinguishable in kind from the ones Google here seeks from the Subpoenaed Parties, remain directly relevant to a central, disputed fact issue in the case.

Google separately showed that the documents it seeks are relevant to Google's claim that AG Hood violated its Fourth Amendment rights because they may show that AG Hood and the Subpoenaed Parties who drafted the CID to Google intended that it be overbroad and oppressive.

---

[17] Google explained in its opening brief that the issue of AG Hood's bad faith is separately relevant to his affirmative defense based on the *Younger* abstention doctrine.  Google Opening Br. at 12-13.  The Subpoenaed Parties argue that on that issue, discovery is not relevant because Judge Wingate "already concluded that *Younger* abstention would not apply."  MPAA/Jenner Opp. at 29; *id.* at 14.  But it was after that determination that the AG asserted his affirmative defense based on *Younger*, and he is simultaneously appealing Judge Wingate's determination.  Until the *Younger* issue is conclusively resolved, the question of AG Hood's bad faith remains relevant for that separate reason as well.

[18] In the underlying action, Google has filed a Motion for Protective Order seeking to halt AG Hood's discovery demand for much of the same information that Judge Wingate enjoined him from seeking via his CID.  Declaration of Christopher Tompkins in Opposition to Google Inc.'s Rule 45 Motion to Compel Compliance with Subpoena ("Tompkins Declaration") Exh. 5 (D.I. 17-1 at 75-93).  The Subpoenaed Parties pretend that in doing so, Google closed the door to discovery in the case altogether.  MPAA/Jenner Opp. at 3, 18-19; DCA Opp. at 1.  In reality, what Google said is that the "fact development" in the case should focus on "the Attorney General's own conduct and motivation."  Tompkins Decl. Exh. 5 at 13 (D.I. 17-1 at 88).  That is precisely what Google is doing here.

[19] Rubin Decl. Exh. 14 (Order on *Ore Tenus* Discovery Motion).  A journalist had filed a public records request with AG Hood for all email with the Subpoenaed Parties regarding the investigation of Google.  *See* Masnick Article.  AG Hood told the journalist that a "preliminary, non-exhaustive search" turned up "nearly 900" e-mails.  *Id.*  In response to Judge Wingate's Order that AG Hood produce the emails with the Subpoenaed Parties that had been gathered, AG Hood took the position that none had actually been "gathered" and thus he will not produce anything.

The Subpoenaed Parties claim that even if they and/or AG Hood had such illicit intent, that would be irrelevant to an "objective" Fourth Amendment analysis. MPAA/Jenner Opp. at 15; DCA Opp. at 14. But this ignores the fact that courts regularly look to intent and motivation when deciding whether a subpoena or civil investigative demand is enforceable. *See NLRB v. Am. Med. Response, Inc.*, 438 F.3d 188, 192-93 (2d Cir. 2006) ("A subpoena that satisfies [the Supreme Court's Fourth Amendment] criteria will be enforced unless the party opposing enforcement demonstrates that the subpoena is unreasonable, or issued in bad faith or for other improper purposes, or that compliance would be unnecessarily burdensome." (internal quotation marks and citations omitted)); *United States v. Bailey (In re Subpoena Duces Tecum)*, 228 F.3d 341, 349 (4th Cir. 2000) ("The requirement that subpoenas be used only for a legitimate and authorized governmental purpose prohibits the government from 'engaging in arbitrary fishing expeditions' and from 'selecting targets of investigation out of malice or an intent to harass.'" (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991))).

Google also established that the information it seeks is likely to undermine AG Hood's credibility in denying the Subpoenaed Parties' role in his endeavor. Google Opening Br. at 14. The MPAA and Jenner charge Google with speculating about what AG Hood's testimony might be, claiming that speculation "does not authorize" the discovery sought here. MPAA/Jenner Opp. at 15. Google is not speculating. The Attorney General has stated publicly that "his views haven't been influenced by the movie industry," that the MPAA "ha[d] no major influence on [his] decision-making," and that he did not know Mr. Perrelli worked for Jenner or that Jenner worked for the MPAA.[20] The Subpoenaed Parties' documents will directly contradict that narrative, making them relevant and discoverable.

---

[20] Liebelson How State AGs Article; Liebelson Emails Show Article.

### B.  The Subpoenaed Parties Internal Documents Are Highly Probative, as the Record Already Shows.

In their opposition briefs, the Subpoenaed Parties declare that only documents physically "seen by" AG Hood could "arguably be relevant" in this case.  MPAA/Jenner Opp. at 14, 16-18; DCA Opp. at 13.  But the Subpoenaed Parties' documents reporting on what was said before, during or after their myriad meetings and conversations with AG Hood about their "Project Goliath" are probative of his thinking regardless of whether those documents were actually shared with him.  Indeed, given that documents consisting of communications with AG Hood are subject to public records requirements, the in-person and phone conversations with AG Hood were presumably more candid.  That would make internal documents relating to those conversations particularly germane.

This is no mere theory.  It is established by the few internal documents that have already come to light.  They show, for example, that it was after Jenner's Perrelli privately "spent more time" with AG Hood "to focus him" on the MPAA's key asks, that AG Hood demanded Google remove various sites from its search results or else.   And in direct response to Google's rejection of that demand, Perrelli gave the word "that the time for letter writing is over" and that AG Hood would move forward with the CID.  It is no stretch to envision one of the Subpoenaed Parties reporting to others: (i) "Hood told me today that while Google is protected from a prosecution, his investigation will feel like one"; or (ii) "Hood wants the CID to pack a punch to make Google come to the table"; or (iii) "Hood said that if Google doesn't censor the sites we're complaining about, he will 'slap' Google with a subpoena."[21]  Documents like these could be case dispositive, yet the Subpoenaed Parties would have the Court believe that they are irrelevant.

---

[21] AG Hood, in fact, said almost the same thing *in a press release*:  "Google is being asked to adequately address the attorneys general concerns or prepare to be slapped with subpoena's [sic] forcing the company to produce documents and answer questions."  AG Hood Press Release.

To be sure, there are particular circumstances in which Party A did not share its views on a topic with Party B, so that Party B has no useful information on what Party A was thinking. But that is not this case.  Here, Party B (i.e., the MPAA) was thinking for Party A (i.e., AG Hood) — the Subpoenaed Parties were dictating key aspects of AG Hood's investigation, and do not deny doing so.  They undoubtedly have insights into his state of mind regarding Google. Their internal documents will reveal those insights and are a proper subject for discovery.

The Subpoenaed Parties' own authority recognizes as much.  *See Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007 (D.C. Cir. 1997) (discussed by the MPAA at p. 18 of its opposition brief).  At issue in *Food Lion* was whether an employer seeking to establish the state of mind of a union in an abuse of process case could subpoena the union's public relations agency for documents regarding the agency's work with other unions. As the court put it, the question was whether to order "a third party to the underlying abuse of process litigation to produce fourth-party documents unrelated to either party in that litigation." *Id*. at 1012-14 (movant sought documents from "two completely independent unions which have absolutely no connection" to case).  Not surprisingly, in that very different context, the court said the subpoena pushed past the outer bounds of relevance.  But the court went on to say that its thinking would be different if "a number of unions were conspiring under the aegis of a broader organization ... to carry on coordinated 'corporate campaigns' encompassing a shared strategy of litigation." *Id*. at 1014 n.10.  That is the part of the decision that is applicable here, where the Subpoenaed Parties and AG Hood in fact engaged in a "coordinated campaign encompassing a shared strategy" against Google, and Google seeks the Subpoenaed Parties' documents regarding that campaign to shed light on AG Hood's state of mind.[22]

---

[22] Other cases cited by the Subpoenaed Parties are far afield.  In *North Carolina Right to Life, Inc. v. Leake*, plaintiffs subpoenaed two non-party advocacy organizations whose only connection to the action was the filing of

Finally, it bears reiterating that the standard here is not admissibility, but discoverability. Even if a Subpoenaed Party's account of a pointed conversation with AG Hood was not admissible on the question of whether he acted with retaliatory intent, the document would still reveal the existence of that conversation and provide Google with evidence on the topic to cross-examine AG Hood.

## II.  Google's Subpoenas Do Not Impose an Undue Burden.

The Subpoenaed Parties paint themselves as having been swept up into litigation that they have nothing to do with.  They cite cases standing for the unremarkable proposition that third-party discovery should be narrowly tailored when possible, chiding Google for not further compromising its already limited requests.  And they complain that there may be tens of thousands of responsive documents, including some involving lawyers.  *See* MPAA/Jenner Opp. at 29; DCA Opp. at 12.  All of this, they say, means that Google's subpoenas present an undue burden from which they should be protected.  They are wrong at each turn.

### A.  Google's Requests Are Narrowly Tailored.

The Subpoenaed Parties repeatedly emphasize that discovery to third parties should be narrow.  MPAA/Jenner Opp. at 11-12; DCA Opp. at 10.  Google agrees.  That is why Google asked the Subpoenaed Parties only for (1) documents that specifically reference both Google and Attorney General Hood; (2) documents concerning efforts to incite AG Hood's investigation of Google, including those concerning the investigation itself and those using the specific code names for the Subpoenaed Parties' projects; and (3) documents concerning the Subpoenaed

---

amicus briefs in which they urged the court to reject the plaintiff's constitutional claims.  231 F.R.D. 49, 50 (D.D.C. 2005).  The court quashed the subpoenas because showing the "bias" of the amici had nothing to do with factual issues in the case, and their briefs were not "evidence" subject to impeachment.  *Id*. at 51; *see also AFSCME v. Scott*, 277 F.R.D. 474, 478 (S.D. Fla. 2011) (cited by MPAA/Jenner Opp. at 16) (quashing subpoena that sought information solely to attack credibility of ACLU, which was not a witness in the case).  While DCA filed an amicus brief in the Mississippi litigation (MS Dkt. 67), its direct involvement in the underlying facts immediately distinguishes it from the amici in *North Carolina Right to Life* and *Scott*.

Parties' campaign contributions and other assistance to AG Hood.  These are categories of documents that are specific, directly focused on issues relevant to this case, and lend themselves to targeted keyword searches.  They are also limited in time, seeking only documents from the last three years, the period cabining "Project Goliath".

Google's Subpoena is, of course, a stark contrast to the sweeping 79-page CID that the Subpoenaed Parties prepared for AG Hood to serve on Google.  Considering that, and given that their lobbying and campaign contributions instigated this matter, it is difficult to take seriously the Subpoenaed Parties' complaints that Google's requests are "extremely broad" and "wide-ranging."  The documents Google requested are directly relevant to the constitutional claims in this case, and will establish how the Subpoenaed Parties worked hand-in-glove with AG Hood to unlawfully chill protected speech.

### B.  The Subpoenaed Parties Have Not Demonstrated Any Undue Burden.

According to the Subpoenaed Parties, at their outer limit, Google's subpoenas would call upon them to review upwards of 100,000 documents at the MPAA, 25,000 documents at Jenner, and 120,000 documents from the DCA.  MPAA/Jenner Opp. at 29; Supp. Rubin Decl. ¶¶ 13.  If those truly are the figures, there is nothing shocking about them, except what they say regarding the Subpoenaed Parties' extraordinary role in AG Hood's effort to censor Google's speech.[23] Having orchestrated AG Hood's three-year campaign, and having involved a disparate group of special interests, their lobbyists, the press, and other government officials, it is no surprise that the Subpoenaed Parties accumulated a raft of relevant documents.

---

[23] *See e.g.*, *Assured Guar. Mun. Corp. v. UBS Real Estate Secs., Inc*., 2013 U.S. Dist. LEXIS 41785, at *17 (S.D.N.Y. Mar. 25, 2013) (review of three quarters of a million documents "by itself, does not warrant curtailing discovery."); *Tiger Capital, LLC v. PHL Variable Ins. Co.*, 2013 U.S. Dist. LEXIS 121395, at *13-14 (S.D.N.Y. Aug. 26, 2013) (compelling production of responsive documents from set of two million documents collected); *Viacom Int'l, Inc. v. YouTube, Inc*., 2009 U.S. Dist. LEXIS 4220, at *15 (N.D. Cal. Jan. 14, 2009) (compelling review of more than one million documents where subpoena target had acted as plaintiff's agent).

It appears, however, that the Subpoenaed Parties have inflated their tally of documents needing review in order to give their burden argument some heft.  The MPAA's search strings (Tompkins Decl. Exh. 1, D.I. 17-1 at 5-7), in particular, seem to be far broader than necessary.[24]  If they were genuinely concerned about burden, the Subpoenaed Parties could have presented their search terms to Google for a dialog aimed at eliminating "false positives."  But despite repeated opportunities during the meet and confer process to explain its alleged burden, the first time Google saw the MPAA's search strings was in the opposition brief.  Supp. Rubin Decl. ¶ 12. Having declined to engage in a productive dialog to reduce their burden, the Subpoenaed Parties cannot direct these complaints in the first instance to the Court.  *Cf. In re Heparin Prods. Liab. Litig.*, 273 F.R.D. 399, 404-405, 410-11 (N.D. Ohio 2011) (finding defendant "ha[d] not substantiated its claim that the requests are unduly burdensome" by making "boilerplate objections," then refusing to provide specific bases for objections despite plaintiffs' request in meet-and-confer.").[25]

In any event, even if the Subpoenaed Parties could demonstrate that Google's subpoena would impose a burden, that would not render the burden "undue."  The Subpoenaed Parties are

---

[24] Although the MPAA does not show which of its search terms generated the bulk of their document count, its terms include "'civil investigative demand*' AND 'illegal conduct'", which would turn up every mention of any investigation into possible illegal conduct that involved a CID, regardless of the entity (federal or state) issuing the CID, the subject conduct, or the target of the investigation (Declaration of Christopher Tompkins, Dkt. 17-1, Exh. 1 at 7); "Google AND CDA", which would turn up any document that mentioned both the CDA, a major law concerning online services, and Google, a major provider of online services (*id*. at 5); and "subpoena* AND (RIAA OR 'Recording Ind* Assoc* of Amer*')", which would turn up any mention of a subpoena issued by the RIAA — an entity that has issued thousands in the copyright context.  *Id*.

[25] In a similar vein, the MPAA and Jenner complain that Google's Request No. 5 is unduly burdensome because it seeks documents relating to the term "Keystone," which they assert is a consulting company that handled multiple matters.  MPAA/Jenner Opp. at 9 n.10.  Google's understanding was that Keystone was an internal code name for the Subpoenaed Parties' efforts to influence AG Hood, which is why the request also seeks documents relating to "Project Keystone."  Again, the opposition brief is the first time that either the MPAA or Jenner asserts otherwise, as they never raised this issue in the meet and confer process.  Had they done so, Google would of course have worked with them to craft search terms to eliminate that burden. Supp. Rubin Decl. ¶ 12.

hardly mere bystanders to this litigation.  They have invested hundreds of thousands of dollars[26] soliciting the activity that is the subject of this lawsuit, activity that has now been adjudged likely illegal and enjoined.  The lawsuit and any accompanying burden are very much of their own making.  *See Morton-Norwich Prods., Inc. v. Matthews*, 415 F. Supp. 78, 81-82 (D.D.C. 1976) (requiring production of material under FOIA request and noting that "heavy burden on the responding agency" was largely "of the agency's own making"); *Peskoff v. Faber*, 251 F.R.D. 59, 63 (D.D.C. 2008) (requiring respondent to pay for expensive forensic examination because "[t]his is a problem of Mr. Faber's own making and, consequently, the expense and burden of the forensic examination can hardly be described as 'undue.'").

Given the Subpoenaed Parties' leading role in the underlying conduct here, the cases they cite regarding undue burden are inapposite, as they involve true non-parties, far removed from the fray.  For example, in *North Carolina Right to Life*, plaintiffs subpoenaed two non-party advocacy organizations (and a third entity funding them) whose only connection to the action came in the filing of amicus briefs supporting the defendant.  231 F.R.D. at 50.  The court held that "the mere filing of an amicus brief" does not open the amici "to broad discovery demands" and therefore quashed the subpoena.  *Id.* at 51.  But Google is not seeking documents from an entity that merely filed an after-the-fact amicus brief on a purely legal question.  It is seeking documents from the very parties that directed AG Hood's illicit anti-Google efforts and were in constant contact with him as it transpired.  If there is a burden to producing those documents, and Google does not believe there is, that burden would certainly not be "undue."[27]

---

[26] According to one article, the MPAA considered various funding levels for Project Goliath, ranging from $585,000 to $1.175 million annually.  *See* Brandom Article.

[27] The other cases that the Subpoenaed Parties cite are equally far afield and unhelpful to them.  *See Scott*, 277 F.R.D. at 478 (cited by MPAA/Jenner Opp. at 16) (quashing subpoena that sought information solely to attack credibility of ACLU, which was not a witness in the case); *Simmons, Inc. v. Bombardier*, 221 F.R.D. 4, 10 (D.D.C. 2004) (cited by MPAA/Jenner Opp. at 18) (where, unlike here, there is nothing to suggest that opinions were

The Subpoenaed Parties separately complain that Google's requests present an undue burden because they seek documents sent among law firms and lawyers. *See* MPAA/Jenner Opp. at 20; DCA Opp. at 12. But here again, this problem is of their own making.[28] The DCA chose to use Mike Moore for their lobbying of AG Hood, knowing that he was a lawyer and that he was somehow simultaneously acting as a deputized Attorney General for AG Hood's "investigation" of Google. Rubin Decl. Exh. 36 (attaching June 29, 2012 engagement letter between Moore and AG Hood). Likewise, the MPAA chose to use lawyers at Jenner to do their lobbying and influence AG Hood's conduct. Any complications these relationships present are not entitled to weight in the burden calculus. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992) (where a "hardship is self-imposed," the asserted burden "will not work against disclosure of the requested information.").

*       *       *

To excuse their compliance with Google's subpoenas, the Subpoenaed Parties were required to prove that Google's requests would impose a burden on them and that that burden would be undue. They have proved neither.

---

communicated to a party, the opinion is not probative of that party's state of mind); *cf. Dunhall Pharms., Inc. v. Discus Dental, Inc.*, 994 F. Supp. 1202, 1205 (C.D. Cal. 1998) ("Negative evidence contained in the attorney's files" raises inference that client was "appraised of the negative opinions.")).

[28] The authority the Subpoenaed Parties cite again affords them no support. Of course a court should be suspicious where a defendant subpoenas the litigation counsel of a different adversary in a separate case, particularly where the target counsel has no connection to the case in which the subpoena is served. *See Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co*., 276 F.R.D. 376, 377-80 (D.D.C. 2011) (discussed at MPAA/Jenner Opp. at 20-21). But that is not this case, or anything close to it.

### III. Google Is Not Seeking Privileged Materials and the Subpoenaed Parties' Failure to Substantiate Their Privilege Assertions Amounts to a Waiver.

The Subpoenaed Parties attempt to shield nearly all of the documents Google seeks behind a veil of privilege. But the privileges they invoke are neither applicable nor substantiated.

#### A. The First Amendment Privilege Does Not Apply to the Documents Google Seeks.

The First Amendment privilege is quite narrow: it is meant for anonymous speakers or those fearing governmental, economic or social reprisal if their speech or associational activities are revealed. Google Opening Br. at 19. There is nothing secret about the Subpoenaed Parties' anti-Google efforts. The press has already spotlighted them. *See generally* Wingfield and Lipton Article; Brandom Article; Mullin Article. And despite having solicited unlawful conduct by AG Hood, the Subpoenaed Parties do not face anything remotely like the sort of reprisals that the First Amendment privilege was crafted to protect.

The cases that the Subpoenaed Parties themselves cite show that no First Amendment privilege applies here. Both *Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010), and *In re Motor Fuel Temperature Sales Practices Litigation*, 641 F.3d 470 (10th Cir. 2011) make clear that to claim such a privilege, parties must make a "*prima facie* showing" that compliance with a request for documents "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights.'" *Perry*, 591 F.3d at 1160 (quoting *Brock v. Local 375, Plumbers Int'l Union of Am.,* 860 F.2d 346, 349-50 (9th Cir. 1988)); *In re Motor Fuel*, 641 F.3d at 488. The Subpoenaed Parties have not made that *prima facie* showing — and they could not make it on these facts. They are powerful and public entities that have enormous financial

resources and unfettered (often controlling) access to major media.  Their lobbying activities and their associational rights are at no risk of chill from Google's subpoena.[29]

The Subpoenaed Parties' parade of horribles falls equally flat.  They claim that enforcing Google's subpoenas would somehow punish "concerned citizens" who "raise law enforcement concerns with law enforcement officials" (MPAA/Jenner Opp. at 16-17) and would mean that "a victim of consumer fraud" could not "approach[] a consumer protection bureau" without being subject to burdensome discovery.  MPAA/Jenner Opp. at 17.  But "concerned citizens" have not accumulated documents from years of concerted lobbying.  Further, they seldom have something to hide in approaching government officials and have no expectation that information they may have of relevance to their complaint will remain secret.  Regardless, no such expectation could stand in a case where the "concerned citizens" actively solicited unlawful government action. Indeed, in cases involving allegations of government misconduct, courts routinely overrule assertions of other privileges.  *See In re Chevron Corp*., 709 F. Supp. 2d 283 (S.D.N.Y. 2010) (overruling journalists' First Amendment privilege objection and requiring productions of video footage that might show instances of political corruption and bribery by opposing counsel); *P. & B. Marina, Ltd. Partnership v. Logrande*, 136 F.R.D. 50, 62 (E.D.N.Y. 1991) (finding "exposure of an appearance of corruption" that "is central to the underlying cause of action" outweighed defendant's assertion of First Amendment privilege to engage in petitioning activities), *cf.* David M. Greenwald, Jenner & Block Practice Series: Protecting Confidential Legal Information (2011) (the "Jenner Privilege Handbook") at 299-300 ("Where there is reason to believe the

---

[29] The Subpoenaed Parties' other cited case, *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 397 (D.C. Cir. 1981), does not support their position either.  At issue in that case was a "sweeping demand" by the government "for membership lists and internal communications of a political group," including "*a list of every official, employee, staff member, and volunteer of the organization, along with their respective telephone numbers*," *id.* at 384, 397 (emphasis added).  That bears no resemblance to the narrowly-drawn subpoenas served here by a private party.

documents sought may shed light on the government's misconduct, the [deliberative process] privilege is usually denied" ... "Once the party seeking disclosure makes an initial showing of government misconduct … the [deliberative process] privilege does not 'enter the picture at all.'") (citing *In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997); *In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 145 F.3d 1422, 1425 (D.C. Cir. 1998), *rev'd in part on reh'g*, 156 F.3d 1279 (D.C. Cir. 1998)).

Contrary to the Subpoenaed Parties' claims, this is not a case where anyone's "freedom to protest policies to which one is opposed" or to "organize, raise money, and associate with other like-minded persons" is at risk, or even remotely in play. *Cf. Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 454 (D.D.C. 2002) (internal quotation omitted); *Perry*, 591 F.3d at 1162-63 (discussing chilling effects of compelled disclosure of internal campaign communications relating to state ballot measure). In this case, powerful special interests secretly solicited a high-ranking government official to violate Google's free speech rights. To recognize a privilege for that behavior and allow the Subpoenaed Parties to hide behind it would be a perversion of the First Amendment.

### B. The Lobbying Materials Google Seeks Are Not Protected by the Attorney Client or Any Other Privilege.

The Subpoenaed Parties contend that Google deliberately seeks materials that are subject to the attorney-client privilege. That is false. As Google made clear in its opening brief, it seeks only non-privileged documents relating to the Subpoenaed Parties' extraordinary lobbying efforts with AG Hood. Google Opening Br. at 9, 16-23. To claim a privilege over those materials, the Subpoenaed Parties would have to show that they were communications made for the purpose of securing legal advice. *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984). The public record reveals that they were anything but. *See, e.g.*, Brandom Article (quoting Jan. 25,

2014 email from MPAA's general counsel "laying out the group's [Project] Goliath strategy," which included "[p]olitical [a]nalyses," by which "we mean political in the broadest sense"); *id.* (citing email from MPAA official to over 60 people at MPAA member studios and the RIAA, attaching a New York Times article about "lobbyists wielding increasing influence over state attorneys general," which Brandom Article says the group "seemed to look to … as an instruction manual").

Here, on behalf of the MPAA, Jenner worked tirelessly to influence AG Hood, to "get him focused" on the MPAA and others' key issues and "asks," to ghost-write letters to Google, and to formulate rebuttals to Google's policy positions. *See* Brandom Article (quoting May 8, 2014 from MPAA proposing communications budget for AGs' anti-Google efforts in order to, *inter alia*, "[r]espond to / rebut Goliath's public advocacy"). That conduct is the very definition of lobbying. *See* Miss. Code Ann. § 5-8-3(k) ("'Lobbying' means: (i) Influencing or attempting to influence legislative or executive action through oral or written communication; or (ii) Solicitation of others to influence legislative or executive action; or (iii) Paying or promising to pay anything of value directly or indirectly related to legislative or executive action."). Likewise, the DCA's Mike Moore was not hired to provide the DCA with legal advice. He was hired to use his position and access to influence AG Hood, and plainly succeeded. *See infra* at 7 n. 11.

Although they are understandably reluctant to say it outright, the Subpoenaed Parties clearly hoped that by using lawyers to spearhead their lobbying activity, they could cloak their entire effort in privilege. But that position finds no support in the law, which is why the Subpoenaed Parties offer none. In fact, the case law is clearly contrary. When a lawyer communicates *as a lobbyist*, the lawyer's communications are not privileged, even when those

communications are with its client.   *See* Google Opening Br. at 22-23.   *In re Grand Jury Subpoenas Dated March 9, 2001*, 179 F. Supp. 2d 270, 290 (S.D.N.Y. 2001) (while strategizing a petition for presidential pardon, defendants' attorneys acted as lobbyists by "identifying and contacting individuals…who could support the Petition, enlisting individuals who had access to the President, and considering how to deal with the media and public reaction"); *see also Blair v. Prof'l Transp., Inc.*, 2015 U.S. Dist. LEXIS 29202, at *6-7 (S.D. Ind. Mar. 9, 2015) (communications among trade association, its members, and its attorney running lobbying efforts were not privileged; documents that "outline a lobbying strategy, solicit information to be used in lobbying, or relay the results of a lobbying effort" do not constitute the giving or receiving of legal advice); *A&R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, 2014 U.S. Dist. LEXIS 20859, *7-12 (D. Conn. Feb. 19, 2014) (documents from "attorney-lobbyists" that do not analyze and interpret legislation, such as a draft of a letter to a government official or "general lobbying activity updates," are not privileged).[30]   The Subpoenaed Parties' only response to this authority is to ignore it.[31]

---

[30]   *See also P.& B. Marina, Ltd. P'ship*, 136 F.R.D. at 58-59 (no privilege for correspondence with a lobbyist hired to "apply[] political pressure" on federal agencies); *In re Bisphenol-A (BPA), Polycarbonate Plastic Prods. Liab. Litig.*, 2011 U.S. Dist. LEXIS 34202, at *41, 56 (W.D. Mo. Mar. 25, 2011) (no privilege in emails to trade association from its attorney about an opportunity to join a "grass roots coalition" in opposition to certain legislation and proposing a letter-writing campaign to the legislature); *N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 110 F.R.D. 511, 517 (M.D.N.C. 1986) (no privilege in documents about "'lobbying' efforts" even though efforts were apparently coordinated by defendant's legal department, where documents consisted of "summaries of various town meetings or reports" about a project defendant opposed and "updates on lobbying activities"; documents were not legal advice or requests for legal advice).

[31]   At one point, the MPAA suggests that Google should not have even read any of the myriad press articles detailing the MPAA's secret lobbying campaign because the NY Times, the Verge, and others quote from supposedly privileged documents. *See* MPAA/Jenner Opp. at 22-23.   But it cites no authority requiring a party to ignore widespread news reports, much less where those reports detail violations of that same party's constitutional rights.   Further, the MPAA's position proceeds from the mistaken premise that the materials quoted by the press are "obviously" privileged.   A facial review of the majority of quoted documents strongly suggests the opposite.   They were all created and circulated (often widely) for unprivileged lobbying purposes — not to secure legal advice. There is nothing privileged about them.

That is not to say that there could not possibly be a privilege in some document connected to the Subpoenaed Parties' lobbying campaign.  Throughout the lengthy meet and confer process that led to the filing of its motion, Google repeatedly inquired about the facts that might support such a claim.  Google acknowledged that *some* of the material covered by the subpoena might potentially be privileged (Google Opening Br. at 4).  But the Subpoenaed Parties have refused to substantiate their privilege claims, instead, categorically asserting that the "documents are squarely covered by the attorney-client privilege" without explaining how or why.  MPAA/Jenner Opp. at 9.  Rule 45 requires that a party asserting a privilege substantiate it by "describ[ing] the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim."  Fed. R. Civ. P. 45(e)(2)(A)(ii).  Not only are privilege logs required, they are essential to evaluating the applicability of privilege claims — and none of the Subpoenaed Parties has provided one.[32]

The Subpoenaed Parties claim that they should be permitted to substantiate their privilege assertions at some undefined point in the future, citing *United States v. Philip Morris, Inc*., 347 F.3d 951 (D.C. Cir. 2003).  In *Philip Morris*, one of the defendants, BATCo, produced many documents and withheld others on the basis of the attorney-client privilege, providing a log to substantiate its privilege assertions.  *Id.* at 952-953.  BATCo also served objections, including that it would not produce documents outside of its custody and control.  Through a separate proceeding, the government learned of an undisputedly privileged memo that had been omitted from BATCo's production and from its privilege log.  BATCo explained that the document had not been logged because BATCo believed the document was outside of its custody and control.

---

[32] Jenner has served a log of documents it provided to AG Hood, but refused to provide to Google.  Jenner does not claim a privilege over any of the documents on the log, but is apparently withholding the documents at AG Hood's behest. Supp. Rubin Decl. Exh. 11 (Jenner Privilege Log).

It then sought to amend its privilege log to include the newly-discovered document. *Id*. at 953. The government argued that it was too late, that BATCo had waived any privilege over the document, and that it should be turned over. *Id*. The district court agreed with the government and found a waiver on that document. The D.C. Circuit reversed, explaining that in such situations, courts should be reluctant to find waiver. Google agrees. But nothing in *Philip Morris* supports the proposition that a subpoenaed party can refuse to substantiate any of its privilege assertions for months and thereby withhold documents indefinitely. Indeed, such an approach would require that Google first litigate this motion to compel, and then later mount a second challenge to the Subpoenaed Parties' yet-to-be-identified privilege claims over those documents. As the Subpoenaed Parties know, there simply is not time under the case schedule for seriatim motion practice. The Subpoenaed Parties' refusal to provide logs and substantiate their privilege claims until some unspecified point in the future is just the kind of "unjustified delay, inexcusable conduct, and bad faith" that the *Philip Morris* case makes clear is inconsistent with the claim of privilege. *Id*. at 954 (citation omitted).[33]

## CONCLUSION

For the reasons discussed above and in Google's Opening Brief, Google respectfully requests that the Court grant its consolidated motions to compel and order the immediate production of documents by the Subpoenaed Parties.

---

[33] The MPAA and Jenner insist that a confidentiality order should be entered here to shield their documents from public scrutiny. But Jenner's meager production of documents they exchanged with AG Hood shows why that is unjustified. Even in the absence of a protective order, Jenner labeled every one of the documents sent to and received from a public official as "confidential," including emails that did nothing more than set up times for phone calls. Supp. Rubin. Decl. ¶ 8. Such documents could not possibly be confidential, yet under a protective order, Jenner's designations would force Google to file everything under seal. In any event, beyond casting aspersions about Google's motives, the Subpoenaed Parties have offered nothing to justify entry of a confidentiality order here. Accordingly, none should be entered. *See Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987) (party seeking protective order must justify confidentiality in face of strong presumption of openness for the judicial process).

Dated:  June 22, 2015                    Respectfully submitted,


                                         WILSON SONSINI GOODRICH & ROSATI
                                         Professional Corporation


                                         By:  */s/ David H. Kramer*  _____

                                             Veronica S. Ascarrunz (D.C. Bar No. 494474)
                                             1700 K Street, NW
                                             Fifth Floor
                                             Washington, DC 20006
                                             Email: vascarrunz@wsgr.com
                                             Phone: (202) 973-8800
                                             Fax: (202) 973-8899

                                             David H. Kramer (admitted *pro hac vice*)
                                             Michael H. Rubin (*pro hac vice* forthcoming)
                                             650 Page Mill Road
                                             Palo Alto, CA 94304
                                             Email: dkramer@wsgr.com
                                             Email: mrubin@wsgr.com
                                             Phone: (650) 496-9300
                                             Fax: (650) 493-6811

                                             *Attorneys for Petitioner*
                                             GOOGLE INC.